IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

AARON L. ESPENSCHEID,
GARY IDLER and RICARDO BOLANO,
on behalf of themselves and a class of
employees and/or former employees
similarly situated,

                                                  OPINION AND ORDER

                                                    09-cv-625-bbc

                    Plaintiffs,

        v.

DIRECTSAT USA, LLC and
UNITEK USA, LLC,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       This is a civil action for monetary and injunctive relief under the Fair Labor Standards

Act (FLSA), 29 U.S.C. §§ 201-219, and wage and overtime compensation laws of Wisconsin,

Minnesota and Pennsylvania.  Plaintiffs Aaron Espenscheid, Gary Idler and Ricardo Bolano

contend that defendants DirectSat USA, LLC and UniTek, LLC violated the FLSA and state

law by not compensating them for certain activities related to their jobs as installation

technicians.  Plaintiffs brought this lawsuit as a class action on behalf of four separate classes

of installation technicians employed or formerly employed by defendants:  (1) a nationwide

opt-in class for violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219; (2) a Wisconsin class for violations of Wisconsin wage and overtime compensation laws; (3) a Minnesota class for violations of Minnesota wage and overtime compensation laws; and (4) a Pennsylvania class for violations of Pennsylvania wage and overtime compensation laws.  Plaintiffs have moved for conditional certification of an opt-in nationwide collective action under 29 U.S.C. § 216(b) and seek authorization to notify potential class members of their right to join this case.  Dkt. #65.  Plaintiffs also request that defendants be ordered to identify those similarly situated individuals to whom the notice should be distributed and provide names, last known mail and email addresses and telephone numbers for potential class members.  (Plaintiffs do not seek certification of classes under Fed. R. Civ. P. 23 for their state law claims at this time.  The deadline for seeking such certification is September 2, 2010.)  Jurisdiction is present.  29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

Plaintiffs have made a modest factual showing that they and potential class members were victims of a common policy or plan that violated the law.  Therefore, plaintiffs may proceed with the proposed collective action and notify potential class members of the existence of this lawsuit.  However, I will reserve ruling on the final content of the notice form until I decide whether defendants' counterclaims should be dismissed or included in the notice.  I anticipate such decision to be made within the month.  Once the form of the notice is approved, plaintiffs may distribute the notice by first class mail and opt-in plaintiffs

will have 60 days in which to opt in to the lawsuit. Also, plaintiffs may create a website containing the notice and issue a court-approved press release directing potential class members to the website.

In determining whether the class should be conditionally certified, I considered the allegations in the amended complaint and any affidavits that have been submitted. <u>Sharpe v. APAC Customer Services, Inc.</u>, 2010 WL 135168, *4 (W.D. Wis. Jan. 11, 2010); <u>Sjoblom v. Charter Communications, LLC</u>, 571 F. Supp. 2d 961, 967-68 (W.D. Wis. 2008). Before I address the parties' arguments, I will summarize the relevant allegations contained in plaintiffs' amended complaint and the affidavits, documents and deposition transcripts attached to the parties' briefs.

## ALLEGATIONS OF FACT

### A.  <u>The Parties</u>

Defendants DirectSat USA, LLC and UniTek USA are citizens of Delaware and Pennsylvania. DirectSat USA is a subsidiary of UniTek USA. Defendants are engaged in the satellite installation business and perform installations and make service calls throughout the United States. They employ more than 1,500 installation technicians who are responsible for installing, upgrading, troubleshooting and maintaining defendants' installation of DirecTV's satellite equipment.

3

Plaintiff Aaron Espenscheid is a citizen of Wisconsin and resides in Beaver Dam, Wisconsin. He was employed in defendant DirectSat's Madison, Wisconsin office. Plaintiff Gary Idler is a citizen of Minnesota and was employed in DirectSat's Claremont, Minnesota office, and plaintiff Richard Bolano is a citizen of Pennsylvania who was employed in DirectSat's King of Prussia, Pennsylvania office. Plaintiffs were employed as installation technicians and were required to drive company-owned or personally-owned vehicles to and from various job sites to perform work related to DirectSat's installation of satellite televisions for DirecTV. They were not paid for certain "productive" and "nonproductive" activities related to their work as installation technicians.

In addition to their own declarations, plaintiffs have submitted declarations from 26 current or former DirectSat employees who worked at offices in 11 different states and the District of Columbia in at least 18 different field offices. These employees declare that they were installation technicians who performed DirecTV installations and were not paid for certain productive and nonproductive activities.


B. <u>Pay System for Installation Technicians</u>

Defendants UniTek and DirectSat have common human resources and payroll policies, and UniTek provides human resources, facilities, logistics and inventory functions to DirectSat. All corporate functions, including human resources and payroll, are located

4

at their national headquarters in Montgomery County, Pennsylvania, and all individuals who are responsible for setting wage and hour policies are employed there. Defendants' policies and procedures governing payroll are set forth in DirectSat's national employee handbook, which was also developed at their national headquarters. Field offices cannot have a policy or practice that differs from what is required by the national employee handbook. DirectSat also has a national fleet policy handbook that governs policies related to installation technicians' work vehicles, including traffic violations, fleet maintenance and safety. These policies apply across the country and are mandatory for all defendants' technicians.

All technicians have the same job description. According to defendants' payroll manager, Yvette Shockman, defendants' official policy is that technicians be compensated for all work-related activities, including required training and meetings, work related telephone calls, vehicle maintenance, picking up equipment and conducting inventory. However, Shockman is aware of no document that is provided to new employees instructing them how to account for time spent loading and unloading equipment, reconciling equipment, completing paperwork or engaging in other essential "nonproductive" (non-installation) work activities.

Plaintiffs and putative class members are not compensated for certain productive and nonproductive time under defendants' compensation system. Instead, plaintiffs and putative class members are compensated, in part, under a "piece rate," or flat fee, system in which

they receive a set amount of compensation for each completed service call, depending on the nature of the services provided.  The "set amount" that each class member receives is tied to an "efficiency rating."  Plaintiffs and class members are assigned to specific, numerically ranked levels of seniority or proficiency within each job category, typically ranging from 1-3.  Individual rates are determined using a scorecard system that takes into account how efficient the class members are in completing installations.  This efficiency rating is determined by dividing the total compensation for piece rate tasks by the number of hours that the class members reported on their timesheets.  Under this system, the higher the efficiency rating for plaintiff or the class member, the more points that class members earn on their scorecards, and the higher the "set amount" for each assigned job.  Class members' pay is determined by multiplying the number of completed installations by their piece rate.  Also, class members with higher efficiency ratings and more points on their scorecards have a better chance of being promoted to a higher pay rate.

In describing the company's "Compensation Philosophy," DirectSat's employee handbook refers to the piece rate pay system as one "component" of the installation technicians' compensation.  There is no agreement between defendants and plaintiffs or the putative class members that the piece-rate system compensates the class members for all nonproductive tasks. Under the piece rate system, installation technicians are compensated only for that time they spend completing installations.  They receive no compensation for

6

work performed before the first piece-rate job of the day, after the final piece-rate job of the day and at various times throughout the work day.

## C.  Uncompensated Non-installation Work Activities

To complete their assigned installation jobs, class members are required to complete a number of "nonproductive" tasks for which they are not compensated.  These tasks are required under defendants' national policies and explained in employee policy manuals.  At the start of each work day, class members must load tools and equipment from their homes or a DirectSat office into their work vehicles.  The employees who submitted declarations spend between 10 and two hours loading equipment each day.  Many class members then call their dispatchers regarding installations scheduled for the day, call customers to discuss installation and estimated arrival times and use their computer or GPS device to obtain directions for installation sites.  Plaintiffs and declarants spend between ten minutes and two hours on these activities.  They may also spend up to three hours calling their dispatchers throughout the day.

Some installation technicians drive to a DirectSat office before their first installation job, either to pick up equipment or to confirm their daily routes.  The travel time ranges from 30 minutes to one hour, and these technicians head to their first job from the office, which may be anywhere from a few minutes to an hour away from the office.  Other class

7

members head directly from home to their first installation job of the day.  They spend an average of twenty minutes to two hours traveling to their assigned job sites in the morning and traveling home from their last job at the end of the day.

Between one and five times each week, class members must restock their vehicles with installation equipment and supplies at a DirectSat warehouse or from another installation technician.  This task takes 20 minutes to two hours to complete.  Once out in the field, class members provide assistance to other technicians at job sites, often at the direction of supervisors.  Providing assistance takes up from four or five hours a month to two hours every day.   After an installation, if a customer calls the class member with a question or complaint, class members are required to return to the customer's home to correct the problem.  Most employees who submitted declarations state that this takes approximately one to five hours a week, though the exact time varies widely.  Declarants are not paid for any of these activities or for installation jobs that cannot be completed because of no fault of their own.

At the end of a work day, class members have another set of nonproductive work activities that must be completed, for which they are not compensated.  First, they must remove all garbage and used equipment from their vehicles.   Next, they must load equipment, including drills, "hand-helds," meters and receivers, into their homes for safekeeping and recharging.  These activities take from 10 to 60 minutes.

8

Class members must also read and respond to work-related emails.  These emails provide the next day's job assignments so that class members may plan their driving routes using a mapping website or GPS device.  This task takes five minutes to one hour.  Finally, class members complete their time cards or other paperwork, which are usually submitted to DirectSat via email.  Declarants report that it takes them between five and 60 minutes to complete their end-of-day paperwork and time sheets.

Installation technicians also have mandatory obligations that occur periodically for which they are not compensated.  On a weekly basis, most class members attend mandatory work meetings that last between 30 minutes to two hours for which they are not compensated.  Some technicians receive a "reduced" or minimum wage for the time spent in the meetings.  Once each month, many class members drive to a DirectSat warehouse for an "all count" or "all scan" inventory, in which every item in the work vehicle is counted under warehouse supervision.  This activity takes between 15 minutes and two hours, depending on where the technicians are in the inventory line.  Finally, several employees report that they are required to clean and maintain their vehicles without compensation, including performing oil changes.  They report that maintaining their vehicles takes between one-and-a-half hours each month to 30 minutes each day.

Plaintiffs and putative class members routinely start work early and end work late in order to complete the required number of expected jobs each day without getting "written

9

up" under defendants' performance policies and procedures.  Often, class members work through their lunch breaks and supervisors instruct class members to deduct the lunch breaks from their productive time.  Putative class members report that they complained to their supervisors on several occasions that they were not being compensated for nonproductive time, but that supervisors responded by saying they were being compensated according to company policy.

Declarants that acted as trainers at some point during their employment with defendants stated that they instructed technicians that their pay started at the beginning of a job and ended when they finished the job.  This instruction was consistent with the trainers' understanding of company policy.

### D.  Uncompensated Overtime for Installations

Pursuant to DirectSat's national policies, class members are directed to complete their assigned jobs "with minimal overtime."  To avoid overtime and achieve a higher proficiency rating and higher rate of pay per completed job, class members do not report all the time they spend performing installations.  Management is aware of the underreporting and in some cases encourages it.  Class members underreport their hours by up to 20 hours each week, with their supervisors' knowledge and acquiescence.   As a result, plaintiffs and the putative class members are not compensated for overtime hours for performing installations.

10

## E.  Management Knowledge

Plaintiffs and putative class members have complained to management about not getting paid for non-installation work and not being able to record time spent in these nonproductive tasks.  Also, management is generally aware of the time that technicians spend engaged in productive and nonproductive tasks.  In particular, DirectSat installs GPS tracking devices in all of the company-owned vehicles assigned to installation technicians.  According to DirectSat's GPS policy, the system gives DirectSat "the ability to track [its] technicians at all times."  Dkt. #96, Ex. C, at 20.  The system monitors technicians' "speed, work hours, surrounding arrival and departure times, job duration and after-hour vehicle usage."  Id.  A related version of the GPS policy states that "[t]he GPS system provides the capability to locate a company vehicle 24 hours a day.  This enables tracking the travel history of the vehicle back in time."  Dkt. #96, Ex. D, at 8.

In October 2009, defendants were involved in several wage and hour law suits and modified some of their practices regarding compensation for nonproductive work time.  Defendants issued a new time sheet that permitted technicians to record their time for training, meetings and a category described as "other hours."  Dkt. #96, Ex. E, at 117.  The time sheet defines "other hours" to include "any hours worked that are not classified as Production, Training, or Meeting hours."  Id.  Dan Yannantuono, the CEO of DirectSat, explained in a memo that one example of "other" compensable hours is "hours worked

11

associated with picking up equipment necessary for [technicians'] routes at the warehouse." Dkt. #69, Ex. F.  In addition, Yvette Shockman testified that "other" compensable hours would include time that a technician spends unloading his or her vehicle pursuant to company policy.  Dkt. #96-2, Ex. A, at 132.  Shockman also testified that the intent of the "other" hours category was to capture any work that technicians performed that was not productive work, such as meetings or training.  Id. at 130.  Thus, after October 4, 2009, some class members began receiving compensation for nonproductive tasks for which they had previously received no compensation.

## OPINION

### A.  Conditional Certification of FLSA Collective Class Action

Plaintiffs seek conditional certification of a collective action for alleged violations of FLSA's unpaid minimum wage and overtime compensation, 29 U.S.C. §§ 206 and 207.  Under 29 U.S.C. § 216(b), such an action may be maintained "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."  As this court has held before, "[a]lthough § 216(b) does not explicitly require the district court to certify a collective action under the FLSA . . . the duty is implicit in the statute and the Federal Rules of Civil Procedure."  Spoerle v. Kraft Foods Global, Inc., 253 F.R.D. 434,

12

438 (W.D. Wis. 2008).

This court has adopted a two-step process for class certification under the FLSA. Sharpe, 2010 WL 135168, at *4 ; Kelly v. Bluegreen Corp., 256 F.R.D. 626, 628-89 (W.D. Wis. 2009); Sjoblom v. Charter Communications, LLC, 2007 WL 4560541, *7-8 (W.D. Wis. Dec. 19, 2007); Austin v. Cuna Mutual Insurance Society, 232 F.R.D. 601, 605 (W.D. Wis. 2006). At the first step, plaintiffs must make "a modest factual showing" that they are similarly situated to potential class members and that they and potential class members were "victims of a common policy or plan that violated the law." Austin, 232 F.R.D. at 605. This determination does not involve adjudication of the merits of the claims; rather, plaintiffs must demonstrate only that there is some factual nexus that connects them to other potential plaintiffs as victims of an unlawful practice. Sjoblom, 571 F. Supp. 2d at 967. If this showing is made, the court conditionally certifies a class and authorizes notice to potential class members and the parties conduct discovery. Austin, 232 F.R.D. at 605. The second step occurs at the close of discovery upon a motion for decertification from the defendant. At that point the court determines whether the plaintiffs are in fact similarly situated to those who have opted in. Id.

In this case, the parties find themselves at the first stage of the process, with plaintiffs seeking conditional certification of the following class:

All current and former DirectSat and Unitek employees who engage or have

13

engaged in tasks and activities identified in paragraph (21)(A)(i)-(xvi) of Plaintiff's Amended Complaint without receiving proper compensation, within the past three years.

Plaintiffs' theory of liability is that defendants' nationwide piece-rate compensation policy pays technicians only for the time they spend completing installations and fails to compensate technicians for nonproductive activities.  Also, plaintiffs contend that under defendants' policy, technicians were encouraged to under report their hours spent working and as a result, technicians are not paid overtime for hours worked in excess of 40 hours a week.

According to plaintiffs, they are similarly situated to the proposed class of installation technicians because all technicians have similar job duties set by company-wide position descriptions, all technicians drive a personally-owned or company-owned vehicle to complete those job duties, all technicians are compensated in part through the piece-rate system, all technicians performed uncompensated nonproductive and productive work for defendants pursuant to nationwide, uniform company policies that are tied to a centralized decision making apparatus and managers aware of the fact that class members performed uncompensated work activities.

Defendants challenge plaintiffs' motion for conditional certification on several grounds.  First, defendants contend that conditional certification is unwarranted because their formal wage and hour policies comply with the FLSA because their piece-rate policy

14

does in fact capture the time technicians spend performing nonproductive work tasks. Defendants point to provisions in their employee handbooks that instruct technicians to "record the actual time worked," and require employees to obtain permission before working overtime. Also, defendants state that they do "not permit altering, falsifying, tampering with timesheets, or recording time on another Employee's timesheet." Defs.' Response Br., dkt. #104, at 5-6. Because their pay policy is legal, defendants argue, plaintiffs must present evidence suggesting that there was a corporate-wide "policy-not-to-follow" the formal policy. Defendants contend that plaintiffs' evidence suggests only that some employees were not fully compensated because certain "rogue" managers and employees refused to comply with defendants' lawful, written policies. Defs.' Response Br., dkt. #104, at 11.

The problem with defendants' argument is that plaintiffs have presented several affidavits from putative class members around the country, stating that defendants' piece-rate compensation policy did not pay technicians for nonproductive work or for hours worked in excess of 40 hours a week. The statements in defendants' employee handbook are insufficient to defeat the motion for conditional certification because an employer's responsibility under the FLSA extends beyond merely promulgating rules to actually enforcing them. Plaintiffs and declarants aver that, in practice, defendants did not pay them in full for the hours they worked and encouraged them to understate their actual hours. Defendants' handbook may not immunize defendants from an FLSA action where there is

15

substantial evidence that they did not follow their own guidelines. C.f. 29 C.F.R. § 785.13 ("[Management] cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough.  Management has the power to enforce the rule and must make every effort to do so.") In contrast to the cases they cite, including Thompson v. Speedway SuperAmerica LLC, 2009 WL 130069, *2 (D. Minn. Jan. 20, 2009) and Pacheco v. Boar's Head Provisions Co., 671 F. Supp. 2d 957, 964 (W.D. Mich. 2009), defendants have presented no evidence to contradict plaintiffs' assertions, such as declarations from installation technicians and field managers averring that they were in fact compensated for overtime and nonproductive work or other evidence that the company followed its formal policies.

Further, although defendants state that "technicians have agreed and acknowledged that job rates applicable to their productive work are intended to cover nonproductive work," Defs.' Response Br., dkt. #104, at 14, defendants offer no evidence to support this assertion. By contrast, a number of plaintiffs' declarants [?] worked at various times as trainers or supervisors and acknowledge that as managers, they understood that technicians were not paid for overtime or nonproductive work according to company policy.  DeSerre Dec., dkt. #75, ¶ 27, Braniff Dec., dkt. #70, ¶ 27-28, Johnson Dec., dkt. #82, ¶¶ 27-28, Hanson Dec., dkt. #80, ¶¶ 27-28.  Also, given the number and varying geographic locations of the declarants, plaintiffs have offered sufficient evidence to suggest that the alleged failure to

16

compensate technicians fully was not attributable solely to "rogue managers."  In light of this available, uncontested testimony, plaintiffs have made a modest showing that a corporate policy, endorsed by field managers, caused installation technicians to under report their hours.

Defendants' next argument against conditional certification is that even if their policies did violate the FLSA, ultimate liability and damages will require individualized inquires and thousands of mini-trials, running contrary to the "economy of scale" envisioned by § 216(b) of the FLSA.  In part, defendants point out that each technician spent varying amounts of time performing nonproductive tasks and working overtime each week and different managers oversaw the technicians' work and timekeeping practices.  Also, defendants argue, plaintiffs' claims will require the court to determine whether individual technicians performed the tasks they purport to have performed, whether they recorded the time they worked, whether they were paid for the work and whether defendants were aware of the work.

Individual circumstances are inevitably present in a collective action.  In some circumstances, the individualized nature of the plaintiffs' claims may make certification inappropriate.  However, this court has rejected the notion that individualized differences preclude conditional certification at this early stage of the analysis.  Sharpe, 2010 WL 135168, at *7 ("[A]rguments regarding similar situation, individual issues and manageability

17

of a nationwide class will become relevant at the second stage . . . at which point the court will examine in detail the evidence and arguments submitted by the parties on the question of similar situation.") (citing Austin, 232 F.R.D. at 695); Sjoblom, 2007 WL 4560541, at *9 ("[D]efendants detailed arguments about the predominance of individualized inquiries and the dissimilarities between plaintiff and other employees are best raised after the parties have conducted further discovery and can present a more detailed factual record for the court to review."); see also Shabazz v. Asurion Insurance Service, 2008 WL 1730318, *3 (M.D. Tenn. Apr. 10, 2008) (holding that defendant's 47-page memorandum explaining specific differences among plaintiffs and the putative class "effectively ignore[d] the requirement that Plaintiffs need only establish a 'modest factual showing' that they are similarly situated employees in order to gain initial conditional class certification and the issuance of Notice."); Musarra v. Digital Dish, Inc., 2008 WL 818692, *5 (S.D. Ohio Mar. 24, 2008) (individualized inquiries inappropriate at first stage of certification analysis); Gambo v. Lucent Technologies, Inc., 2005 WL 3542485, *6 (N.D. Ill. Dec. 22, 2005).

In this case, plaintiffs are challenging the lawfulness of defendants' company-wide piece-rate pay system. The declarations and other evidence offered by plaintiffs suggest that defendants had central control over the compensation system and that the same piece-rate system applied to all installation technicians. Thus, I am not persuaded at this stage that the technicians' individualized situations should preclude certification. Monroe v. FTS USA,

18

LLC, 257 F.R.D. 634, 638 (W.D. Tenn. 2009) (rejecting defendant's argument that individual inquiries preclude certification because "[i]t is the lawfulness of the [piece-rate] policy that is challenged in this litigation"); see also Kautsch v. Premier Communications, 504 F. Supp. 2d 685, 690 (W.D. Mo. 2007) (rejecting defendants' argument that individualized inquiries precluded certification because despite differences in individual technicians' circumstances, they all performed "essentially the same job for the same employer and [were] paid using [defendant's] piece-rate system" ).

Finally, defendants contend that plaintiffs have not demonstrated that they are similarly situated to the proposed class members, citing several cases in which district courts denied certification when plaintiffs provided only a handful of affidavits from potential class members.  Plaintiffs seek conditional certification of a collective action for more than 5,000 individuals working at approximately 25 locations throughout the country.  Defendants contend that the 29 declarations plaintiffs submitted, representing approximately 0.6% of the proposed class, are insufficient to show that plaintiffs are similarly situated to the individuals they seek to represent.  At most, defendants argue, plaintiffs' submissions show that a few employees and supervisors applied company policies illegally.

As I stated in Sharpe, 2010 WL 135168, at *6, "[a]dducing evidence from a small percentage of the potential class does not preclude conditional certification of a class under the FLSA."  A representative plaintiff is not required to adduce evidence of hundreds of

19

particular wage and overtime violations to make the requisite factual showing for conditional certification. <u>Kelly</u>, 256 F.R.D. at 629. "Where an apparent company-wide policy is behind the alleged FLSA violations, the plaintiff seeking certification for a company-wide class action should not be required to collect specific violations from each location or from each state before seeking authorization to provide notice to employees from all locations." <u>Id.</u> at 631. In this case, plaintiffs have submitted an adequate sampling of declarations to permit a reasonable inference that plaintiffs are similarly situated to the prospective class members. These declarations are drawn from 11 different states and the District of Columbia, and at least 18 different field offices. With these declarations and other evidence, plaintiffs have demonstrated that defendants' installation technicians have the same job duties, are compensated according to company-wide policies, are required to perform and actually perform nonproductive work activities for which they are not compensated and work under managers who regularly instructed technicians that they could not record all of their time on time sheets.

At this stage, plaintiffs need demonstrate only that there is some factual nexus that connects their claims to other potential plaintiffs as victims of an unlawful practice. <u>Austin</u>, 232 F.R.D. at 605. They have met this initial burden. Defendants' arguments regarding individual issues and manageability of a nationwide class may become relevant at the second stage. At the close of discovery, defendants may move to decertify the class, at which point

20

the court will examine in detail the evidence and arguments submitted by the parties on the question of similar situation.  If the court finds that any of the opt-in plaintiffs are not similarly situated to the representative plaintiffs, it may dismiss them without prejudice.  Also, the court may decertify the entire class if none of the class members are similarly situated.

In sum, because plaintiffs have made a colorable showing that they are similarly situated to the putative class members with respect to nonpayment for productive and nonproductive time, I will grant their motion for conditional certification of the class proposed in the complaint and allow them to notify potential members of the class.

## B.  Notice

Along with their brief in support of conditional certification, plaintiffs submitted a proposed notice and consent form and ask that opt-in plaintiffs be allowed 60 days to file the approved consent forms and opt in to the lawsuit.  Plaintiffs also seek approval for certain methods of distributing the notice to potential class members.  Defendants object to both the content of the notice and the proposed methods of dissemination.

As an initial matter, plaintiffs ask the court to "strike the unprofessional statements" from defendants' objections and "admonish Defendants' counsel that future incidences of such conduct will result in sanctions."  Plfs.' Reply Br., dkt. #108, at 14.  I will not strike

21

language from defendants' brief; however, I have disregarded accusations regarding the character of counsel in this matter because they are irrelevant to the legal issues at hand. The parties and their counsel would be well advised to focus on the legal issues in the case and not spend their time criticizing opposing counsel.

Turning to the parties' substantive disputes, one of defendants' objections to the content of the notice is that the notice must contain information regarding defendants' counterclaims against plaintiffs Espenscheid, Idler and Bolano and all opt-in plaintiffs for misrepresentation, unjust enrichment and detrimental reliance. Defs.' Supplemental Objs., dkt. #117. Defendants contend that potential class members must be warned that they may be sued if they opt in to the collection action. Id. Plaintiffs object to inclusion of this warning, contending that defendants' counterclaims lack merit, constitute an impermissible act of retaliation and would have a chilling effect on the proposed collective action. Dkt. #119. Plaintiffs have also filed a motion to dismiss defendants' counterclaims that is being briefed by the parties. Dkt. #123. Defendants' opposition brief is due on June 8, 2010 and plaintiffs' reply is due June 18. I anticipate ruling on the motion within the month. Because I conclude that it would be prudent to wait until the court has ruled on the motion to dismiss to determine whether defendants' counterclaims should be included in the notice form, I will reserve ruling on the final content of the notice. However, the parties also have the following disputes that can be resolved at this time.

22

1.  Content of the Notice

Defendants object to the content of the proposed notice on several grounds.  First, defendants contend that the proposed notice form should not be addressed to employees of "UniTek" and DirectSat because UniTek, as the parent company of DirectSat, is a separate legal entity that does not employ the individuals who comprise the proposed class.  However, plaintiffs' claims are brought against DirectSat and UniTek as a joint employer of the proposed class members.  Plaintiffs have adduced evidence that UniTek and DirectSat are closely connected companies with common human resource and payroll policies and both exercise control over installation technicians.  Thus, it is appropriate to identify UniTek as an "employer" in the notice form.

Second, defendants contend that the notice form provides insufficient space to defendants' litigation position by "tactically plac[ing] [it] in an unfavorable and subtly hidden location."  Defs.' Br., dkt. #106, at 4.  Defendants request that they be permitted to have an entire section of the notice dedicated to their legal position.  Under the heading "Description of the Lawsuit," the proposed notice form states that "[d]efendants deny plaintiffs' allegations that they violated the FLSA and contend that they properly compensated employees for all compensable working time."  This is a sufficient description of defendants' position for purposes of the notice form and is consistent with other FLSA notice forms that have been approved by this court.  E.g., Sharpe v. APAC Customer

23

Services, Inc., 2010 WL 1292154, *1 (W.D. Wis. Mar. 29, 2010) ("[Defendant] denies plaintiff's allegations and has asserted various defenses to plaintiff's claims."); Austin, 232 F.R.D. at 608 ("[Defendant] denies that it violated the Fair Labor Standards Act.") However, as discussed above, I am reserving ruling on whether a description of defendants' counterclaims should also be included in the notice form.

Defendants' third objection is that the proposed notice "downplays" the burden opt-in plaintiffs may face after joining the lawsuit, such as testifying in depositions or at trial. As it is written, plaintiffs' proposed notice states that individuals "may be required to participate in the discovery process."  Plaintiffs have agreed to amend the notice form to state that "While this lawsuit is pending, individuals who opt in may be required to provide information or documents, appear for a deposition, testify at trial or otherwise participate in this action."  Thus, the proposed notice form should be amended accordingly.

Defendants' fourth objection is that plaintiffs' disclosure concerning plaintiffs' counsel is "misleading" and "deceptive."  Under the heading "Your Right to Participate in This Suit," the notice states in boldface type that opt-in plaintiffs "are not required to pay any money to participate" in the lawsuit.  Under the heading "Effect of Joining This Suit," the notice states that

> [R]epresentative plaintiffs in this lawsuit have entered into a contingency fee
> agreement with plaintiffs' lawyers, which means that if there is no recovery,
> there will be no attorneys fees or costs chargeable to you from plaintiffs'

24

> lawyers.  If there is a recovery, plaintiffs' lawyers will receive a part of any settlement obtained or money judgment entered in favor of all members of the class, subject to the discretion of the court.

Defendants contend that this language improperly "promotes the services of the two law firms" representing plaintiffs, suggests that plaintiffs' attorneys have agreed to represent the putative plaintiffs gratuitously and fails to inform prospective plaintiffs that defendants are entitled to recover their costs from plaintiffs if defendants are successful.  Defendants' criticisms are misplaced and are more suggestive of an animosity toward plaintiffs' counsel than of concern about whether opt-in plaintiffs are adequately informed.  The proposed descriptions serve the purpose of informing putative class members that plaintiffs have retained counsel on a contingency fee basis and there are no up-front costs to participate in the lawsuit.  This language is appropriate and has been approved by this court on at least one previous occasion.  E.g., Sjoblom v. Charter Communications, LLC, 07-cv-451-bbc, Mar. 7, 2008 Order, attached as Ex. C to Modl Aff., dkt. #109.  Further, I will not require plaintiffs to include a statement regarding defendants' costs, because as I explained in Austin, 232 F.R.D. at 608, "the [FLSA] is silent with respect to fee shifting for prevailing defendants" and "such a warning would chill participation in collective actions."  Also, as plaintiffs point out, defendants' proposed language regarding costs is inaccurate according to plaintiffs' fee agreement with counsel in which opt-in plaintiffs are not required to pay costs.

Defendants' fifth objection to plaintiffs' proposed notice is that the notice describes

the protections of the FLSA inaccurately.  The "Description of Lawsuit," portion of the notice states that the "FLSA requires that an employer pay both wages and overtime compensation for all work-related activities that are compensable under federal law." Defendants contend that this statement is deceptive because the FLSA requires only that employers pay (1) the minimum wage and (2) overtime for hours worked in excess of 40 hours, and does not require that an employer pay wages for "all work-related activities." Although I disagree with defendants that the statement in the notice form is a misstatement of the law, I will modify the language slightly to state:

> The FLSA requires that an employer pay minimum wages for all work performed on an employer's behalf and pay overtime compensation for hours worked in excess of 40 hours per week.

Defendants' sixth objection is that plaintiffs' proposed notice "deceptively emphasize[s] the importance of joining this suit," and seeks to "scare potential class members into joining this action" by stating in boldface type that it is "extremely important" for individuals to return the consent form and emphasizing the running of the statute of limitations. Defs.' Br., dkt. #106, at 7. Defendants suggest that plaintiffs' counsel included this language in an attempt to maximize the amount of attorney fees they will recover.  I disagree with defendants.  This language appropriately notifies potential class members that if they are to participate in the lawsuit, they must file the opt-in notice within a given time. In addition, the language appropriately notifies potential plaintiffs that the statute of

26

limitations continues to run on FLSA claims until a plaintiff opts in to the collective action or files an individual lawsuit.  I see no problems with including this language in the notice.

Defendants' seventh objection is that the notice fails to advise recipients that they can file their own lawsuit with their own attorney or join in this lawsuit with their own attorney. Defendants again suggest that plaintiffs' counsel left out this information with hopes of collecting more attorneys fees.  However, under the section labeled "No Legal Effect in Not Joining This Suit," the notice states that

> If you choose not to join this lawsuit, you will not be affected by any judgment or settlement for the Fair Labor Standards Act claims in this case, whether favorable or unfavorable to the class.  You will not be entitled to share any amounts recovered by the class.  *You will be free to file your own lawsuit, if you wish to do so.*

Dkt. #95, Ex. A, at 46 (emphasis added).  This language is sufficient to notify recipients that they may file their own lawsuits.  Moreover, I disagree with defendants that potential plaintiffs must be informed of their right to join this collective action with their own attorneys.  As I explained in <u>Kelly</u>, 232 F.R.D. at 632, "[a]nyone who knows how lawyers work knows that a collective action allowing each opt-in plaintiff to have his or her own lawyer is simply not workable.  Potential plaintiffs who want a different lawyer are free to take action on their own instead of opting into the suit, as the notice already explains." (internal quotations omitted).

Finally, defendants object that the notice section titled "Further Information" is

27

"superfluous" and is either an "oversight or blatant effort to convince individuals to call and talk to Plaintiffs' counsel directly." Defs. Br., dkt. #106, at 9. The section states that

> Further information about this Notice or the lawsuit may be obtained from plaintiffs' attorney at the addresses, telephone numbers, fascimile numbers, or email addresses identified above, or on the Internet at _____. Please see the website for information and updates on the lawsuit.

The preceding section is titled "Right to Consult With Us," and states that "[i]f you want to talk with us about this lawsuit, please feel free to call, write or email us from your personal (not work) e-mail account during non-working time . . . ."

I agree with plaintiffs that the "Further Information" section is neither unnecessarily redundant or biased. The "Right to Consult With Us" section informs the putative class members that they have the right to discuss the lawsuit with plaintiffs' counsel, and provides counsels' contact information. The subsequent section states that putative class members may obtain information regarding the notice form *and* lawsuit from plaintiffs' counsel or online. There is nothing improper about highlighting the recipients' right and ability to contact class counsel.

2. Opt-in period

Defendants request that the court set a 45 day opt-in period for putative class members to opt in to this action, while plaintiffs request a 60 day opt-in period. In the past,

this court has approved 60 and 90-day opt-in periods for nationwide FLSA classes.  E.g.,

<u>Sharpe</u>, 2010 WL 1292154, at *2 (60 days); <u>Kelly</u>, 256 F.R.D. at 632 (90 days).  In light

of the size of the FLSA national class and its widespread geographic dispersal, I conclude that

a 60 day opt-in period is reasonable.


3.  <u>Three-year statute of limitations</u>

FLSA violations are subject to a two-year statute of limitations unless the violation

is willful, in which case a three-year statute of limitations applies. 29 U.S.C. § 255(a).

Defendants object to the notice form because it contemplates a three-year statute of

limitations for putative class members, contending that plaintiffs have made no showing that

any FLSA violation was "willful."   Whether defendants violated the FLSA and whether any

such violations were willful are questions pertaining to the merits of this action and are not

properly entertained at this early stage of the proceeding.  At this stage of litigation, justice

is most readily served by notice reaching the largest number of potential plaintiffs.

Therefore, any notice sent will assume a three-year statute of limitations.


4.  <u>Distribution of the notice</u>

Plaintiffs seek approval of the following methods for notifying potential class

members:

29

- Distribution of the notice and consent to current and former DirectSat employees who fall within the class by first-class mail to the employees' last-known address, as provided by DirectSat;

- Email notification attaching the notice and consent form to both current and former employees who fall within the class, to email addresses provided by DirectSat;

- Creating a website containing the notice and consent form;

- A court-approved press release directing putative class members to the website;

- If these methods are unsuccessful in providing notice to former DirectSat employees who fall within the class, phone contacts with putative class members by plaintiffs' counsel using a court-approved script;

- A grant of leave for plaintiffs to seek additional methods of notice if the methods are shown to be inadequate to reach a significant number of putative class members;

To effectuate this notice process, plaintiffs ask that defendants be required to produce the names and last-known regular and email addresses for all putative class members. In addition, where plaintiffs are unsuccessful in providing notice to former employees who fall within the class, plaintiffs ask that defendants be required to provide all available last-known telephone numbers of former employees.

Defendants object to plaintiffs dissemination of notice by any means other than first class mail, contending that alternate methods are unnecessary and overbroad. Plaintiffs do not explain why they need to distribute notice through so many channels, other than

30

asserting that this court has approved its proposed method in the past.  With respect to email notification, some courts, including this one, have allowed email distribution of notice forms for FLSA collective actions.   E.g., Sjoblom, 07-cv-451-bbc, Mar. 7, 2008 Order, attached as Ex. C. to Modl Aff., dkt. #109; Davis v. Westgate Planet Hollywood Las Vegas, LLC, 2009 WL 4019424, *3 (D. Nev. Nov. 19, 2009); Lewis v. Wells Fargo & Co., 669 F. Supp. 2d 1124, 1128-29 (N.D. Cal. 2009); Cranney v. Carriage Services, Inc., 2008 WL 608639, *5 (D. Nev. Feb. 29, 2008).  Other courts have denied requests to notify potential class members by email, citing concerns about distortion or misleading notification through modification of the notice itself or the addition of commentary.   Hintergerger v. Catholic Health System, 2009 WL 3464134, *13 (W.D.N.Y. Oct. 21, 2009); Kuznyetsov v. West Penn Allegheny Health System, Inc., 2009 WL 1515175, *6 (W.D. Pa. June 1, 2009) (quoting Reab v. Electronic Arts, Inc., 214 F.R.D. 623, 630 (D. Colo. 2002)); Gordon v. Kaleida Health, 2009 WL 3334784, *11 (W.D.N.Y Oct. 14,2009); Karvaly v. eBay, Inc., 245 F.R.D. 71, 91 (E.D.N.Y.2007).  Although this court has allowed email distribution of notices in a previous case, I agree with the reasoning of the courts suggesting caution be used in allowing email notification because of the potential for recipients to modify and re-distribute email messages.  In some circumstances, email notification may be necessary to reach potential class members.  Plaintiffs have provided no reason why it is necessary in this case.  Thus, plaintiffs may not send the notice form by email and defendants are not

required to provide email addresses of former employees to plaintiffs at this time.

With respect to plaintiffs' proposed website and press release, defendants do not explain how such notice methods, if pre-approved by the court, carry the same risks as email notification. As long as plaintiffs post only the pre-approved notice form on the website and publish only a court-approved press release, I see no problem with these methods of distribution. Also, defendants have not explained why plaintiffs should be prohibited from contacting putative class members by telephone, using a court-approved script, if other methods of notice are unsuccessful.

In sum, once the final notice and consent form is approved by the court, plaintiffs are permitted to distribute the notice and consent form to current and former DirectSat employees by first-class mail. Plaintiffs may also create a website containing the notice and consent form and publish a court-approved press release directing putative class members to the website. After using these methods, if plaintiffs are unsuccessful in contacting former employees within the class, plaintiffs' counsel may attempt to contact those employees by telephone, using a court-approved script. Defendants must provide to plaintiffs the full names and last known mailing addresses for all potential class members. If necessary under the terms of this order and upon plaintiffs' request, defendants must provide plaintiffs with all available last known telephone numbers of former employees.

32

5.  Restriction of plaintiffs' counsel's contacts with potential class members

Finally, defendants request that this court prohibit plaintiffs' counsel from contacting putative class members by any other methods than those approved by the court for giving notice.  In response, plaintiffs' counsel has agreed to limit their contacts with putative members of the FLSA class during the opt-in period to those methods approved by the court. However, plaintiffs' counsel request that, if necessary, they be allowed to contact during the opt-in period those individuals who may also assert claims as members of the proposed Fed. R. Civ. P. 23 state-law classes for investigation and fact-finding purposes, agreeing that they will not encourage these individuals in any way to opt in to the FLSA portion of the case. I conclude that contact for investigative and fact-finding purposes is reasonable.  Thus, during the opt-in period, plaintiffs' counsel may contact putative FLSA class members only by those methods approved by the court, including first class mail, a court-approved press release, website and telephone calls, and for the limited purpose of investigating the state-law claims also asserted in this case.

ORDER

IT IS ORDERED that

1.  The motion for conditional certification and court facilitation of notice, dkt. #65,

filed by plaintiffs Aaron Espenscheid, Gary Idler and Ricardo Bolano is GRANTED in part and STAYED in part.  Conditional certification of the FLSA nationwide class proposed in plaintiffs' amended complaint is GRANTED.  A decision is STAYED regarding the final content of the written notice and consent form that will be distributed to potential opt-in plaintiffs, pending a decision on plaintiffs' motion to dismiss defendants' counterclaims, dkt. #123.

2.  Once the court approves a notice and consent form, defendants will have 14 days within which to provide plaintiffs with the full names and last known mailing addresses for all potential class members.  If necessary under the terms of this order and upon plaintiffs' request, defendants shall provide plaintiffs with all available last known telephone numbers of former employees within the class.

3.  Once the court approves a notice and consent form, plaintiffs are authorized to send the notice to all DirectSat and UniTek current and former employees by the methods authorized in this order.

4.  Once the court approves a notice and consent form, opt-in plaintiffs will have a 60-day period within which to file notices of consent to join the lawsuit.

5.  Plaintiffs' counsel may communicate with potential opt-in plaintiffs only by those methods approved by the court, with the exception that plaintiffs' counsel may contact potential opt-in plaintiffs who may also be plaintiffs in the proposed Fed. R. Civ. P. 23 state

actions for the limited purpose of investigation and fact-finding related to the state-law claims.

Entered this 4th day of June, 2010.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge