IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

AARON L. ESPENSCHEID,
GARY IDLER and MICHAEL CLAY,
on behalf of themselves and a class of
employees and/or former employees
similarly situated,

                                              OPINION and ORDER

                                                09-cv-625-bbc

                  Plaintiffs,

         v.

DIRECTSAT USA, LLC and
UNITEK USA, LLC,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

        This is a civil action for monetary and injunctive relief under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219, and wage and overtime compensation laws of Wisconsin, Minnesota and Pennsylvania. Plaintiffs Aaron Espenscheid, Gary Idler and Michael Clay contend that defendants DirectSat USA, LLC and UniTek, LLC violated the FLSA and state law by not compensating them for certain activities related to their jobs as installation technicians. On June 7, 2010, I granted conditional certification of a nationwide FLSA class and authorized notice to be sent to approximately 4,000 putative class members. 952

individuals have opted into the collective action.  Now before the court is plaintiffs' motion to certify state classes under Fed. R. Civ. P. 23, dkt. #211, and defendants' motion to decertify the FLSA collective action, dkt. #318.

After considering the arguments of the parties and conducting an independent review of the deposition testimony and other documents in the record, I conclude that plaintiffs' FLSA claims may proceed as a collective action and their state law claims meet the standard for class treatment under Rule 23.  Although there are individual variances between the opt-in plaintiffs' and putative class members' employment experiences, the inquiry at the heart of this case is whether defendants' nationwide policies and practices, which applied to all installation technicians, caused violations of federal and state wage and hour laws.  It makes sense to decide the lawfulness of those policies with respect to all employees in one case.  Defendants have not identified any persuasive reason why individual lawsuits would be a superior method to resolving the parties' disputes regarding these policies in a single lawsuit.

With respect to the FLSA collective action, however, I conclude that the nationwide class should be divided into the following three subclasses, organized around plaintiffs' specific experiences and theories of liability:  (1) plaintiffs who were denied overtime because they recorded a lunch break that they did not take or otherwise underreported hours they worked between their first and last installation or service job of the day; (2) plaintiffs who were denied overtime because they were not compensated for work performed before their

2

first installation or service job of the day or after their last installation or service job of the day; and (3) plaintiffs whose regular and overtime wages for nonproductive work were calculated improperly. I will grant defendants' motion to decertify the FLSA collective action to the extent opt-in plaintiffs have asserted any individual claims falling outside these three classes, but will deny the motion to decertify in all other respects. I will grant plaintiffs' motion to certify state classes under Rule 23.

Before turning to the merits of the parties arguments, a procedural matter requires attention. The court granted permission to plaintiffs to file a single combined brief constituting their reply in support of their motion for Rule 23 certification and their response in opposition to defendants' motion to decertify the FLSA collective action. Plaintiffs filed the combined brief on December 1, 2010 and defendants filed a reply on December 8. Dkt. #356. On December 15, plaintiffs filed a "supplement" to their combined opposition/reply brief, stating that they forgot to include a footnote in the factual section of the combined brief indicating that they were incorporating by reference evidence that they had submitted previously in support of their motion for conditional certification and motion for Rule 23 certification. Dkt. #363. This evidence included approximately 70 declarations of opt-in plaintiffs and putative class members, as well as depositions of defendants' corporate representatives and several field managers. Defendants filed a response in opposition to plaintiffs' supplement, contending that plaintiffs' filing is an

3

unauthorized sur-reply and that plaintiffs should not be allowed to incorporate this evidence because they "abandoned" it by failing to cite it specifically or rely on it in their combined brief. Dkt. #364. Defendants contend that they undermined the reliability, credibility and weight of plaintiffs' declarations and that because plaintiffs did not rebut defendants' factual showing, the court should not use the declarations in determining whether plaintiffs have met their burden in showing that collective and class action treatment is appropriate.

I will accept plaintiffs' supplement. Although ordinarily I do not accept unauthorized sur-replies, plaintiffs' supplement does not raise arguments or evidence that was not in the record already. Plaintiffs relied heavily on the evidence at issue in their opening brief supporting Rule 23 certification, and although they do not cite specific declarations in their combined brief, nothing the combined brief gives any reason to believe that plaintiffs abandoned or retreated from their evidence or the theories of liability it supports. Rather than repeat the arguments they made in their certification brief and address defendants' challenges regarding individual variances among witnesses directly, plaintiffs state in their brief that defendants "fail[] to acknowledge the substantial testimony, from these same witnesses, that carefully outlines DirectSat's policy and practice of denying compensation to technicians for compensable productive and nonproductive time." Plfs.' Br., dkt. #356, at 26; see also id. at 30 ("The declarations of the opt-in plaintiffs paint a powerful picture of a corporate culture in which managers and supervisors actively prevented opt-ins from

4

recording all of the hours that they worked.")   These statements, along with others throughout the brief, made it clear that plaintiffs were not abandoning previous arguments or evidence on which they had relied.

From the declarations, depositions and other materials submitted by the parties, I find the following facts for the purpose of deciding the parties' motions.

## BACKGROUND

### A. The Parties

Defendant DirectSat is a Delaware limited liability company with its principal place of business in King of Prussia, Pennsylvania.  It provides installation service to DirecTV at approximately 24 locations across the country.  Defendant UniTek is DirectSat's parent company.  It is also a Delaware limited liability company with corporate offices located in Blue Bell, Pennsylvania.   UniTek provides human resources, finance and payroll departments, as well as personnel policies related to timekeeping, overtime and use of company vehicles to DirectSat.

The technicians involved in this case are non-exempt, hourly employees who are responsible for installing, upgrading and servicing DirecTV equipment.  Generally, they work by themselves in discrete locations.  Named plaintiff Aaron Espenscheid was employed as an installation technician in DirectSat's Madison, Wisconsin office.  Named plaintiff Gary Idler

worked out of DirectSat's Claremont, Minnesota office and named plaintiff Michael Clay worked out of DirectSat's King of Prussia, Pennsylvania office.

## B. Defendant DirectSat's Employment Policies

Defendant DirectSat has national policies and practices contained in the company's employee handbooks, policy booklets and fleet policy handbook. The policies apply uniformly to all technicians regardless of location. Supervisors and managers at field offices cannot change policies in the national employee handbook. If an employee does not comply with company policies he may be subject to disciplinary action.

## 1. Standard work day

It is defendant DirectSat's policy that a technician's work day starts when the technician arrives at the first customer job of the day and ends when the technician finishes the last customer job of the day. Multiple managers and supervisors from different offices testified that they instructed technicians to record time on their time sheets for work done in this window only. Technicians had to sign a "payroll explanation and compliance form" attesting to the statement that "I understand that I am required and I agree to keep detailed records on a daily basis of my time from when I arrive at the work site until I complete the

final job for the day, including travel time to and from jobs throughout the day, the time to perform each job, and the time during which I take my lunch break." Dkt. #96-12.

## 2. Vehicle policy

Defendants have a national company-owned vehicle policy that requires technicians to perform a daily inspection of their vehicle, keep the vehicle in safe working condition and maintain the vehicle according to the company's vehicle operator policy. Under the policy, maintenance and cleanliness of company-owned vehicles is the sole responsibility of the technicians. Maintenance includes oil changes, brake work and other normal vehicle maintenance.

DirectSat also has a personally-owned vehicle policy. Both the company and personally-owned vehicle policies require technicians to remove all tools and equipment from the vehicles at the end of the workday. If tools or equipment are stolen or lost, the technician will be expected to pay for the loss and may be subject to discipline. DirectSat has charged technicians who have had equipment stolen from their vehicles.

## 3. GPS policy

Related to its vehicle policy, defendant DirectSat administers a national GPS policy under which DirectSat installs GPS tracking devices in all of the company-owned vehicles

assigned to the technicians to monitor and improve the efficiency of the technicians. DirectSat tells technicians that they are tracked "at all times" in the company owned vehicles and that the "system will monitor speed, work hours surrounding arrival and departure times, job duration and after hour vehicle usage." Dkt. #96-3.

The GPS system can follow the movement of every technician on a "real time" basis and determine when a company owned vehicle is in motion. Through its third-party vendor, DirectSat receives reports regarding a vehicle's movements throughout the day. The GPS policy states that "employee time sheets shall be audited against data obtained from the GPS system to verify the accuracy of times submitted for pay." Dkt. #96-4.

4. Mandatory calls

Defendant DirectSat has a national technician cell phone policy that requires the technicians to call all of their customers at the beginning of the day to provide an estimated time of arrival. Each customer call takes approximately four to five minutes. The cell phone policy prohibits technicians from using their cell phones while driving. Failure to abide by the technician cell phone policy may result in "disciplinary consequences."

5. Payroll and overtime policy

Defendant DirectSat's payroll, overtime and time sheet policies apply to all

8

technicians.  A technician's time is tracked on weekly time sheets that are collected at the local field offices and forwarded to payroll in Pennsylvania.  DirectSat instructs its technicians to "record the actual time worked."  DirectSat pays technicians for any work, including non-productive work that is recorded on their time sheets.  Employees are required to sign their timesheets before submitting the final version at the end of the workweek.

The employee policy booklet's "overtime policy" states that overtime is not "generally" permitted.  The overtime policy explains how technicians are monitored with respect to "nonproductive" work and overtime:

> Please note: All technicians will be monitored on revenue per truck goals daily. Each technician is expected to complete the designated amount of jobs per day with minimal overtime.  If there is a trend of non-productive work and excessive hours, the manager will assess whether or not it is a training need or a performance discrepancy.  At that time corrective action or more training may be recommended.

Dkt. #251-20.

Although DirectSat discourages overtime, technicians are eligible to receive overtime compensation for any hours of overtime that they work.  They are required to seek approval for all overtime they work before crossing the 40-hour threshold.  If the employee does not seek approval, however, it is DirectSat's policy to pay that employee for all earned overtime.

9

6. <u>Lunch breaks</u>

Defendant DirectSat's time card policy requires employees to take a mandatory unpaid half-hour or one-hour lunch break. Technicians are supposed to record the lunch break on their time cards.

7. <u>Meetings and equipment pickup</u>

Technicians are required to attend weekly meetings and can be disciplined for failing to attend. Also, they are required to attend safety meetings and mandatory training on occasion.

Technicians pick up equipment from the warehouse on a weekly basis. The pick-ups can take up to an hour, depending on how much equipment is needed. Once a month, technicians go to the warehouse to perform an inventory of all the equipment in their vehicles. This can take three to four hours.

8. <u>Paperwork and other responsibilities</u>

Work orders are distributed to technicians on a daily basis. During the time period relevant to this case, defendant DirectSat sent daily job assignments to plaintiffs' homes via fascimile, email or a handheld device that technicians reviewed before planning their routes for the day. Some technicians reviewed the routes the night before their jobs and others

10

reviewed the routes in the morning.  Some technicians had to come to the office each day to pick up equipment or their assignments. After reviewing the daily work assignments, technicians had to call dispatch to check in.  At the end of the day or the following morning, technicians must complete and submit to their supervisor the completed and incomplete work orders from the previous day.

DirectSat has no written policy about working from home, though many technicians complete required paperwork at home including time sheets and daily logs.  In addition, technicians received emails and work orders and mapped their routes while at home.

C.  Piece Rate System

Defendant DirectSat pays installation technicians pursuant to a "piece rate" system. In other words, the technicians are paid based on the quantity and type of work that they complete at a subscriber's home rather than receiving a typical hourly wage.  DirectSat assigns a value to each installation or service job, and after performing the task, the technician is credited with the value assigned to that task.  A single trip to a subscriber's home or office can result in multiple and distinct tasks, each of which carries a separate piece rate.  For example, a technician may need to relocate a satellite dish and also install an additional box.  A different piece rate is attached to each of these discrete jobs and the technician will receive compensation for the successful completion of each of these jobs.

11

Technicians are paid only for the jobs they complete. If a technician's work does not meet specifications or there are other problems with an installation, he or she must return and complete the work at no additional pay other than the computed hourly rate. At the end of the week, the value of the jobs performed is aggregated to determine the technician's production value for the week. This value is used to calculate wages, including overtime.

The precise rate paid to a particular technician is also determined by the "level" at which the technician is designated by DirectSat. The higher a technician's level, the higher the piece rate will be for each job. A technician's individual rate is a determined using a scorecard system that takes into account how efficient the technician is in completing installations. This efficiency rating is determined by dividing the total compensation for piece rate tasks by the number of hours that the class members reported on their time sheet. The higher the efficiency rating, the more points that the class members earn on their scorecards. Those class members who have more points on their scorecards have a better chance of keeping their technician class level and avoiding disciplinary action. Under the efficiency system, DirectSat expects technicians to achieve a base hourly rate of $15.00 an hour. A technician may be disciplined, including termination, if the technician does not meet the $15.00 an hour standard for multiple quarters.

To calculate a technician's effective hourly rate, the payroll department takes the production value for each week and divides that value by the total number of productive and

12

nonproductive hours worked by the employee during the relevant week.  For example, if a technician has a production value of $1,200 for a given week and a total of 40 productive and nonproductive hours, the effective hourly rate is $30.00 an hour ($1,200/40 hours = $30.00/hour).  The technician's gross pay for the week is $1,200.  When a technician's effective hourly rate is less than the applicable state or federal minimum wage, defendants adjust the technician's hourly rate so that the technician receives the appropriate minimum wage.

If an installation technician works more than 40 hours in a single week, the technician's effective hourly rate is calculated in the same manner as above, by dividing the production hours for the week by the number of hours worked.  For example, if the technician's production value for the week is $1,200 and that technician has recorded 50 hours, the technician's effective hourly rate is $24.00 an hour ($1,200/50 = $24.00 an hour).  To calculate the technician's pay for the week, DirectSat multiples the total hours worked (5) by the effective rate ($24.00) to reach the employee's "regular wages."  To calculate overtime wages, DirectSat multiplies the overtime hours (10) by one-half of the hourly rate ($12.00).  The regular hours and overtime are then added together to determine a technician's pay ($1,200 + $120 = $1,320).

Before October 2009, technicians were not paid a separate hourly rate for nonproductive work such as meeting attendance, picking up equipment, paperwork or

loading and unloading vehicles.  Instead, if an employee included the time he or she spent on nonproductive work on his or her timesheet, the nonproductive tasks were grouped with productive hours and the total hours were divided into the technicians' total compensation for the week.  In October 2009, DirectSat modified the timesheet to include a space for employees to record "other" work, including time spent in meetings and picking up equipment at the warehouse.

### D.  Testimony of Named, Opt-in Plaintiffs and Corporate Representatives

Plaintiffs submitted approximately 70 declarations from opt-in plaintiffs and putative class members.  Plaintiffs also deposed defendants' corporate representatives, including Daniel Yannantuono, the CEO of DirectSat, Yvette Shockman, the director of human resources for DirectSat and Cathy Lawley, the human resources manager at defendant UniTek, as well as several field managers.  Defendants took depositions of the named plaintiffs and approximately 35 opt-in plaintiffs.  Most technicians testified either through their declarations or depositions that they were not allowed to record work performed before they arrive at their first installation or service call of the day or after they complete their final installation or service call of the day.  Specifically, several technicians testified that they completed the following tasks outside the official work day window without compensation:

- loading tools and equipment into their work vehicles and unloading equipment

14

into their homes;

- receiving job assignments, planning routes and completing paperwork;

- calling customers to provide estimate arrival times;

- driving from their homes to their first installation or service call and from their final installation or service call back to their homes;

- restocking equipment;

- cleaning and maintaining work vehicles;

- constructing satellite dishes;

- attending weekly safety and training meetings; and

- attending monthly inventory meetings and quarterly technician meetings.

Not all technicians performed all of these tasks, nor did they perform them everyday or for a consistent period of time each day. For example, some technicians testified that they spent a significant amount of time loading and unloading equipment from their vehicles everyday, while others admitted that they rarely unloaded equipment. Similarly, some technicians testified that they may have included time spent in meetings on their timesheets, while others stated that they never included this time.

Many technicians testified that they were not paid for activities that occurred between the first installation or service call and the final installation or service call, including assisting other technicians with installation or service calls; returning to an installation site to address

15

customer questions or complaints; and performing installations and service calls that were not completed for reasons beyond the technician's control. Not all technicians testified that they performed these tasks without compensation. In addition, those who were not compensated for these tasks did not perform them for the same amount of time everyday or even every week.

Finally, many technicians testify that they underreported the actual number of hours they worked during the day performing installations and service calls. The technicians testified to a variety of reasons for underreporting, such as their supervisors encouraged it, they needed to increase their efficiency ratings, they had been scolded for too many hours or overtime hours or that that is just the way the job worked. Some technicians underreported hours by shaving off an hour or two everyday, some excluded their driving time between jobs, some used mathematical formulas that they believed would give them the best efficiency rating and several others testified that they recorded taking a lunch break when they actually worked through their lunch break regularly. Although most technicians contend that defendants owe them for uncompensated overtime, some technicians recorded overtime on their timesheets on several occasions and were paid for overtime when it was recorded.

16

E.  <u>Defendants' Knowledge of Underreporting</u>

Several technicians testified that they complained to their supervisors or managers about not getting paid for certain tasks and not being able to record time spent in these tasks.  Testimony from field managers and supervisors suggests that management was aware that technicians underreported their hours and actually encouraged or instructed technicians to underreport.   Some managers testified that the efficiency rating system led to the underreporting of hours.  One manager stated, "[i]f technicians did the jobs the correct way and did not cut corners, the vast majority of the techs would not have been able to meet the minimum efficiency rating required to avoid discipline. . . Aside from cutting corners or not counting all the hours, in order to get an acceptable efficiency rating, a technician would have to get lucky and get a few very easy jobs for a day, and that would be a rare occurrence."  Dec. of Chad Ludlum, dkt. # 240, ¶ 9.

CEO Yannantuono testified that he was not aware that technicians were intentionally not recording hours.  However, in October 2007, Yannantuono emailed Elizabeth Downey, the chief administrative officer of UniTek, stating that "I know I have been very vocal to you about my concern that technicians are knowingly underreporting hours."  Dkt. #357-11.  Also, in September 2008, Jim Dellinger, the national training director of DirectSat, emailed to Yannantuono, stating in part:

The reality is we have built minimum 10 hours a day 6 days a week schedules

17

. . ., my math might not be top notch but I see 60 hours of work being generated. . . . I understand that *sometimes* you will complete your day early on occasion. . . . Should we believe that almost all of our techs nationwide that report 40 hours a week in total work time even though we have [him] built to get at least 10 hours of work a day 6 days a week.  I of all people understand controlling [overtime], I'm saying what a lot of others just won't say, the bulk of the country is under-reporting. [The schedules] might be marginally off, they are not off by 20+ hours a week.

Dkt. #357-10 (emphasis in original).

UniTek human resources manager Cathy Lawley knew that technicians complained about compensation issues including not being paid for all hours worked and being told by supervisors to not put down more than 40 hours on their time sheets because managers will otherwise get in trouble.  Lawley testified that she was constantly getting telephone calls and complaints about these matters.

Some managers testified that they were aware technicians skipped lunch breaks, and the managers had discussions with the human resources department about technicians not actually taking lunch breaks.  Some supervisors told to technicians to record a lunch break regardless whether the technician actually took a break.  One manager forwarded an email to all of his technicians indicating that they must show a lunch as taken each day even if they do not take a lunch break.

Daniel Yannantuono, the CEO of DirectSat, and at least one general manager were aware the technicians took vehicles in for maintenance on their own time.  At least one

18

manager testified that he knows technicians call their customers before getting into their vehicle.

## F.  Dr. David Lewin's Expert Reports

Plaintiffs offer David Lewin as an expert in human resource and management and employment relations and submitted two of his reports in support of their motion for class certification.  Dkt. ##251-17, 251-18.  Lewin examined DirectSat's management structure and the policies and practices relevant to the disputes in this case and provided the following opinions:

- DirectSat maintains highly centralized management and operations that closely control and monitor the work performed by technicians.

- DirectSat maintains highly centralized payroll policies that cover technicians companywide.

- DirectSat maintains a policy of not paying technicians for nonproductive work activities.

- DirectSat's piece rate system does not compensate technicians for their nonproductive time.

- There is no agreement between DirectSat and the technicians regarding what constitutes "non-productive time" or that piece rate compensation includes payment for such non-productive time.

- DirectSat knows of the underreported hours that the technicians work.

19

OPINION

A.  Defendants' Motion to Decertify FLSA Collective Action

The FLSA requires employers to compensate their non-exempt hourly employees at overtime rates for time worked over the statutorily-defined maximum of 40 hours per week. 29 U.S.C. § 207(a).  If an employer does not provide that pay, the statute authorizes an employee to bring suit against his or her employer not only on behalf of him or herself, but also on behalf of other "similarly situated" employees.  29 U.S.C. § 216(b); Alvarez v. City of Chicago, 605 F.3d 445, 448 (7th Cir. 2010); Jonites v. Exelon Corp., 522 F.3d 721, 725-26 (7th Cir. 2008).  The purpose of allowing this type of action is to serve the interest of judicial economy and to aid in the vindication of plaintiffs' rights.  Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989).

This court applies a two-part test to determine whether an FLSA claim may proceed as a collection action.  Espenscheid v. DirectSat USA, LLC, 2010 WL 2330309, *6 (W.D. Wis. Jun. 7, 2010); Austin v. Cuna Mutual Insurance Society, 232 F.R.D. 601, 605 (W.D. Wis. 2006).  At the first stage, the court considers whether potential opt-in plaintiffs are similarly situated and whether notice should be sent to potential plaintiffs.  Id.  The standard at the first stage is fairly lenient.  On June 7, 2010, I ruled on the first part of the test when I granted plaintiffs' motion to conditionally certify their FLSA claims as a collective action.

20

Defendants triggered the second part of the test by moving to decertify the collective action.  At the second stage, the court must determine whether, given what has been learned through discovery, the individuals who chose to opt in to the FLSA action are actually similarly situated.  Because the parties have conducted discovery and the court has more information on which to base its decision, the court's inquiry is more stringent at the second stage.  Anderson v. Cagle's, Inc., 488 F.3d 945, 952-53 (11th Cir. 2007); Reed v. County of Orange, 266 F.R.D. 446, 449-50 (C.D. Cal. 2010); Pacheo v. Boar's Head Provisions Co., 671 F. Supp. 2d 957, 959 (W.D. Mich. 2009).  Although defendants are the "movants" at the second stage, the burden remains on the plaintiffs to establish that the individual class members are similarly situated.  Proctor v. Allsups Convenience Stores, Inc., 250 F.R.D. 278, 280 (N.D. Tex. 2008).  If the class members are similarly situated, the representative action may proceed.  If they are not, the class is decertified, the opt-in plaintiffs are dismissed and the original named plaintiffs may proceed with their individual claims only.

Although the statute does not define "similarly situated" and the Court of Appeals for the Seventh Circuit has not articulated a standard for making the determination, the majority of courts considering the issue consider three factors at the second stage of the analysis:  (1) whether the factual and employment settings of the individual plaintiffs are similar or disparate; (2) whether defendants may assert various defenses that appear to be individual to each plaintiff; and (3) whether fairness and procedural considerations support

21

proceeding as a collective action.  E.g., Thiessen v. General Electric Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001); Russell v. Illinois Bell Telephone Co., 721 F. Supp. 2d 804, 811 (N.D. Ill. 2010); Mielke v. Laidlaw Transit, Inc., 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004).  I am persuaded that these factors help a court determine whether it can manage the case and bring about a fair and reasonably expeditious resolution of the collective action and will apply them in determining whether the opt-in plaintiffs are similarly situated.

1. Shared factual and employment settings: Subclasses

When considering the employment experiences of the opt-in plaintiffs, the main inquiry is whether the existence of individual issues will interfere substantially with plaintiffs' ability to prove their case with evidence that is class-wide in nature.  If the individual nature of the claims precludes class-wide adjudication, the plaintiffs are not similarly situated for purpose of § 216(b) and certification of a collective action is no longer viable.  Jonites, 522 F.3d at 725-26 (use of collective action mechanism in § 216(b) is "egregious" where claims at issue are "hopelessly heterogenous"); Anderson, 488 F.3d at 953 ("[T]he more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action.")

Defendants contend that a collective action is inappropriate because the named and opt-in plaintiffs are asserting numerous different theories of liability that would require

22

individualized assessment and because plaintiffs cannot show a company-wide policy or practice that violates the FLSA and deprives employees of overtime pay.  For example, plaintiffs' theories range from contending that field supervisors prohibited all overtime to allegations that the field supervisors permitted them to record some overtime, to assertions that they were permitted to record all of their time worked.  Some plaintiffs used mathematical formulas for recording their time in order to increase their efficiency rating, while other plaintiffs excluded discrete periods of time, such as time spent driving between jobs.  In sum, plaintiffs were subject to variant and localized directions that governed their day-to-day experiences and time-keeping habits.

In some cases, courts have concluded that the great variety of factual allegations among individual plaintiffs may result in claims that are too individualized and difficult for the court to manage collectively.  See e.g., Pacheo, 671 F. Supp. 2d at 961-62 (denying certification of FLSA collective action because plaintiffs' claims and employment experiences varied greatly); King v. CVS/Caremark Corp., 2008 WL 5973490, *2-4 (S.D. Fla. Sept. 11, 2008) (same); Simmons v. T-Mobile USA, Inc., 2007 WL 210008, *6 (S.D. Tex. Jan. 24, 2007) (same); Williams v. Accredited Home Lenders, Inc., 2006 WL 2085312, *4 (N.D. Ga. Jul. 25, 2006) (denying certification of FLSA collective action where fact-specific, individualized inquiry into a plaintiff's day-to-day activities would be required); Saxton v. Title Max of Alabama, Inc., 431 F. Supp. 2d 1185, 1188 (N.D. Ala. 2006) (same); Johnson

23

v. TGF Precision Haircutters, Inc., 2005 WL 1994286, *4-5 (S.D. Tex. Aug. 17, 2005) (decertifying collective action where individualized inquiries would be required); Basco v. Wal-Mart Stores, Inc., 2004 WL 1497709, *7-8 (E.D. La. Jul. 2, 2004) (denying certification of FLSA collective action for overtime claims where plaintiffs "performed different jobs at different geographic locations and were subject to different managerial requirements" and plaintiffs' testimony showed that policy was not "uniformly or systematically implemented at any given store").

However, as plaintiffs point out, although certification requires a factual nexus, plaintiffs in a FLSA collective action need not be situated *identically*. Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1260-61 (11th Cir. 2008); Brennan v. Qwest Communications International, Inc., 2009 WL 1586721, at *2 (D. Minn. June 4, 2009); Jordan v. IBP, Inc., 542 F. Supp. 2d 790, 813 (M.D. Tenn. 2008). The Court of Appeals for the Seventh Circuit explained recently that certification may be appropriate despite individualized questions and circumstances, so long as common questions predominate. Alvarez, 605 F.3d at 449 ("If common questions predominate, the plaintiffs may be similarly situated even though the recovery of any given plaintiff may be determined by only a subset of those common questions."); see also O'Brien v. Ed Donnelly Enterprises, Inc., 575 F.3d 567, 585 (6th Cir. 2009) ("[T]he plaintiffs were similarly situated, because their claims were unified by common theories of defendants' statutory violations, even if the proofs of these

24

theories are inevitably individualized and distinct."); Chabrier v. Wilmington Finance, Inc., 2008 WL 938872, *3 (E.D. Pa. Apr. 4, 2008) ("The need for individual factual determinations is not fatal to certification of a FLSA collective action."); Underwood v. NMC Mortgage Corp., 2009 WL 1322588, *4-5 (D. Kan. May 11, 2009) (same).

In addition, rather than decertifying the entire collective action, courts may group individuals who share common claims into subclasses because "[r]esolving common questions as a class, even through the additional mechanism of subclasses, remains inherently more efficient." Russell, 721 F. Supp. 2d at 812 (quoting Fravel v. County of Lake, 2008 WL 2704744, *3 (N.D. Ind. July 7, 2008)). In fact, in Alvarez, 605 F.3d at 449-50, the court of appeals in noted that district courts are not "forbid[den] from adopting the subclaim approach merely because the variety of subclaims renders the class 'heterogenous,'" and held that the district court erred by not considering whether subclasses would be an efficient way to resolve the plaintiffs' claims. Alvarez, 605 F.3d at 449-50. See also Thiebes v. Wal-Mart Stores, Inc., 1999 WL 1081357, *3 (D. Or. Dec. 1, 1999) (noting that court could "divide the class into subgroups" in FLSA action); Cf. Takacs v. Hahn Automotive Corp., 1999 WL 33127976, *1-3 (S.D. Ohio Jan. 25, 1999) (finding that, where plaintiff-employees in FLSA case could be divided into several job categories, they could attempt to prove damages by presenting testimony from representatives of each category).

In this case, the opt-in plaintiffs deposed by defendants testified to varying

25

employment experiences.  However, I agree with plaintiffs that this case should proceed as a collective action because all plaintiffs were subject to defendants' nationwide policies and practices, including the timekeeping and payroll system, which plaintiffs contend are inherently flawed.  Moreover, unlike the cases cited by defendants in support of decertification, the claims in this case are not so factually individualized that it is impossible to create subclasses withing the group.  E.g., Reed, 266 F.R.D. 446, 454-55 and n.7 (plaintiffs' claims were "simply too varied . . . . [they] vary from assignment to assignment and individual to individual."); Proctor, 250 F.R.D. at 283 ("Plaintiffs' claims vary from store to store and manager to manager.")

The differences defendants point out may be remedied by dividing plaintiffs' claims into three subclasses for the purposes of trial.  Although not all plaintiffs contend that they underreported the time spent on installations or that they are owed overtime for tasks performed outside the official work day window, most plaintiffs who were deposed or submitted declarations claim overtime or compensation in one or both of those categories.  In addition, it appears that all plaintiffs are asserting a claim for miscalculation of their compensation for nonproductive time.  Therefore, I will certify the following subclaims:  (1) plaintiffs who were denied overtime because they recorded a lunch break that they did not take or otherwise underreported hours they worked between their first and last installation or service job of the day; (2) plaintiffs who were denied overtime because they were not

26

compensated for work performed before their first installation or service job of the day or after their last installation or service job of the day; and (3) plaintiffs whose regular and overtime wages for nonproductive work were calculated improperly. Any claims that do not fall under those subclasses will be decertified. I will discuss below whether the opt-in plaintiffs within each subclass are similarly situated.

One final note on the subclaims. I will not decertify plaintiffs' claims for wage and overtime violations that occurred after October 2009 in any of the three subclasses. Defendants contend that the modified timesheets allow technicians to record nonproductive time in a separate category for which they are paid a set hourly wage. However, some plaintiffs allege that they continued to underreport their hours after October 2009 and that they could not record all nonproductive time in the "other" category. Although plaintiffs may be unable to prove this claim at summary judgment or trial, I will not decertify the claims at this time.

a.  Unpaid overtime for work performed within the official "work window"

Plaintiffs contend that as a matter of policy and practice, defendants seek to prohibit technicians from receiving overtime compensation and that this policy, combined with the efficiency rating system, the amount of daily work assigned to technicians and the threat of discipline, cause plaintiffs to record less time than they actually worked. Defendants

27

contend that plaintiffs who allege that they underreported their time spent on installation and service calls are not similarly situated because there is no nationwide policy requiring technicians to work off the clock; instead, the only official nationwide policy states clearly that employees will be paid for all hours worked.  In addition, it is not unlawful for an employer to have a policy of discouraging overtime and, to the extent plaintiffs are relying on other general policies, these are insufficient to make plaintiffs similarly situated because they are not inherently unlawful, were not consistently enforced and affected plaintiffs differently.  Anderson, 488 F.3d at 953 ("[T]he similarities necessary to maintain a collective action under § 216(b) must extend beyond the mere facts of job duties and pay provisions") (citation and quotation omitted).

However, plaintiffs have alleged more than a general, lawful policy.  They allege that their claims arise out of nationwide policies that led to specific FLSA violations.   In any event, whether defendants' policies are lawful and whether defendants actually violated the FLSA are questions beyond the scope of a motion for decertification.  Plaintiffs contend that defendants' policies and practices caused them to work unpaid overtime, which if proven will establish a viable FLSA claim.  Burch v. Qwest Communications International, Inc., 677 F. Supp. 2d 1101, 1115 (D. Minn. 2009) ("The law does not require that employees be compelled to work overtime to bring an FLSA claim; it is enough that the employer suffers or permits the work.")  Where a facially valid policy, "in combination with other factors,

28

leads to a consistent pattern of FLSA violations, it can support a finding that Plaintiffs are similarly situated for purposes of § 216." Falcon v. Starbucks Corp., 580 F. Supp. 2d 528, 536 (S.D. Tex. 2008).

Defendants contend that even if plaintiffs did underreport, they were not motivated by nationwide policies, but were following informal, supervisor-driven policies or used their own methods for achieving high efficiency ratings. They argue in addition that collective treatment of their claims is inappropriate because plaintiffs did not underreport the same amount of time each week and sometimes reported overtime for which they were paid. Several of the cases cited by defendants are those in which the court was unable to identify a common policy or practice. E.g., Reed, 266 F.R.D. at 460; Proctor, 250 F.R.D. at 282. In those cases, one or relatively few managers gave the unlawful instruction or provided several different unlawful instructions, resulting in disparate individualized claims.

This case is more similar to Falcon, 580 F. Supp. 2d 528, a case cited by both parties in support of their positions. In Falcon, defendant Starbucks Corp. moved to decertify the nationwide class of assistant managers who were claiming denial of overtime for time worked off the clock. Defendant contended that the opt-in plaintiffs were not similarly situated because there was no nationwide policy requiring assistant managers to work off the clock; instead, the official policy stated clearly that employees would be paid for all hours worked. Also, some opt-in plaintiffs testified that store managers pressured them to work off the

29

clock, while others were not pressured explicitly.  The court concluded that even though the opt-in plaintiffs worked at different stores under the supervision of different individuals, they were similarly situated because they held the same job title with the same job description and supervision hierarchy; they were all scheduled less than 40 hours a week; and they were subject to the same pay provisions and written performance reviews.  Id. at 536.  Also, the plaintiffs had "made a strong showing that Starbucks' general policy of requiring [assistant managers] to perform job duties that could not easily be completed within 40 hours while, at the same time, strongly discouraging overtime . . ., failing to increase labor budgets, and basing bonuses, at least in part, on labor hours created an environment that at least strongly motivated managers to commit the alleged FLSA violations."  Id.  The court found it irrelevant that the assistant managers did not perform exactly the same duties off the clock or that the opt-in plaintiffs were paid some overtime because "[a]ll of the deposed opt-ins allege that they were not compensated for job duties they performed over 40 hours either because they worked those hours off-the-clock or because managers shaved time off of hours they reported."  Id.  In sum, plaintiffs had presented "significant evidence that the environment created by Starbucks' policies appears to have led to a pattern of off-the-clock work and time shaving."  Id.; See also Wilks v. Pep Boys, 2006 WL 2821700, *4-6 (M.D. Tenn. Sept.  26, 2006) (denying motion to decertify where evidence of common, impermissible policies and practices trumped alleged disparities in employment settings); see

30

also Moss v. Crawford & Co., 201 F.R.D. 398, 410 (W.D. Pa. 2000).

In this case, plaintiffs' evidence shows that defendants' overtime policy, efficiency rating system and unwritten policy of pressuring or encouraging technicians to underreport their hours was widespread and ties the plaintiffs' claims together. Russell, 721 F. Supp. 2d at 814 (noting that common policy or practice "may take certain individualized issues out of the case," adding to the similarities between the opt-in plaintiffs' factual settings). Although defendants have presented evidence of varying individual employment experiences, defendants do not present persuasive evidence to dispute plaintiffs' position that it was difficult for technicians to complete their tasks without overtime, that off-the-clock work was widespread, that technicians were encouraged or motivated to underreport their hours and that defendants' representatives were aware of an underreporting problem. The varying experiences of the opt-in plaintiffs is consistent with plaintiffs' theory of liability that defendants' piece rate system fostered an environment of widespread noncompliance with the FLSA. Plaintiffs across the subclass allege that they worked unpaid overtime; the record sufficiently reflects that this practice was prevalent and involved more than just a few managers and technicians who failed to follow company policies. Collective treatment will efficiently and effectively determine the validity of defendants' policies in the context of a single lawsuit. Cf. Spoerle v. Kraft Foods Global, Inc., 253 F.R.D. 434, 440 (W.D. Wis. 2008) ("When the plaintiffs are challenging a 'uniform policy,' class certification is likely to

31

be appropriate because it is more efficient to determine the validity of that policy in the context of a single lawsuit.")

b.  Unpaid overtime for work performed before and after official work day window

Plaintiffs contend that as a matter of national, companywide policy and practice, defendants permit technicians to record time only within a window that begins when a technician arrives at the first installation or service call of the day and ends when the technician leaves the final installation or service call of the day.  At the same time, defendants' national policies require technicians to perform certain tasks both before and after this window.  Thus, as a matter of policy and practice, technicians perform this work "off the clock."

Defendants contend that the named plaintiffs' claims are not typical of the class because all plaintiffs did not perform the same nonproductive tasks, or even the same tasks everyday.  Also, plaintiffs were not guided by one official policy when performing these tasks and would have been compensated for their time had it been recorded.

I conclude that plaintiffs' claims arise from defendants' nationwide policies allegedly requiring off-the-clock work at the beginning and end of the day.  Although opt-in plaintiffs have provided varying testimony pertaining to discrete discussions with their supervisors regarding the recording of their hours, plaintiffs point to evidence in the record that

32

defendants' executive representatives told employees that arrival at the first customer job or the warehouse should mark the start of their work day on their time sheets. Plaintiffs also point to company-wide policies that require plaintiffs to unload their vehicles each night and call their first customer before leaving for the daily assignments. In addition, the named and opt-in plaintiffs testified that they were instructed not to include drive time on their time sheets. Although the specifics vary, there are a limited number of preliminary and postliminary activities for which plaintiffs are claiming they should have been compensated. Plaintiffs cite evidence establishing that each of the plaintiffs performed off-the-clock work in one or more of the following categories: (1) driving to their initial job and home from their last job; (2) unloading and loading equipment and organizing vehicles; (3) receiving daily assignments and mapping routes; (4) calling their customers and supervisors; (5) performing safety checks and maintenance on their work vehicles; (6) completing work activity logs and other paperwork; (7) reading work related emails; (8) attending mandatory meetings and (9) conducting inventory and swapping equipment.

I am not persuaded that it matters significantly whether plaintiffs performed the same off-the-clock tasks, performed them everyday or spent the same amount of time on these tasks, so long as they all allege that defendants' policies and practices required them to perform work outside of the official work window for which they were uncompensated. Kasten v. Saint-Gobain Performance Plastics Corp., 556 F. Supp. 2d 941, 956-57 (W.D.

33

Wis. 2008) ("Regardless whether plaintiffs work in different areas, on different shifts and don and doff different amounts of protective gear, they were subject to defendant's general practice of not compensating employees for donning and doffing certain protective gear and walking to work areas, in violation of the FLSA."); <u>see also</u> <u>Falcon</u>, 580 F. Supp. 2d at 536 ("Although the incentives created by Starbucks' conflicting mandates may not have led all managers nationwide to act in lockstep" and all opt-in plaintiffs "did not perform exactly the same duties off-the-clock," "[a]n employer should not be allowed to escape class liability simply because some managers do not commit FLSA violations as long the evidence shows that there is a factual or legal nexus that binds together the claims of the opt-in plaintiffs").

c.  Insufficient compensation for nonproductive time

Plaintiffs contend that defendants' piece rate payment system does not compensate technicians properly for time spent on necessary nonproductive work activities.  Specifically, plaintiffs allege that they were not paid for their nonproductive time at the regular hourly rate set for productive work for all hours up to 40, and at a rate of at least one-and-a-half times that rate for hours in excess of 40.  This nonproductive work includes assisting other technicians with installations or service calls, returning to an installation site to address customer questions or complaints and other tasks such as meetings or equipment pick up that were recorded. Although defendants contend that this claims lacks legal merit under the

34

FLSA, they set forth no argument why the opt-in plaintiffs would not be similarly situated with respect to their claim for nonproductive time.  Because all of the technicians in this subclass were paid under the same piece rate system for their nonproductive time, they are similarly situated with respect to this claim.

In sum, I conclude that when the claims and experiences of the opt-in plaintiffs are divided into these three subclaims, they are not so disparate as to make a collective action improper.

2.  Affirmative defenses available to defendants

The next consideration is "whether defendants' defenses could be applied across the board to plaintiffs' claims and potential plaintiffs' claims or whether many and perhaps disparate defenses could be raised." Russell, 721 F. Supp. 2d at 820 (citation and quotation omitted); see also Moss, 201 F.R.D. at 410 ("[T]he district court has the discretion to determine whether the potential defenses would make the class unmanageable.")  Defendants contend that their affirmative defenses are individualized and vary with each plaintiff. However, as this court has noted, "[i]f one zooms in close enough on anything, differences will abound." Kasten, 556 F. Supp. 2d at 957 (citation and quotation omitted).

Plaintiffs contend that defenses relating to liability may be adjudicated by referring largely to company policies and records, such as the piece rate system and GPS records, as

well as representative testimony.  To the extent defendants' possible defenses involve the measure of damages, the case can be bifurcated into separate liability and damages phases. The damages stage would involve examination of how any practices found unlawful affected each plaintiff.  In particular, the amount of overtime plaintiffs worked each week and how many weeks they worked in the class period are issues that could be determined at the damages stage of a bifurcated case.  Although it may be necessary to create additional subclasses to determine damages, possible complications in damages do not warrant decertification at this stage.  Id.; Madden v. Corinthian Colleges, Inc., 2009 WL 4757269, *3 (N.D. Ill. Dec. 8, 2009) ("[v]ariations in damages . . . do not warrant decertification").

However, defendants contend that most of their affirmative defenses go to liability, not damages only.  Even if this is true, most of defendants' defenses are applicable to all opt-in plaintiffs or one of the subclasses.  For example, whether defendants were or should have been aware of uncompensated overtime worked by its employees is a question applicable to all plaintiffs that a fact finder can determine from company records, management conversations and emails.  Similarly, certain questions apply to all plaintiffs or entire subclasses.  These include determinations concerning what activities constitute "work" and "overtime" under the FLSA, questions involving activities subject to the *de minimus* exception, the applicability of the Portal-to-Portal Act, statute of limitations issues, whether the piece rate system compensated plaintiffs' overtime and nonproductive work properly and whether

plaintiffs who worked unpaid overtime failed to avail themselves of methods provided for compensation.  It will be possible to group together questions concerning individuals who did not report overtime for various reasons (including, they did not believe the work was compensable work, did not know they could report overtime or were instructed by their managers to limit work hours or used their own formulas to achieve high efficiency ratings), so these questions may be grouped together and decided across all plaintiffs or subclasses using representative testimony, which is common in collective-action cases.  E.g., Shultz v. Capital International Security, Inc., 466 F.3d 298, 310 (4th Cir. 2006); Grochowski v. Phoenix Construction, 318 F.3d 80, 88 (2d Cir. 2003); Reich v. Gateway Press, Inc., 13 F.3d 685, 701-02 (3d Cir. 1994) Thiebes v. Wal-Mart Stores, Inc., 2004 WL 1688544, *1 (D. Or. July 26, 2004).

In sum, I am not persuaded that defendants' possible defenses are so individualized that they make collective treatment of plaintiffs' claims inappropriate.

3.  Fairness and procedural concerns

The final inquiry is whether fairness or procedural concerns counsel against collective treatment of plaintiffs' claims.  The remedial nature of the FLSA and the purposes of § 216 militate strongly in favor of allowing cases to proceed collectively.  See, e.g., Hoffman-La Roche, 493 U.S. at 170 (Congress intended to give "plaintiffs the advantage of lower

37

individual costs to vindicate rights by the pooling of resources"); <u>Bradford v. Bed Bath and Beyond, Inc.</u>, 184 F. Supp.2d 1342, 1351 (N.D. Ga. 2002) (noting that plaintiffs can "hardly be expected to pursue these small claims individually, so there is little likelihood that their rights will be vindicated in the absence of a collective action.")  However, district courts should determine whether a collective action is an efficient and fair way to resolve the plaintiffs' claims, <u>Alvarez</u>, 605 F.3d at 450, or whether other methods of adjudication would be more efficient and better at protecting the parties' due process rights.

Defendants contend that the court should decertify the case because plaintiffs cannot rely on common evidence to establish liability and thus, it would be difficult for the court to manage plaintiffs' claims as a collective action.  Also, defendants contend that they have inadequate notice of each plaintiff's individualized claims, in violation of defendants' due process rights, because the plaintiffs who have testified thus far do not represent the entire group.  Finally, defendants contend that allowing a collective action in a case in which there are individualized affirmative defenses violates its due process rights because it cannot defend itself and its property fairly.

Plaintiffs' claims, however, involve a limited number of issues and focus on company-wide practices and policies, namely, whether defendants have a nationwide policy and practice of encouraging or condoning underreporting of hours worked during the work day and whether defendants' policies fail to compensate technicians for work done off the clock.

38

These common liability-related questions can be resolved in collective trials even though there are some individualized questions.  In addition, "[defendants' due process] rights must be balanced with the rights of the plaintiffs, many of whom likely would be unable to bear the costs of an individual trial, to have their day in court."  <u>Wilks</u>, 2006 WL 2821700, at *8.

Defendants' concerns are manageable through bifurcation and the creation of subclasses.  I have no doubt that it will be challenging to resolve plaintiffs' claims, even on a bifurcated and subclass basis.  However, I am persuaded that a collective action is the most efficient method of addressing these claims without infringing the parties' due process rights. <u>Alvarez</u>, 605 F.3d at 450 ("Sifting through the subclaims of each of the myriad plaintiffs is an unenviable task.  But plaintiffs are nonetheless entitled to their day in court.") Therefore, I will deny defendants' motion to decertify plaintiffs' FLSA claims that fall within the subclasses identified above.

B.  <u>Plaintiff's Motion for Fed. R. Civ. P. 23 Certification of State Law Claims</u>

In addition to their FLSA claims, plaintiffs assert claims under the wage and hour laws of Wisconsin, Minnesota and Pennsylvania.  Their state law claims closely resemble their FLSA claims.  Specifically, the putative Wisconsin class brings a claim under Wisconsin's wage laws, which allow employees to seek recovery of unpaid wages and overtime. Wis. Stat.

§§ 104.02, 109.03; Wis. Admin. Code DWD §§ 272.12, 274.03. The putative Minnesota class asserts claims under Minnesota's Fair Labor Standards Act (MFLSA), which requires employers to pay minimum wage for all hours worked, Minn. Stat. § 177.24, and prohibits an employer from permitting an employee to work more than 48 hours in a workweek "unless the employee receives compensation for employment in excess of 48 hours in a workweek at a rate of at least 1-1/2 times the regular rate at which the employee is employed." Id. § 177.25(1). In addition, the MFLSA requires that "employers must permit each employee who is working for eight or more consecutive hours sufficient time to eat a meal." Id. § 177.254(1). The putative Pennsylvania class is asserting claims under the Pennsylvania Minimum Wage Act, which mandates that "[e]mployees shall be paid for overtime not less than one and one-half times the employee's regular rate," 43 Pa. Stat. § 333.104(c), and the Pennsylvania Wage Payment and Collection Law, which allows employees to recover unpaid wages, 43 Pa. Stat. § 260.3.

As an initial matter, defendants contend that class certification is improper with respect to plaintiffs' claims under Pennsylvania's Wage Payment and Collection Law because plaintiffs have failed to allege the existence of an employment contract and, even if an employment contract existed, the terms of the contract would require individual analysis. The Law "does not create a right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages." Weldon v. Kraft,

40

Inc., 896 F.2d 793, 801 (3d Cir. 1990).  Thus, to state a claim under the PWPCL, a plaintiff must show that he was "contractually entitled to compensation from wages and that he was not paid."  Long v. Valley Forge Military Academy Foundation, 2008 WL 5157508, *10 (E.D. Pa. Dec. 8, 2009) (citing Sullivan v. Chartwell Investment Partners, LP, 873 A.2d 710, 716 (Pa. Super. Ct. 2005)).  However, plaintiffs allege that putative members of the Pennsylvania class were technicians who had an employment relationship with defendant DirectSat and that the relationship was governed by defendants' uniform policies and procedures.  For the purpose of determining whether class certification is appropriate, the existence of an employment relationship is sufficient to show that there was an employment contract.  Engstrom v. John Nuveen & Co., 668 F. Supp. 953, 957 (E.D. Pa. 1987) ("Under Pennsylvania law . . . every employment relationship is a contractual relationship.") Moreover, it is not clear why individualized inquiries would be necessary to determine the terms of the employment relationship if all technicians are governed by the same policies. Thus, I will not decline to certify the Pennsylvania class on that basis.

District courts maintain broad discretion in determining whether certification of a class action lawsuit is appropriate.  Keele v. Wexler, 149 F.3d 589, 592 (7th Cir. 1998). Nonetheless, in addressing a request for class certification, courts are required to conduct a "rigorous analysis" of the request to determine whether the requirements under Rule 23 are satisfied and thereby "protect[] absent class members whose rights may be affected by the

class certification." Davis v. Hutchins, 321 F.3d 641, 649 (7th Cir. 2003). "[P]laintiff has the burden of proving that a case is appropriately a class action and meets all the requirements of Rule 23." Valentino v. Howlett, 528 F.2d 975, 978 (7th Cir. 1976) (citation omitted). Before addressing the express requirements under Rule 23, courts have addressed two implicit ones. Blihovde v. St. Croix County, 219 F.R.D. 607, 614 (W.D. Wis. 2003). First, the proposed class definition must be definite, that is, ascertainable, precise and objective. Id. (citation omitted); see also Alliance to End Repression v. Rochford, 565 F.2d 975, 977-78 (7th Cir. 1977). Second, the named plaintiffs "must be members of the class they propose to represent." Blihovde, 219 F.R.D. at 614.

The express requirements under Rule 23 begin with the four listed in the rule:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Next, the party requesting certification must satisfy one of the requirements under Rule 23(b). In this case, plaintiffs request certification of the proposed classes under Rule 23(b)(3), which requires "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3); Amchem Products, Inc. v.

42

Windsor, 521 U.S. 591, 615-16 (1997).  If the party seeking class certification fails to satisfy any requirements under Rule 23, the court should not grant class certification.  Pruitt v. City of Chicago, 472 F.3d 925, 926-27 (7th Cir. 2006).

1.  Implicit requirements

Plaintiffs' proposed state law classes are defined as follows:

Wisconsin class:  All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2007 and October 13, 2009, and who may assert claims under the applicable wage and hour laws of Wisconsin.

Minnesota class:  All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2006 and October 13, 2009, and who may assert claims under the applicable wage and hour laws of Minnesota.

Pennsylvania class:  All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2006 and October 13, 2009, and who may assert claims under the applicable wage and hour laws of Pennsylvania.

These proposed class definitions are patterned after the FLSA nationwide class that was conditionally certified.  They are objective and definite.  As with the FLSA class, however, I will divide these general classes into subclasses in order to address defendants' concerns regarding commonality, typicality and management of the case.  Fed. R. Civ. P. 23 (c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as

43

a class under this rule. ").  Thus, I will divide the classes as follows:

Wisconsin classes:

(1)  All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2007 and October 13, 2009, and who were denied overtime because they recorded a lunch break that they did not take or otherwise underreported hours they worked between their first and last installation or service job of the day;

(2) All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2007 and October 13, 2009, and who were denied overtime because they were not compensated for work performed before their first installation or service job of the day or after their last installation or service job of the day; and

(3) All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2007 and October 13, 2009, and whose regular and overtime wages for nonproductive work were calculated improperly.

Minnesota classes:

(1)  All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2006 and October 13, 2009, and who were denied overtime because they recorded a lunch break that they did not take or otherwise underreported hours they worked between their first and last installation or service job of the day;

(2) All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2006 and October 13, 2009, and who were denied overtime because they were not compensated for work performed before their first installation or service job of the day or after their last installation or service job of the day; and

44

(3) All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2006 and October 13, 2009, and whose regular and overtime wages for nonproductive work were calculated improperly.

<u>Pennsylvania classes:</u>
(1)  All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2006 and October 13, 2009, and who were denied overtime because they recorded a lunch break that they did not take or otherwise underreported hours they worked between their first and last installation or service job of the day;

(2) All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2006 and October 13, 2009, and who were denied overtime because they were not compensated for work performed before their first installation or service job of the day or after their last installation or service job of the day; and

(3) All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2006 and October 13, 2009, and whose regular and overtime wages for nonproductive work were calculated improperly.

As for the second implicit requirement, plaintiff Espenscheid is a member of the proposed Wisconsin state-law class, plaintiff Idler is a member of the proposed Minnesota state-law class and Michael Clay is a member of the proposed Pennsylvania state-law class. All three named plaintiffs fall within the class membership by having worked during the relevant time period without being paid for certain work.  Therefore, plaintiffs have satisfied

the two implicit requirements.  Next, I must analyze the class under Rule 23.

2.  <u>Express requirements under Rule 23(a)</u>

a.  Numerosity

According to plaintiffs, the proposed Wisconsin class has 370 members, the Minnesota class has 535 members and the Pennsylvania class has 718 members.  Joinder of this many members under Fed. R. Civ. P. 20(a) would be impractical.  <u>E.g.</u>, <u>Kasten</u>,556 F. Supp. 2d at 959 (state class of approximately 700 members satisfied numerosity requirement).  Thus, the proposed classes satisfy the numerosity requirement.

b.  Commonality

Commonality is present if there is at least one question of law or fact common to all class members.  <u>Blihovde</u>, 219 F.R.D. at 610 ("[A] single common issue is sufficient to satisfy this requirement.").  Generally, "[a] common nucleus of operative fact[s]" satisfies the commonality requirement under Rule 23(a)(2).  <u>Rosario v. Livaditis</u>, 963 F.2d 1013, 1018 (7th Cir. 1992) (citation omitted).  Here, the common questions of fact in each subclass include whether defendants' policies and practices caused plaintiffs to perform specific job activities for which defendant did not compensate them.  In addition, plaintiffs have identified common questions of law, namely, whether defendants' failure to provide

46

compensation for specific job activities violates labor laws of Wisconsin, Minnesota and Pennsylvania. These are sufficient to satisfy the commonality requirement. E.g., Musch v. Domtar Industries, Inc., 252 F.R.D. 456, 460 (W.D. Wis. 2008) (commonality element satisfied in case in which plaintiffs alleged that employer failed to pay maintenance employees for time spent donning and doffing personal protective equipment; common issue of law as to whether defendant's failure to pay for such time violated state minimum wage law).

c. Typicality

The typicality requirement under Rule 23(a)(3) overlaps substantially with the similarly situated analysis under § 216, Spoerle, 253 F.R.D. at 439, and "ensure[s] that only those plaintiffs . . . who can advance the same factual and legal arguments may be grouped together as a class." Mace v. Van Ru Credit Corp., 109 F.3d 338, 341 (7th Cir. 1997); see also Retired Chicago Police Association v. City of Chicago, 7 F. 3d 584, 596-97 (7th Cir. 1993). Under the typicality requirement, the focus is whether the representative plaintiff's claim is based on the same legal theory and arises from the same conduct that gives rise to the claims of the other members of the proposed class. Rosario, 963 F.2d at 1018 (citing De La Fuente v. Stokely–Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983) ("A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise

47

to the claims of other class members and his or her claims are based on the same legal theory")).

In challenging plaintiffs' ability to satisfy the typicality requirement, defendants focus on factual variances between the testimony of putative class members and the lack of a general policy that led to specific wage and hour law violations. However, plaintiffs Espenscheid, Idler and Clay contend that defendant DirectSat fails to pay its installation technicians for certain tasks and directs its technicians to record less time than they actually worked, in violation of the state wage and hour laws of Wisconsin, Minnesota and Pennsylvania. Each of the named plaintiffs has claims falling under the first subclass, because they each aver that they underreported hours worked during the official work window. Dep. of Espenscheid, dkt. #288, at 48 (did not record time during day spent helping other technicians), at 100-01 (shaved off hours to achieve higher efficiency rating); Dep. of Clay, dkt. #284, at 99-100 (shaved off hours because supervisor told him not to record more than 40 or 46 hours of work), at 130 (did not record time spent driving between jobs); Dep. of Idler, dkt. #291, at 44-49, 80-81, 166 (did not record all time worked each day, rather, recorded time using mathematical formula to increase efficiency). Similarly, each of the plaintiffs has claims falling under the second subclass because they allege that they performed work outside of the work day window that was uncompensated. Dep. of Espenscheid, dkt. #288, at 47-48 (not paid for time spent reading emails, getting routes,

48

loading and unloading trucks and attending meetings); Dep. of Clay, dkt. #284, at 90-91 (not paid for time driving to first job of day or home from last job of the day or time spent building satellite dishes at home), at 99 (not paid for attending meetings), at 112 (not paid for time traveling from warehouse to first job), at 126 (not paid for performing safety and maintenance check on work vehicle); Dep. of Idler, dkt. #291, at 169-72 (not compensated for time spent loading and unloading, performing vehicle maintenance, driving, paperwork or emails). Finally, because defendants' piece rate system uses the same method for calculating all technicians' nonproductive work, each of the named plaintiffs has claims that he was compensated improperly for his nonproductive work.

These claims rely on the same legal theory, a violation of state labor law, and arise out of the same course of conduct, defendants' pay practices, as other potential class members' claims. The reasons that supported my conclusion that plaintiffs are similarly situated under the FLSA support a finding of typicality. Because the individual plaintiffs' claims arise from the same alleged practices giving rise to the other class members' claims and the claims are based on the same legal theories, the named plaintiffs' claims satisfy the typicality requirement under Rule 23(a)(3).

d. Adequacy of representation

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest

49

between named parties and the class they seek to represent." <u>Amchem</u>, 521 U.S. at 625. To establish that they will represent the interests of the class fairly and adequately, class representatives must show that their claims are not antagonistic to or in conflict with those of the proposed class, they have sufficient interest in the outcome of the case and they are represented by experienced, competent counsel. <u>Rosario</u>, 963 F.2d at 1018.

Defendants do not challenge the adequacy of named plaintiffs' lawyers, and I conclude that they have the experience and resources to provide representation to the entire class. However, defendants argue that the lack of typicality among the plaintiffs' claims undercuts their ability to act as adequate class representatives. As discussed above, the named plaintiffs' claims are typical of those brought by the putative class members and there is no indication that their interests are inconsistent with those of other class members. Moreover, defendants do not deny that named plaintiffs Aaron Espenscheid, Gary Idler and Clay have submitted to depositions, participated in discovery and actively assisted plaintiffs' counsel. Therefore, the named plaintiffs have demonstrated that they are adequate representatives for the respective classes.

2. <u>Rule 23(b)(3) requirements</u>

Fed. R. Civ. P. 23(b)(3) sets out two additional requirements for class certification, which are often referred to as the predominance and superiority requirements. <u>Szabo v.</u>

<u>Bridgeport Machines, Inc.</u>, 249 F.3d 672, 676 (7th Cir. 2001).  Rule 23(b)(3) also provides

a non-exhaustive list of four factors to be considered when addressing the predominance and

superiority requirements.  A court should consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).


a.  Predominance

Under Rule 23(b)(3), a class action may be maintained if "the court finds that the

questions of law or fact common to class members predominates over any questions affecting

only individual members."  Although similar to the commonality requirement under

23(a)(2), the predominance requirement is more demanding, and is meant to test "whether

proposed classes are sufficiently cohesive to warrant adjudication by representation."

<u>Amchem</u>, 521 U.S. at 623.  To determine whether the liability issues would require

individual fact-intensive determinations or whether they are subject to class-wide proof, the

court examines such factors as the substantive elements of plaintiffs' claims, the proof

necessary for those elements and the manageability of trial on those issues.  <u>Fletcher v. ZLB</u>

<u>Behring LLC</u>, 245 F.R.D. 328, 332 (N.D. Ill. 2006).

51

In this case, questions of law and fact common to class members predominate over any questions affecting individual members only. As discussed in detail above, plaintiffs have identified company-wide policies and practices that resulted allegedly in defendants' failure to compensate plaintiffs for work performed during the class period. Plaintiffs have submitted testimony from several putative class members averring that they were subject to these policies and practices. The overriding legal issue is whether defendants' national wage and hour policies violate state wage and hour laws. These questions predominate over any individual questions. Farmer v. DirectSat USA, LLC, 2010 WL 3927640, *22 (N.D. Ill. Oct. 4, 2010) ("The class-wide questions of whether DirectSat is liable for wages related to these tasks and whether overtime was improperly denied predominate over any individualized questions, including questions of damages"). When a class of employees is attacking the validity of an employer policy or practice, "the validity of that policy predominates over individual issues and class certification is appropriate." Blihovde, 219 F.R.D. at 620 (citations omitted). Therefore, class treatment is appropriate.

b. Superiority

Finally, the court must determine whether a class action is superior to other methods for the adjudication of the proposed class' claims. Szabo, 249 F.3d at 676; Mejdrech v. Met-Coil Systems Corp., 319 F.3d 910, 911 (7th Cir. 2003) ("[C]lass action treatment is

appropriate and is permitted by Rule 23 when the judicial economy from consolidation of separate claims outweighs any concern with possible inaccuracies from their being lumped together in a single proceeding for decision by a single judge or jury."). Defendant contends that addressing plaintiffs' state law claims as a class action is not the superior method to address the claims because of the likely difficulties in managing such a class action. Once again, defendants point to the different employment experiences of the class members. However, for the same reasons that an FLSA collective action is a fair and efficient method of adjudicating plaintiffs' claims, a class action is the superior method for addressing the validity under state law of a practice that affects hundreds of people. Defendants' concerns about variations in damages can be addressed in two ways: (1) later altering or amending the class under Rule 23(c)(1)(C); or (2) having sub-classes created and determining a proper course of proceedings to prevent undue complication in addressing damages, in accordance with Rule 23(c)(5) and (d)(1)(A). Therefore, the superiority requirement is satisfied.

In sum, plaintiffs' motion for class certification will be granted and the proposed Wisconsin, Minnesota and Pennsylvania classes will be certified. Plaintiffs may have until February 18, 2011 in which to submit a proposed notice to defendants. By February 25, 2011, the parties must file a joint agreed notice with the court. If they cannot agree, defendants should provide the grounds for its objections to plaintiffs by February 23. Then on February 25, defendants should submit its objections to the court and plaintiffs should

file their proposed notice, addressing plaintiffs' objections.

## C.  Conclusion

It is conceivable that as this case develops further or reaches the damages phase, it may become unmanageable in its current form.  If the case proves to be unmanageable, I reserve the right to reconsider the issue of decertification of the FLSA collective action and any or all of the state law classes.  Fed. R. Civ. P. 23(c)(1)(c); In re School Asbestos Litigation, 789 F.2d 996, 1011 (3d Cir. 1986) ("When, and if, the district court is convinced that the litigation cannot be managed, decertification is proper.")  In addition, it may become necessary to modify these classes and subclasses for purposes of trial and damages calculations in particular.  As the trial nears, I will direct the parties to submit proposed trial plans describing how and whether the FLSA subclasses and state law classes should be modified further and how many representative witnesses will be necessary to address each subclaim.

## ORDER

IT IS ORDERED that

1.  The motion to certify classes under Fed. R. Civ. P. 23, dkt. #211, filed by plaintiffs Aaron Espenscheid, Michael Clay and Gary Idler is GRANTED.  The following

state law classes are certified:

(a)  <u>Wisconsin classes</u>:

(1)  All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2007 and October 13, 2009, and who were denied overtime because they recorded a lunch break that they did not take or otherwise underreported hours they worked between their first and last installation or service job of the day;

(2) All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2007 and October 13, 2009, and who were denied overtime because they were not compensated for work performed before their first installation or service job of the day or after their last installation or service job of the day; and

(3) All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2007 and October 13, 2009, and whose regular and overtime wages for nonproductive work were calculated improperly.

<u>Minnesota classes</u>:

(1)  All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2006 and October 13, 2009, and who were denied overtime because they recorded a lunch break that they did not take or otherwise underreported hours they worked between their first and last installation or service job of the day;

(2) All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2006 and October 13, 2009, and who were denied overtime because they were not compensated for work performed before their first installation or service job of the day or after their last installation or service job of the day; and

55

(3) All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2006 and October 13, 2009, and whose regular and overtime wages for nonproductive work were calculated improperly.

Pennsylvania classes:

(1)  All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2006 and October 13, 2009, and who were denied overtime because they recorded a lunch break that they did not take or otherwise underreported hours they worked between their first and last installation or service job of the day;

(2) All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2006 and October 13, 2009, and who were denied overtime because they were not compensated for work performed before their first installation or service job of the day or after their last installation or service job of the day; and

(3) All current and former DirectSat technicians who engaged in any of the work activities described in paragraph 21(A)(i)-(xvi) of plaintiffs' amended complaint between October 13, 2006 and October 13, 2009, and whose regular and overtime wages for nonproductive work were calculated improperly.


2.  The motion to decertify the FLSA collective action, dkt. #318, filed by defendants

DirectSat USA, LLC and UniTek USA, LLC is GRANTED with respect to any claims that

fall outside of the following three subclasses:

(a) plaintiffs who were denied overtime because they recorded a lunch break that they did not take or otherwise underreported hours they worked between

56

their first and last installation or service job of the day;

(b) plaintiffs who were denied overtime because they were not compensated for work performed before their first installation or service job of the day or after their last installation or service job of the day; and

(c) plaintiffs whose regular and overtime wages for nonproductive work were calculated improperly.

The motion to decertify is DENIED in all other respects.

3.  Plaintiffs may have until February 18, 2011  in which to submit a proposed notice to defendants.  By February 25, 2011, the parties must file a joint agreed notice with the court.  If they cannot agree, defendants should provide the grounds for its objections to plaintiffs by February 23.  Then on February 25, defendants should submit its objections to the court and plaintiffs should file their proposed notice, addressing plaintiffs' objections.

Entered this 10th day of February, 2011.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge