# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

|  |  |  |
|---|---|---|
| AARON ESPENSCHEID, GARY IDLER, and MICHAEL CLAY, on behalf of themselves and a class of employees and/or former employees similarly situated, Plaintiffs, | : : : : : : : : | Case No. 09-cv-625 |
| v. | : : : | |
| DIRECTSAT USA, LLC and UNITEK USA, LLC, Defendants. | : : : : | |

---

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO PRECLUDE PLAINTIFFS' PROPOSED EXPERT, DR. DAVID LEWIN, FROM TESTIFYING OR OTHERWISE PROFFERING THE OPINIONS AND CALCULATIONS CONTAINED IN HIS PROPOSED EXPERT REPORTS

---

ELLIOTT GREENLEAF & SIEDZIKOWSKI, P.C.

Frederick P. Santarelli
Eric J. Bronstein
John P. Elliott
Colin D. Dougherty
Gregory S. Voshell
Union Meeting Corp. Ctr.
925 Harvest Dr., Suite 300
Blue Bell, PA 19422
(215) 977-1000

Laura Skilton Verhoff
Drew J. Cochrane

STAFFORD ROSENBAUM LLP

222 W. Washington Ave., Suite 900
Madison, Wisconsin 53701-1784
(608) 256-0226

DATED: May 6, 2011

*Counsel for Defendants*

## TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................... 1

II.  DR. LEWIN'S DAMAGES AND LIABILITY REPORTS ................................. 3

    A.  Dr. Lewin's Original and "Revised" or Supplemental Damages Reports ....... 3

    B.  Dr. Lewin's Liability Report ........................................................................ 8

III.  DR. LEWIN'S DAMAGES REPORT AND CALCULATIONS THEREIN
SHOULD BE STRICKEN AND HIS PROPOSED TESTIMONY PRECLUDED
BECAUSE HE DID NOT PREPARE THE REPORT AND THE
CALCULATIONS; HIS SAMPLING AND SURVEYING METHODOLOGIES
ARE FATALLY FLAWED AND NOT RELIABLE; HIS USE OF "AVERAGES"
IS AN INHERENTLY AND EMPIRICALLY UNRELIABLE METHOD OF
PROOF; AND HE BLINDLY RELIED UPON DATA PRODUCED AND
CALCULATED BY PLAINTIFFS' ADVOCATES WITHOUT ANY
INDEPENDENT VERIFICATION. ............................................................... 9

    A.  Plaintiffs' Counsel "Prepared" Dr. Lewin's Report in Violation of Rules
26(a)(2)(B) and 37(c)(1) by Designing the "Sample," Collecting and Creating
the Data and Information, Performing All of the Data Analysis, Completing
All of the Data Calculations, and Asking Dr. Lewin to Rubber-Stamp Work
He Did Not Prepare, Review, Analyze or Verify. ............................................. 9

        1.  Dr. Lewin Conceded that He Did Not Perform Any of the Data
Analysis and that He Did Not Compute Any of the Figures and
Calculations Comprising His Report and the Calculations of Damages
He Proposes To Provide To the Jury as the Alleged Compensation
Owed to Technicians. ........................................................................ 10

        2.  Dr. Lewin's Lack of Involvement in the Preparation of His Report
Violates Rule 26 And Requires it be Stricken and Dr. Lewin
Precluded From Testifying. ................................................................ 19

        3.  Plaintiffs' Violation of Rule 26 Mandates Preclusion of the Report
Under Rule 37(c)(1). ......................................................................... 21

    B.  Plaintiffs' Sampling, Surveying, and Calculations Are the Products of
Unreliable and Unscientific Methodologies, which Generated Unreliable
Data and Conclusions in Violation of Daubert and the Federal Rules of
Evidence. ...................................................................................................... 22

        1.  The Applicable Standard of Review Under Daubert and its
Progeny. ............................................................................................ 24

i

2.      Plaintiffs' Sample Is the Product of an Unscientific Design that has Generated an Unreliable and Biased Subset of Data upon which Plaintiffs' Report is Premised. ............................................................25

        a.      Plaintiffs' Counsel Failed to Employ a Scientific Methodology When Conducting the Sampling Contained in their Report. ...26

                i.      Plaintiffs Concede that their Methodology Lacked any "Design or Plan," Much Less a Scientific One, and that They Ignored the Court's Certification Opinion..........27

                ii.     The Absence of a Scientific "Plan or Design" Created Multiple Biases in the Sample that Plaintiffs' Counsel Used as the Cornerstone of their Calculations and Opinions on Damages..................................................32

                iii.    Conclusion Concerning Plaintiffs' Sampling "Methods" ...................................................................38

        3.      The Data Obtained through Counsel's Undisclosed, Informal Surveys Are Not the Product of Reliable Scientific Principles and Methods. ...39

        4.      Plaintiffs' Proposed Method of Calculating Damages, which Relies upon Plaintiffs' Flawed Methodology For Constructing Supposedly "Average" Technicians, Is an Unreliable Method of Meeting their Burden of Proof. ...................................................................................48

                a.      Plaintiffs' Report Presumes that Their Calculations of "Averages" Are Appropriate, But Their "Averages" Cannot Meet Their Burden of Showing that this Method Is Reliable. .48

                b.      The Empirical Data Demonstrates Unequivocally that Plaintiffs' "Averages" Are Not a Reliable Indicator of Whether an Individual Plaintiff Suffered Damage. .............................49

        5.      Even if One Was To Disregard the Aforementioned Flaws, the Calculations and Dr. Lewin's Reports Are Unreliable Because Dr. Lewin Admittedly Did Not "Independently Verify" Plaintiffs' Counsel's Calculations, Summary Charts and Analysis of Information They Solicited From Technicians.......................................................53

IV.     DR. LEWIN MUST BE PRECLUDED FROM TESTIFYING AS TO THE ISSUES RAISED IN HIS LIABILITY REPORT BECAUSE THAT REPORT IS EITHER MOOT OR SEEKS TO OFFER CONCLUSIONS THAT INVADE THE PROVINCE OF THE JURY.......................................................54

**V.    CONCLUSION** ...................................................................................................59

Defendants DirectSat USA, LLC and UniTek USA, LLC (together, "Defendants"), through the undersigned counsel, submit this Brief in support of their Motion to Preclude Plaintiffs' Proposed Expert, Dr. David Lewin, from Testifying or Otherwise Proffering the Opinions and Calculations Contained in His Proposed Expert Reports.   Defendants seek to preclude this proposed testimony pursuant to Federal Rules of Civil Procedure 26(a) and 37(c), Federal Rules of Evidence 401, 702, 703, 801, and 802, and the binding guidelines set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  For the reasons that follow, Defendants' Motion should be granted, Dr. Lewin's reports should be stricken, and he should be precluded from testifying at trial.

## I.   **INTRODUCTION**

This is a wage and hour lawsuit, in which Plaintiffs contend that they were not compensated for all of the overtime hours that they worked.  Plaintiffs propose to use expert testimony to calculate the overtime compensation allegedly owed based upon what Plaintiffs claim to be an "expert report on damages authored by Professor David Lewin."[1]  This Court recently identified several facial and substantive problems with Plaintiffs' proposed expert reports.  Dkt. No. 549, at 7 (noting that neither of Plaintiffs' proposed reports "identified any objective criteria or other method that can be used to determine which absent class members belong in which class, if any.").  There are even greater problems, both in terms of reliability and methodology, when one sees behind the four corners of the proposed reports.

As recently revealed at Dr. Lewin's deposition, Dr. Lewin is not the "author" of this report.  Dr. Lewin did not design the sample, did not determine what data to review, and did not conduct any of the interviews used to generate the data and information relied upon.  Dr. Lewin

---

[1]   See Ex. 1, March 11, 2011 cover letter of Plaintiffs' counsel, enclosing the report titled, "Espenscheid Damages Model," signed by David Lewin.

did not analyze any of the data or summary charts he relied upon in the report. And, Dr. Lewin did not perform any of the report's calculations. Rather, as Dr. Lewin was required to admit when examined under oath, all calculations and all data analysis were performed solely by Plaintiffs' counsel, who then provided their pre-packaged analysis to Dr. Lewin, who appears (at best) to have merely signed off on a narrative description of how Plaintiffs' counsel generated the calculations and conclusions in the report. The report itself did not disclose that the calculations were actually those of Plaintiffs' counsel. This was learned only after Defendants traveled to California to depose Professor Lewin. As set forth later in this Motion, the case law is clear that this alone, i.e., the fact that the report is Plaintiffs' counsel's work and not that of the expert, requires preclusion of the report and proffered "expert" testimony. See Section "III.A.," infra (preclusion under F.R.Civ.P. 26(a)(2)(B) and 37(c)(1).)

Aside from the troubling revelation that Plaintiffs' attorneys—not Professor Lewin—are the actual authors of the calculations and data analysis, the damages calculations themselves have now been exposed as the product of a fatally flawed and unreliable methodology, which Dr. Lewin himself could not and would not characterize as scientifically valid. In fact, when pressed on the issue, Professor Lewin leveled the fatal blow to any scientific validity in the "sample" upon which all of the calculations are based, when he was forced to admit, with respect to Plaintiffs' counsel's calculations: "this isn't a scientific study . . . I have no basis for using these data in terms of a scientific sense."[2] When asked if he considered the damages model in "his" report to be a "scientifically-based model," Professor Lewin—who knows a scientifically valid study, sample and survey when he sees one—had no alternative but to evade answering the questions until, ultimately, he had to admit: "It isn't a set of estimates that's been put with others

---

[2] See Doc. No. 540, Lewin Deposition ("Lewin Dep.") at 59.

to be tested in a larger scientific model.  That's not its intent."[3]

Countless reliability flaws flow from the admitted lack of scientific validation, each of which requires this Court to preclude Dr. Lewin's reports and his proffered testimony.  Aside from the fact that Dr. Lewin himself did not perform any of the actual calculations (which were admittedly "authored" by counsel)—a fact which inevitably doomed the scientific validity of these calculations from the start—the "surveying," "sampling," and "averaging" methodologies forming the basis of the calculations cannot possibly survive the requirements of the federal rules and the well-established principles espoused by Daubert and its progeny.[4]  See Section "III.B," infra (preclusion under Daubert and F.R.E.'s 702, 703).

Accordingly, Plaintiffs' damages expert report and proposed expert testimony are inadmissible as a matter of law.  Defendants also move to preclude Plaintiffs' liability expert report, also authored by Dr. Lewin, as that report is irrelevant and otherwise inadmissible under Rules 702-704.

## II.   DR. LEWIN'S DAMAGES AND LIABILITY REPORTS

### A.   Dr. Lewin's Original and "Revised" or Supplemental Damages Reports

Plaintiffs' proposed damages reports are based upon Plaintiffs' counsel's calculations from data they pulled from, inter alia, GPS records, payroll records, and various other "averages"

---

[3] Id. at 59-60.

[4] After Defendants served their rebuttal expert report exposing numerous defects in Plaintiffs' original damages report dated March 11, 2011, Plaintiffs' counsel filed a motion seeking leave to serve a "revised" damages report, which is actually an unauthorized "sur-rebuttal" or supplemental report that is wholly unauthorized by this Court's Scheduling Order.  See Ex. B, Lewin's Proposed Revised Report ("Proposed Report").  Plaintiffs' motion for leave is opposed, is presently pending before the Court, and should be denied.  In any event, as Dr. Lewin admitted under oath, all of the calculations and analysis in both damages reports were performed not by him, but by Plaintiffs' counsel.  Further, as demonstrated in Dr. Lewin's deposition, this "revised" report suffers from the same fatal flaws in methodology as his first report.  Defendants, therefore, address both the March 11, 2011 damages report and the proposed April 21, 2011 "sur-rebuttal" report in this Motion, without waiver of their position that the "revised" or supplemental proposed report should not be permitted or should be otherwise stricken.

calculations they performed, all of which are premised on a subset of 53 technicians that they hand-picked out of the 2,300 or so technicians in the group.  Counsel also used information they obtained through surveys and interviews that they personally conducted under unidentified circumstances, which they recorded in the form of "declarations" they drafted for these technicians they hand-picked.  Notably the calculations are performed as if all class members are one class, without accounting for any of the sub-classes crafted by this Court.

In general, Plaintiffs' calculations are comprised of two components: (1) Plaintiffs compare "total" GPS time averages to recorded payroll data, to calculate and determine the difference between what Plaintiffs argue is "time worked" and time that was reported and recorded through payroll by the technician;[5] and (2) Plaintiffs' counsel conducted interviews, in an undisclosed manner, soliciting information from technicians whom counsel selected, concerning the kinds of activities and time spent doing them allegedly "at home," and which would not be recorded in the GPS data, and counsel then drafted declarations purportedly recording the information (approximately half of the "declarations" are of the variety this Court reviewed at the certification stages; the other half were recently-produced, and are six or seven paragraph declarations that are remarkably similar in substance and form).  See Ex. A, at 1-3.

---

[5] The "Total" GPS time was supposed to measure the entire amount of time between a technician departing from home in the morning and that technician returning home at night, such that it is designed to include all commuting time to and from work.  While the available GPS data also provides detailed, stop-by-stop data for each vehicle equipped with a monitoring device, Plaintiffs' "total" GPS model ignores all intermittent stops during the workday, without any effort whatsoever to account or adjust for any stops.  Instead, they add all of it into the calculation of "work" hours as if all of it is compensable work.  This erroneously presumes that all activities between the first and last data points constitute compensable "work."  As explained by Defendants' expert, equating the "total" GPS time as "work" time is an inherently inaccurate and unreliable method of computing damages in this case, because it falsely inflates the number of hours worked per day, per technician, by ignoring without even an effort to account for the fact there are non-work stops (including lunch) that occur during the day.  See Ex. D, Crandall Rebuttal Damages Report at 20-23, 31-37.

Compare Dkt. No. 80, Declaration of Mitch Hanson, with, Ex. I, Example of New Declaration.[6]

After obtaining the "numbers" in this manner for this subset of 53 technicians they picked, Plaintiffs' counsel added the two figures together to determine what they believed to be the total number of hours "worked," per week, for the particular technician. Plaintiffs' counsel—apparently by hand—conducted this calculation for each of the 53 technicians in the sample, and then calculated an "average" amount of time for the 53-tech sample as a whole. Plaintiffs' counsel argues this is the average amount of time "worked" by supposedly "average" technicians. The original damages report, see Ex. A, did not contain or include any documentation showing the data, math and calculations presumably used by Dr. Lewin (or, as was later discovered, by Plaintiffs' counsel), but their proposed "revised" report does include some of the backup data and reflects some of the calculations by counsel, in the form of three exhibits, see Ex. E-G (containing Exhibits 3-5 of the "revised" report).

In the original damages report, Dr. Lewin (later discovered to be Plaintiffs' counsel) calculated that this 53-technician "sample" of supposedly "average" technicians averaged 61.25 hours of work per week (52.07 "GPS hours" and 9.45 "at home" hours).[7] From this "sample" of 53 technicians, for a limited 13-week period also chosen by Plaintiffs' counsel, the report then extrapolates to conclude that every one of the 2,300 or so other technicians in the class also

---

[6] Professor Lewin had no involvement whatsoever in the selection methodology for any of the 53 technicians in the "sample," nor did he have any involvement in the "surveying" or interviewing of the 53 technicians who signed the Declarations prepared by Plaintiffs' counsel.

[7] Plaintiffs' report discloses no explanation as to how they arrived at this particular number of "52.07" for GPS hours. Consequently, Defendants have thus far been unable to replicate any formula or math by which Plaintiffs' counsel generated this number. Ex. D, at 12-13. Defendants have still not received all of the backup data and calculations used by Plaintiffs' counsel in their reports. After learning at the April 26, 2011 deposition of Dr. Lewin that Plaintiffs' counsel, not Dr. Lewin, did all of the calculations, on the next day upon returning from California, Defendants' counsel sent Plaintiffs' counsel a letter explicitly requesting all of the relevant documents, data, and excel sheets from Plaintiffs. Plaintiffs never responded. In any event, at this point, the time for such production is long past and the prejudice to Defendants (and this Court's schedule) is irreparable and provides yet another ground for preclusion under Rule 37.

worked 61.25 hours per week ("Total Hours Estimate"). Plaintiffs' counsel then purports to calculate the number of allegedly unpaid overtime hours, by subtracting "40" from their "Total Hours Estimate" of 61.25, to obtain the number of allegedly uncompensated overtime hours. Significantly, among the fatal defects in the calculations, this number erroneously presumes that Defendants did not pay any overtime, wholly ignoring and not even attempting to account or adjust for the indisputable evidence showing technicians were, in fact, paid overtime. See Ex. D, Crandall Rep. at 24-25. Thus, that number falsely inflates the amount of alleged unpaid overtime, because it pretends that no overtime at all was paid when, in fact, overtime was paid on a regular basis. See Ex. J, Crandall Rep.

Plaintiffs then take this number of allegedly unpaid overtime hours, and multiply it by the product of the so-called "regular rate of pay," multiplied by the applicable overtime premium (either .5 if there is an understanding that the piece rate will cover all time worked or a hybrid of .5 for productive time, and 1.5 for non-productive time if there is no understanding). From this, Plaintiffs' counsel purports to calculate an "average" amount of unpaid overtime per week for the 53-tech sample. They next multiply that amount (i.e., alleged average amount of unpaid overtime), by the purported "average" number of weeks worked by an unidentified group of individuals (presumably, though not identified in the report itself, some subset of the 53-tech sample). The report states that this "average" number of weeks worked was "33."[8] Plaintiffs'

---

[8] Professor Lewin, in his deposition, had no idea where this "33" number came from, or how it was calculated by Plaintiffs' counsel, even though it appears in "his" report. Lewin Dep. at 219-23. In the "revised" damages report, this same number is inexplicably increased to "46.4." Again, Professor Lewin has no idea why it increased, or how Plaintiffs' counsel came to discard "33" in favor of using "46.4" in the revised supplemental report. It is certainly curious to note that if "33" was used in the "revised" report as it was in the original report, the damages in the revised report would have been substantially reduced even more so than they were already being reduced as a result of deducting hours for commute time and "gap time." Absent any explanation otherwise, and given the fact the report's calculations were done by advocates whose duty is to maximize their clients' recovery, it may not be mere coincidence that when the Court's summary judgment required reductions for commute time and "gap time, the number of weeks increased from "33" to "46.4" in the second report in order to

6

counsel then doubles the amount by presuming liquidated damages. Id. at 6-7. Plaintiffs failed to account for a number of factors they were aware of, but ignored. Id. at 7 (listing many known caveats and carve-outs they decided not to address).

In the "revised" report (served after having the opportunity to review Crandall's report), Plaintiffs use primarily the same method of calculation, but they begin to adjust for factors that were exposed as having been ignored in their original report. As a preliminary matter, Plaintiffs' counsel appears to have re-calculated all of the numbers between the time of their first and second reports, as reflected by the fact that the GPS, payroll, and workweek calculations have somehow all changed in the "revised" report, even though the raw data did not change. Dr. Lewin could not explain this. See Ex. C, Red-line Comparison of Two Reports. Second, Plaintiffs subtract from their "Total Hours Estimate" 5 hours for commuting time, and 6 hours for straight time (based upon rulings the Court's summary judgment opinion). Plaintiffs also include reductions for the October 4, 2009 payment method change; for the ruling that routing and vehicle maintenance is non-compensable; and for the fact that Minnesota law provides for a 48-hours overtime threshold, not 40. In sum, Plaintiffs' revisions reduce the "Total Hours Estimate" to 49.56 hours, or 9.56 "premium" hours under the FLSA, and 1.56 premium hours under Minnesota law. Plaintiffs then use the same flawed method of calculating the allegedly unpaid overtime, with the exception of accounting for varying state law penalties.

Of course, none of these calculations—in either the first or second report—make any effort at all to address the sub-classes defined by this Court and, as such, they are wholly irrelevant. Far from being capable of assisting any trier of fact, this alone renders them

---

compensate for and minimize the total reduction in damages that would occur. Again, there is no explanation otherwise from Dr. Lewin, who knew nothing about it. Without the data and calculations from the first report, Defendants have no way of testing how Plaintiffs' "work week" averages jumped nearly 30 percent between reports.

inadmissible, as further explained in Section III, <u>infra</u>.

### B.      Dr. Lewin's Liability Report

On October 12, 2010, Plaintiffs served their expert liability disclosures.   <u>See</u> Ex. H, Lewin Expert Liability Report ("Liability Rep.").   In his report, Dr. Lewin offers four "opinions" that he reached after allegedly reviewing corporate depositions and technician declarations. Notably, Dr. Lewin did not review any technician depositions when preparing his liability report, and Plaintiffs have never sought leave to supplement his report, nor have they stated whether they even provided Dr. Lewin with the fifty technician depositions now available for purposes of offering any "liability" opinions.

First, Dr. Lewin's "liability" expert report opines that the technicians in this case were paid under a piece rate system.   Second, he opines that Plaintiffs are "non-exempt" employees under the law and, as such, are eligible to receive overtime payments under the applicable law. Third, Dr. Lewin offers his "opinion" and belief that there is no "agreement" between DirectSat and technicians concerning payment of non-productive time.   Finally, Dr. Lewin offers his "opinion" and belief about what Defendants "knew," i.e. opining that Defendants "knew" the technicians were under-reporting hours.

As set forth in Section IV, Dr. Lewin's first two conclusions have been mooted by this Court's opinions.   There is no need for any "opinions" from Dr. Lewin on those subjects.   As for his final two "opinions," they are clearly not admissible as expert "opinions" under the Federal Rules of Evidence.   They are nothing more than (1) his subjective conclusions of law and perception of facts applied to the law, about whether all of the techs have a mutual "agreement" or "understanding" with DirectSat; and (2) his subjective view or belief of what the evidence shows as to Defendants' state of mind, or what Defendants supposedly "know."   No "expert," let

8

alone Professor Lewin, may usurp and perform the role of a jury by weighing the evidence and facts presented, and applying the law to the facts as he perceives them and otherwise propounding legal conclusions.   That is the role of the jury and Court.   Consequently, Dr. Lewin's liability report and such "expert" opinions are inadmissible.

**III.    DR. LEWIN'S DAMAGES REPORT AND CALCULATIONS THEREIN SHOULD BE STRICKEN AND HIS PROPOSED TESTIMONY PRECLUDED BECAUSE HE DID NOT PREPARE THE REPORT AND THE CALCULATIONS; HIS SAMPLING AND SURVEYING METHODOLOGIES ARE FATALLY FLAWED AND NOT RELIABLE; HIS USE OF "AVERAGES" IS AN INHERENTLY AND EMPIRICALLY UNRELIABLE METHOD OF PROOF; AND HE BLINDLY RELIED UPON DATA PRODUCED AND CALCULATED BY PLANITIFFS' ADVOCATES WITHOUT ANY INDEPENDENT VERIFICATION.**

**A.    Plaintiffs' Counsel "Prepared" Dr. Lewin's Report in Violation of Rules 26(a)(2)(B) and 37(c)(1) by Designing the "Sample," Collecting and Creating the Data and Information, Performing All of the Data Analysis, Completing All of the Data Calculations, and Asking Dr. Lewin to Rubber-Stamp Work He Did Not <u>Prepare, Review, Analyze or Verify.</u>**

Following Dr. Lewin's deposition, we now know that <u>Plaintiffs' counsel</u> designed the "sample" being used as the basis for all of the damages calculations; solicited in some unidentified and unscientific manner all of the information from technicians they picked for inclusion in the "sample;" performed all of the data calculations (including for a hand-picked subset of the GPS data, payroll data, and other discovery); completed all of the data analysis (including comparisons between GPS data and payroll records); and calculated each and every single number used in the damages analysis.   All of this was done without the assistance, review, oversight, supervision, input or instruction of Dr. Lewin.   Rather, as we now know, Dr. Lewin simply accepted the pre-ordained work product, analysis and calculations of Plaintiffs' advocates.

The Federal Rules codify the common sense principle that the report and calculations of

an expert witness must be the work product of the expert—not the legal advocate.  Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), expert disclosures must be "accompanied by a written report—prepared and signed by the witness . . . ." (Emphasis added); see also United Stated v. Deloitee & Touche, LLP, No. 99-1093, 2008 WL 7136868 (W.D. Tex. Sept. 26, 2008). This rule, in conjunction with Rule 37(c)(1), plainly precludes an expert witness from simply signing-off on a report and calculations that the expert did not prepare or, as here, where the expert did not have any role in performing the survey, the sample, and calculations that comprise the report.

    **1.**        **Dr. Lewin Conceded that He Did Not Perform Any of the Data Analysis and that He Did Not Compute Any of the Figures and Calculations Comprising His Report and the Calculations of Damages He Proposes To Provide To the Jury as the Alleged Compensation Owed to Technicians.**

The verbiage used in the proposed damages reports is curiously vague and conspicuously silent on the question of who actually analyzed the data, and who actually performed the calculations and damages conclusions contained in the reports.  Although not apparent prior to his deposition, the significance of this chosen verbiage and silence is now manifest.  Dr. Lewin conceded during his deposition that he did not perform any of the data analysis or mathematic calculations in his report.  Indeed, his lack of involvement is rooted at the very beginning stages of the work contained in Plaintiffs' report.  We have now discovered that Plaintiffs' counsel—not Dr. Lewin—designed the framework for the "sample," created the framework for calculating damages, and dictated the assumptions that Plaintiffs' counsel wanted to use in generating the calculations, all without the supervision, preparation or assistance of an individual professing expertise in such areas of study.  Dr. Lewin's "hands-off" approach continued throughout the collection, analysis, and calculation of the data and information forming the cornerstone of the

report.

- First, despite testifying to his expertise in the design of samples and surveys—having designed "scores" of samples in connection with other lawsuits, Lewin Dep. at 12:6-10—Dr. Lewin did not design the sample in this case, nor was he asked to design a proper scientifically valid survey and sample from which reliable conclusions could possibly be drawn and calculations made. id. at 20:18-21:1. Instead, that task was performed by William Daily, Esquire—one of Plaintiffs' attorneys. See Dkt. No. 212; see also Lewin Dep. at 42:21-45:9.[9]

- Despite the fact that Attorney Daily's "sample" is a crucial cornerstone of the damages calculations, Dr. Lewin never even spoke to Mr. Daily before or after signing either of "his" reports. Dr. Lewin did not even know whether he had reviewed the Daily Declaration before he signed the first damages report; he hedged in testifying only that, he "believed he would have seen [Daily's Declaration]" before the first report. Lewin Dep. at 63:19-64:7, 68-69 (emphasis added); see also id. at 59:4-10 (stating, in any event, that he was relying upon what amounted to " secondary data and secondary sources"). Therefore, Dr. Lewin, a self-proclaimed surveying and sampling expert, admittedly played no role whatsoever in the development or design of Plaintiffs' counsel's surveying and sampling methodologies, and no role in conducting, supervising or directing the surveying and sampling.[10]

---

[9] At some unknown point in time, Plaintiffs' counsel apparently provided Dr. Lewin with a copy of a declaration that Attorney Daily executed, in which Attorney Daily purports to describe how he created part of the "sample" of 53 technicians. ("Daily Declaration"). Dr. Lewin could not remember if and when he ever saw the Daily Declaration before his original report. Dr. Lewin's original report certainly makes no reference to his having seen or relied upon it. See Ex. A. The unreliable and biased nature of the "sample" chosen by Plaintiffs' counsel is discussed later in this brief in connection with Defendants' discussion of the Daubert standards. See Section "III.B," infra. For purposes of complying with Rule 26, however, it is sufficient to address in this Section Dr. Lewin's lack of involvement in the sampling and surveying process forming the basis of the calculations.

[10] Notably, Dr. Lewin's original report did not include any mention of Attorney Daily's declaration or the method that Plaintiffs employed to select the "sample" they used. See Ex. C, Red-Line Comparison of Original and "Revised" Expert Reports ("Redline Comparison"). Dr. Lewin's inability to

- Second, Dr. Lewin did not play any role in the solicitation or collection of data and information about the 53 technicians. As Dr. Lewin himself explained, he was not involved in "obtaining" or "preparing" the data used in the report. He had no explanation for this, other than to say that was just how "the responsibilities were divided up in this particular matter." Lewin Dep. at 77:8-13; see also id. at 122:21-24 (noting that typically, Dr. Lewin or his staff perform the "data crunching" involved in his expert reports). Instead, Plaintiffs' counsel picked a self-selected subset of the GPS and payroll records and solicited additional information from the "random" group of technicians through unknown means.[11] See also Section III.C. (discussing how lack of proper methodology in surveying and interviewing data sources violates Daubert and the Federal Rules of Evidence).

- Third, even after the data and information for the 53 technicians were collected, Dr. Lewin assumed no role in analyzing it. This point bears repeating—Plaintiffs proposed damages expert, who signed a report that is premised upon the results derived from the analysis of GPS and payroll data, **did not analyze any of this underlying data**. This fact is conveniently omitted from "his" report, but at his deposition, Dr. Lewin was forced to admit this fact:

> Q.    How about the data analysis that was recently produced with your second report, damages report? Did you do the data analysis that's reflected in your second report?
> A.    No, counsel. In my second report, no.

---

remember if he received the Daily Declaration before his first report, coupled with the absence of any reference to the Daily Declaration in the first report, indicates that Plaintiffs' counsel had not even informed their expert of the manner in which they selected the "random" group of technicians.

[11] Again, there is no disclosure anywhere in the reports, and Dr. Lewin did not know, about the manner in which questions were asked or interviews conducted; which specific questions were asked of sampled technicians; non-response rates; the phrasing of questions; whether they were phrased in uniform fashion to each subject of the sample; etc. As set forth in greater detail in Section III. C. infra, one must at least know the answers to these questions before one can even begin to proclaim the process was scientific and in accordance with accepted methodologies for surveying information from a sample, from which reliable and valid generalizations or extrapolations can possibly be made for the broader group.

> Q.    Who did that data analysis?
> A.    That would have been staff in counsel or co-counsel –
>       <u>plaintiffs' counsel or co-counsel's office</u> – office or offices.
>       I did not.

Lewin Dep. at 69:16-24 (emphasis added); <u>see also id.</u> at 78:13-14 ("I did not myself deal with the raw GPS data.  I think that's correct to say.").  Plaintiffs' counsel apparently reviewed a hand-picked subset that they chose from the payroll data, the GPS data, the depositions, and the declarations, for purposes of compiling the underlying data, which counsel then used to calculate, <u>inter alia</u>, (1) an average weekly technician pay for the 53 technicians, (2) an average time the 53 technicians allegedly spent working at home during the day, (3) an average amount of "total" GPS time for the 53 technicians, for a limited 13-week period surrounding August, 2009 -- a period also picked by Plaintiffs' counsel, which happens to be the busiest season producing the most hours, (4) the amount of time to deduct from "at home" time for routing jobs; and (5) the average number of workweeks per technician.

       In other words, every numeric figure that plugs into every one of the equations in Plaintiffs' damages report comes from data that Plaintiffs' counsel picked, collected, reviewed, and calculated.  As Dr. Lewin stated, Plaintiffs' counsel "<u>performed all of the calculations and data analysis</u>" reflected in the exhibits and charts that are the keystone of the proposed reports. Dr. Lewin Dep. at 79:10-20; <u>see also id.</u> at 133-34 (review of the GPS data, which is the bedrock of Plaintiffs' entire damages report, "would be done by counsel"); <u>see also</u> Ex. E-G (Exhibits 3-5 of Lewin's "Revised" Report).[12]  In Lewin's own words, he "wasn't <u>actually engaged</u> in the

---

[12] Defendants never received any exhibits containing calculations when they received Dr. Lewin's original March 11, 2011 damages report.  Nor have Defendants received such backup data for the March 11, 2011 report to this day, despite this Court's Order requiring Plaintiffs' to produce such backup information for the March 11, 2011 report.  <u>See</u> Dkt. No. 485 at 69.  Thus, the source of the numbers in the March 11, 2011 report remains a mystery, which Plaintiffs remain in violation of this Court's Order.  As described below, Dr. Lewin was unable to discern where the numbers in "his" original March 11, 2011 report came from, or how they were calculated.

analysis" or compilation of the data that comprises his report, and, given the volume of depositions and declarations, he did not review those documents either.  Lewin Dep. at 131:18-132:25, 134.

- Fourth, even though he was well aware that Plaintiffs' counsel prepared, analyzed, and reviewed the data and documents at issue and that they performed all of the relevant calculations, Dr. Lewin did not independently review, verify, or double-check Plaintiffs' counsel's analysis or math, nor did he instruct, direct or supervise Plaintiffs' counsel's performance of the calculations in "his" report.  Lewin Dep. at 82:7-18.

For example, as part of Exhibit 3 to Plaintiffs' "revised" supplemental expert report, Plaintiffs included a print-out from an apparent "Excel" sheet, which supposedly contains a comparison between hours shown in GPS records and in payroll data.  As we have since learned, Attorney Daily's Exhibit "A" to his October, 2010 Declaration is actually in the same format as this Exhibit in Dr. Lewin's "revised" report, and is likely the same "excel" sheet with some added information inputted by Plaintiffs' counsel.  See Ex. E.  Defendants' counsel asked Dr. Lewin what a particular number in that chart represented.  Dr. Lewin could not give a straight answer, and because neither he nor anyone in his staff prepared the excel sheet, he could only state what "he understood" the number to mean.  When asked whether he knew that to actually be the case, Dr. Lewin was incapable of formulating an answer, because neither he nor anyone on his staff analyzed the underlying data or created the excel sheet:

> Q.   So if I were to go to the GPS data for Mr. Whitrock for that week and count how many hours the GPS data is showing for him, I would get 61.25?
> A.   Yes.
>
> Q.   Is that what you are saying?
> A.   That's what the document is saying.

> Q.      Well, you are relying on it.  Is that what it is?
> A.      You asked me what do I believe <u>this document</u> is and I'm
>         telling you that's what <u>I believe it is</u>.
>
> Q.      Did you check to find out?
> A.      No, I did not.
>
> Q.      Did you do any checking of any of these numbers to see if
>         they are accurate?
> A.      I did not.  <u>I took them as they were provided to me</u>.

Lewin Dep. at 74:23-75:20; 76:10-23 (emphases added).   Dr. Lewin, answering additional

queries that formed part of this same line of questioning, confirmed that while he could have

checked the math, he decided not to do so:

> Q.      So you had the ability to check it out and see what it was
>         and how it was calculated based on the electronic format;
>         right?
> A.      Well, I could do that probably, counsel.  But you asked a
>         question that did I personally record these data was I
>         thought the gist of your question.   <u>Did I get these data
>         myself.  You used 61.25 as an example, and I said to you
>         no, I did not</u>.
>
> Q.      Yea.  I was asking did you check on it to see if the math
>         was right.  You said no?
> A.      No.  That's right.

<u>Id.</u> at 76:10-23; <u>see also id.</u> at 78:9-14 ("I did not myself deal with the raw GPS data."); <u>id.</u> at

79:21-24 (admitting that he did "[n]o tests of the math"); <u>id.</u> at 188-89 (testifying that Plaintiffs'

counsel also created Exhibits 4-6 of Dr. Lewin's report, which include the calculations for (a) the

average weekly compensation, (b) the average number of weeks worked by the technicians, and

(c) the ultimate damages calculation under Model No. 1).  These admissions further confirm that

Dr. Lewin simply accepted the math calculations as they were pre-packaged for him by

Plaintiffs' counsel.

        While Dr. Lewin admitted this in his testimony directly, his unfamiliarity with the

calculations in "his" report was painfully apparent when he was unable to explain how several of the numbers in "his" report were calculated, and when he was unable to even discern the origin of other numbers in "his" report.  For example:

- After being provided a calculator at his deposition, Dr. Lewin was unable to replicate the calculation Plaintiffs' counsel used to compute the average weekly pay for the technician class.  This is a cornerstone of the damages calculations, and it was proven <u>wrong</u> by Dr. Lewin himself doing the calculations at his deposition.  <u>See</u> Lewin Dep. at 188-211 (admitting after lengthy attempt to piece together calculations contained in Exhibit 4 of his own report, that the calculations were inaccurate).  Dr. Lewin was unable to replicate the crucial calculation that was, in turn, used to calculate the average regular rate of pay, which was itself used to calculate the relevant overtime premiums, which were then used to calculate the alleged damages that serve as the <u>sole opinion in his report</u>.[13]

- Dr. Lewin was unable to identify, with respect to his first March 11, 2011 report, how the report's calculations arrived at the number of "33" for the "average number of weeks worked" per technician.  Lewin Dep. at 219-22 (conceding that he did not recall where that number came from).  In the second, "revised" report dated April 21, 2011, that number was changed to "46.4," and Dr. Lewin had <u>no</u> idea why the two numbers were different in both reports, despite the fact they were both supposed to be the "average number of weeks" for the same population.

- Dr. Lewin's original report was premised on an "average workweek" of "5.66" days.  In the "revised" report, however, Plaintiffs' counsel used "5.0" days as the "average" for some purposes.  However, the average amount of GPS time was inexplicably <u>higher</u> in the "revised" report than it was in the original report, notwithstanding the fact that the report assumes <u>less</u> days worked.  This, of course, is another unexplained contradiction.  Dr. Lewin testified that Plaintiffs' counsel calculated these numbers, and he was unable to discern why the number in the second report was higher.  Lewin Dep. at 139-60 (demonstrating inability to answer questions concerning the difference between calculations in first report and second report); <u>see also id.</u> at 152:15-22, 154:14-17 (stating that a "recalculation of the data . . . was done by counsel's office" and that "[s]ince [h]e didn't make the adjustment himself" he did not know whether GPS days were adjusted).

---

[13] How many other of these unscientific and non-expert calculations by advocates are wrong? How is an adversary able to find out the answers when the advocate, despite being exposed as the true author, never produced any of the underlying data calculations and back-up work product they used to do the calculations?  This case presents a classic example of why the Federal Rules codify the common sense principle that the expert—not the advocate—must do the work in order to present expert opinion calculations to the Jury under the guise of expert testimony.

- In "his" second, "revised" report, Dr. Lewin ostensibly excluded from the "average number of workweeks" a total of 5 weeks for time spent in training and time spent working in non-technician capacities or on light duty. When asked how he arrived at "5" weeks, instead of answering the question, Dr. Lewin begins discussing the payment change DirectSat made on October 4, 2009, and the manner in which DirectSat technicians were paid for intermittent training after that date. This, as the Court knows, is a completely separate issue from initial training and other time spent working in a non-technician capacity. Lewin Dep. at 225-28. Dr. Lewin was so unfamiliar with the "5" weeks Plaintiffs' counsel excluded in "his" second report, that he began discussing an entirely different issue altogether, without ever answering the original question because he had no idea what Plaintiffs' counsel did in "his" report on this issue. Id.

- Finally, in the "revised" report dated April 21, 2011, Plaintiffs' counsel excluded "5" hours of GPS time as non-compensable commuting time. Dr. Lewin was asked about where he developed the number "5," and after originally stating that he "had been reading . . . depositions and declarations," he recanted that testimony, stating that the number "was generated" by Plaintiffs' counsel, because the depositions and declarations were too voluminous to read. Lewin Dep. 128-33. This is another instance in which Dr. Lewin did not know how numbers were calculated and appeared in "his" report.

These examples further demonstrate that Dr. Lewin (1) does not know what is included in "his" report, and (2) is incapable of describing or explaining where the figures and calculations come from, or replicating the calculations that are contained in the report he signed. In the end, and perhaps because of his admitted unfamiliarity with the report he signed, Dr. Lewin was forced to simply concede that he "did not investigate the data correctly." Id. at 143:10-12 (emphasis added).

- Finally, as discussed in greater detail below, Dr. Lewin's lack of knowledge concerning the other contents of his report became patently obvious during his deposition. In many instances, Dr. Lewin attempted to side-step his lack of personal knowledge by invoking the passive tense or testifying as to what he "understood," or what he was "led to believe" by Plaintiffs' counsel. These carefully chosen phrases merely confirm Dr. Lewin's own lack of

familiarity, and establish the absolute dominion Plaintiffs' counsel exercised over the preparation of "his" report.  For example:

- When asked about the subset of the 53 individuals who were handpicked, Dr. Lewin referenced a spreadsheet created by Plaintiffs' counsel, and stated that "here is a set that are labeled 'handpicked.'  That should be 25.  I take that to mean they were handpicked by plaintiffs' representatives."  Lewin Dep. at 57:11-20 (emphasis added).

- When asked what one of the charts included in Exhibit 3 to the report he signed was, Dr. Lewin stated: "I presume it's what it says it is."  Lewin Dep. at 73:23-74:3 (emphasis added).  Dr. Lewin answered in the same way when he is asked about what the data in the spreadsheets means—"It's my understanding, counsel, that this reports the number of hours in that workweek . . . ."  Lewin Dep. at 74:23-75:4.

- When asked about the role of the GPS data to the report he signed, Dr. Lewin stated only that he ""th[ought] they [counsel] were counting" GPS data and the differences between GPS data and payroll data.  Lewin Dep. at 89:1-8 (emphasis added).

- When asked about the daily time captured by the GPS data, Dr. Lewin stated that he was not even sure what the GPS system installed in DirectSat vehicles captured, and stating that he thought it was the time the vehicle was turned on until the vehicle returned home at night and was shut down, but acknowledged that was just what he "thought [he] understood to be what counsel was counting."  Lewin Dep. at 92:9-93:8.

- When asked the simple question of how much time Dr. Lewin used for so-called at-home time in his report, Dr. Lewin did not know the answer, and resorted to reading a portion of his report—verbatim—into the record as his answer.  Lewin Dep. at 139-40.

In sum, Plaintiffs' counsel—not Dr. Lewin—prepared the substance of both reports and all of the calculations that form the basis of the damages opinions therein.  Notwithstanding Plaintiffs' counsel's efforts to pass-off this report's calculations as prepared by Dr. Lewin, they clearly are not the work of Dr. Lewin.

**2.      Dr. Lewin's Lack of Involvement in the Preparation of His Report Violates Rule 26 And Requires it be Stricken and Dr. Lewin Precluded From Testifying.**

By passing off adopting the work and mathematic computations of Plaintiffs' counsel as his own, Dr. Lewin's reports violate Rule 26(a)(2)(B), because Lewin did not "prepare" the reports as he and Plaintiffs' counsel led everyone to believe before the deposition.  While Rule 26(a)(2)(B) may not preclude the assistance of counsel in connection with an expert report, it certainly requires that the "substance of the opinions" come from the expert, not the advocate. Deloitte & Touche, 2008 WL 7136868, at *3 (emphasis added).  "Whether an expert report was prepared in a manner consistent with the mandates of Rule 26 usually turns on whether counsel's participation so exceeds the bounds of legitimate assistance as to his own report, i.e., the expert must substantially participate in the preparation of his report."   Bekaert Corp. v. City of Dyersburg, 256 F.R.D. 573, 578 (W.D. Tenn. Mar. 5, 2009) (emphasis added).

While aiding an expert in "fine-tuning" a report may be permissible in some instances, "'preparing the expert's opinion from whole cloth and then asking the expert to sign it if he or she wishes to adopt it, is not."  Id. (quoting In re Jackson Nat'l Life Ins. Co. Premium Litig., 96-1122, 2000 WL 33654070, *3 (W.D. Mich. Feb. 8, 2000)); see also Jackson Nat'l Life, 2000 WL 33654070, at *3 (precluding report under Rules 26(a)(2)(B) and 37(c)(1) where counsel formulated the opinions of the expert, and concluding that "misleading and evasive" answers to deposition questions reflected a "cavalier and stubborn disregard for the Rules of Civil Procedure and the integrity of the judicial process").

Here, Plaintiffs' counsel -- not Dr. Lewin -- hand-picked the "sample" to be analyzed, collected the surveyed data themselves, and performed the calculations.  Thus, as in Bekaert, where the expert reviewed a draft declaration prepared by counsel, Dr. Lewin admittedly affixed

his name to the data analysis and mathematic calculations performed by Plaintiffs' counsel. 256 F.R.D. at 579 (finding that expert could not point to the relevant portion of the declaration he drafted and concluding that "the present set of facts is more akin to the situation in which testimony was wholly prepared by counsel with [the expert's] participation amounting to his signature after reviewing the document"); see also Deloitte & Touche, 2008 WL 7136868, at *3 (finding joint collaboration between experts violated Rule 26 and criticizing expert further for failing to disclose the role of the second expert in the preparation of the report);[14] E.E.O.C. v. Rockwell Int'l Assoc., 60 F. Supp. 2d 791, 795-96 (N.D. Ill. 1999) (finding that the proposed expert "did not know to what the calculations in the chart related or from where the data came" and chastising expert for his "willingness to blindly accept" information obtained from plaintiff's counsel).

Put simply, it is "one thing for lawyers to make authorized revisions to an expert's prepared report," but "[i]t is quite another for an expert to include calculations upon which he did not rely and he would not rely on simply to appease his client's attorney," because "[a] proffered expert must 'bring to the jury more than the lawyers can offer in argument.'" Rockwell Int'l Assoc., 60 F. Supp. 2d at 797 (quoting Salas v. Carpenter, 980 F.2d 299, 305 (5th Cir. 1992)).

Plaintiffs' counsel's preparation of the report and calculations in this case is more substantial than in any of the cases cited above. The "conclusions" in Dr. Lewin's damages reports are the "numbers" themselves and these numbers were generated by Plaintiffs' counsel's calculations. Regardless of what role (if any) Dr. Lewin took as scrivener in writing the narrative description of the calculations (which appears quite limited), there is no dispute that conclusions that Plaintiffs will seek to introduce at trial (i.e., the damage calculations and the

---

[14] Dr. Lewin's report itself did not disclose Plaintiffs' counsel's role in the calculations. In hindsight after the deposition revealed the truth about Plaintiffs' counsel's role in the calculations, invocation of the "passive voice" in the report is even more conspicuous.

calculations that comprise the components thereof) were developed, calculated, and conveyed solely by Plaintiffs' counsel.  Cf. Minasian v. Standard Chartered Bank, PLC, 109 F.3d 1212 (7th Cir 1997) (Easterbrook, J.) (explaining how "vital it is that judges not be deceived by the assertions of experts who offer credentials rather than analysis," and applauding district court judge for not being "snookered" by "expert" declaration).  Here, the "substance of the opinions" contained in the two damages reports derive from Plaintiffs' counsel's analysis of the data, and Plaintiffs' counsel's mathematic calculations, not from work performed by Dr. Lewin, who simply repeated the numbers as they were given to him.  See Deloitte & Touche, 2008 WL 7136868, at *3; see also Stein v. Foamex Int'l, Inc., No. 00-2356, 2001 WL 936566 (E.D. Pa. Aug. 15, 2001) (excluding supplemental affidavit where expert had little substantive input in preparation).

Accordingly, because he and Plaintiffs violated Rule 26(a)(2)(B), Dr. Lewin cannot be permitted to testify to the contents of Plaintiffs' counsel's report.  Cf. Crowley v. Chait, 322 F.Supp.2d 530, 546-47 (D.N.J. 2004) (where expert relied on summaries prepared by counsel and conducted little independent investigation, "to allow him to offer testimony to a jury as to conclusions he has reached on the basis of this highly filtered version of events, is unacceptable.").

### 3.    Plaintiffs' Violation of Rule 26 Mandates Preclusion of the Report Under Rule 37(c)(1).

"Federal Rule of Civil Procedure 37(c)(1) requires compliance with Rule 26(a), and 'mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'"  Bekaert, 256 F.R.D. at 579 (quoting Matilla v. S. Ky. Rural Elec. Co-op. Corp., 240 Fed. App'x 35, 42 (6th Cir.2007)).  Here, there is no justification for what Plaintiffs' counsel has done, much less a "substantial"

justification. Plaintiffs' counsel prepared every component and calculation that went into a report that they attempted to pass-off as the work of Dr. Lewin.[15] All of the conclusions—i.e., the calculations—are the product of <u>Plaintiffs' counsel's</u> data analysis and computation. <u>Id.</u> at 579 (preclusion proper under Rule 37(c)(1) proper where testimony is prepared by counsel with little oversight from proposed expert); <u>see also</u> <u>In re Jackson</u>, 2000 WL 33654070, *5 (Rule 37(c)(1) required preclusion where counsel disregarded "integrity" of the legal process and where expert gave "misleading and evasive" answers about the report at his deposition).

Further, if Plaintiffs' attorneys had not masked their involvement in the expert report for as long as they did, their report would have been stricken months ago, and Defendants would not have needed to incur the time and costs associated with preparing a rebuttal to Plaintiffs' report. Defendants would not have been required to travel to California to depose Dr. Lewin. Thus, not only is Plaintiffs' counsels' conduct unjustified, but Defendants are significantly prejudiced by the actions of Plaintiffs' counsel, which are inexcusable under the federal rules. No amount of <u>post hoc</u> rationalizations could justify counsel's conscious decision to prepare Dr. Lewin's report and pretend that Dr. Lewin authored the calculations. Thus, under Rule 37(c)(1) this Court should preclude the damages reports.

**B.    Plaintiffs' Sampling, Surveying, and Calculations Are the Products of Unreliable and Unscientific Methodologies, which Generated Unreliable Data and Conclusions in Violation of Daubert and the Federal Rules of Evidence.**

Aside from the foregoing reasons for precluding Dr. Lewin, the record is now clear that

---

[15] In fact, Defendants have since obtained a copy of Dr. Lewin's billing information, <u>after</u> Dr. Lewin's deposition. As this Court recalls, Plaintiffs' counsel sought extra time to complete their expert disclosures because they allegedly needed more time. Dkt. No. 425-26. This Court agreed and granted Plaintiffs an extension of one week on March 4, 2011, moving the due date for the disclosures to March 11, 2011. Tellingly, according to his billing records, Lewin—the individual Plaintiffs' counsel are holding out as the author of the report—did not spend any time on the report until March 10, 2011. Thus, despite stating that an extension was necessary, the billing records show that Plaintiffs <u>own</u> expert did no work on the report until the day before the new deadline. <u>See</u> Ex. K, Lewin Billing for March, 2011.

Plaintiffs' counsel failed to employ scientifically valid and reliable methodologies for preparing a proper sample and conducting a proper survey, in violation of Supreme Court precedent and the Federal Rules of Evidence.  See Big Lots Stores, No. 05-6627, 2008 WL 1930681, *15-17 (E.D. La. Apr. 29, 2008); Dukes v. Wal-Mart, 222 F.R.D. 189 (N.D. Cal. 2004).  Aside from fatally defective "sampling" and "surveying" methodologies, counsel's methodology for calculating damages is inherently unreliable, as demonstrated by a proper empirical analysis of the available data showing that counsel's calculations fail significant tests on a scientific basis.  Finally, even if one were to overlook the defects of these methodologies, Dr. Lewin failed to "independently verify" Plaintiffs' counsel's calculations, in violation of his express duties under the Federal Rules of Evidence and binding precedent.

In Subsection 1 below, Defendants recite the well-established principles under Daubert and Rules 702 and 703.  In Subsection 2, Defendants demonstrate the unreliable and unscientific sample Plaintiffs' counsel created, and the unreliable data and calculations that were generated as a result.   In Subsection 3, Defendants establish that counsel's surveying methods fail the standards required by federal courts addressing surveys and interviews conducted by attorneys independent of their expert.   In Subsection 4, Defendants empirically show that Plaintiffs' specific use of averages further undermines the validity of their particular calculations.  Finally, in Subsection 5, Defendants demonstrate that there is an admitted failure to "independently verify" the unreliable data Dr. Lewin received from Plaintiffs' counsel, and this, under an under an uncontested line of cases requires the Court to preclude "expert" testimony.  Each of these reasons independently requires that the Court strike the reports and preclude the testimony of Dr. Lewin.

1.    **The Applicable Standard of Review Under Daubert and its Progeny.**

Federal Rule of Evidence 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  Rule 702 "also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case."  Happel v. Walmart Stores, 602 F.3d 820, 824 (7th Cir. 2010).   "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the Daubert standard."  Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 705 (7th Cir. 2009).

In Daubert, the Supreme Court held that Rule 702 "imposes on the trial court the obligation, when dealing with expert witnesses, to ensure that scientific testimony is 'not only relevant but reliable.'"  Goodwin v. MTD Products, Inc., 232 F.3d 600, 608 (7th Cir. 2000) (quoting Daubert, 509 U.S. at 589).  As such, the district court serves as a "'gate-keeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert."  Winters v. Fru-Con Inc., 498 F.3d 734, 741-42 (7th Cir. 2007) (quoting Autotech Tech. Ltd. P'ship v. Automationdirect.com, 471 F.3d 745, 749 (7th Cir. 2006)).  The district court is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); see also Jenkins v. Bartlett, 487 F.3d 482, 489 (7th Cir. 2007). Accordingly, not all opinions that happen to be held by an expert are "expert opinions."  See United States. v. Benson, 941 F.2d 598, 604 (7th Cir. 1991).

To offer an expert opinion:  "the witness must be qualified as an expert by knowledge, skill, experience, training, or education; the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue.[16]  Ervin v. Johnson & Johnson, Inc., 492 F.3d 901, 904 (7th Cir. 2007) (internal quotations and citations omitted).  Daubert provides several factors to aid district courts in this analysis:  (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has a known or potential rate of error; and (4) whether the relevant scientific community has accepted the theory.[17]  Daubert, 509 U.S. at 593-94.

## 2.    Plaintiffs' Sample Is the Product of an Unscientific Design that has Generated an Unreliable and Biased Subset of Data upon which Plaintiffs' Report is Premised.

Plaintiffs' sample frame in this case includes (i) the three named Plaintiffs, (ii) twenty-five individuals "hand-picked" by Plaintiffs' counsel, and (2) twenty-five individuals selected by Attorney William Daily, one of Plaintiffs' attorneys, which Plaintiffs now characterize as "random," but which is nothing more than "hand-picked" using inherently biased criteria that purposely excludes entire categories of workers.

---

[16] "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the Daubert standard." Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 705 (7th Cir. 2009).

[17] The court may also consider whether:  (1) "maintenance standards and controls" exist; (2) the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation," or developed "expressly for purposes of testifying"; (3) "the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (4) "the expert has adequately accounted for obvious alternative explanations"; (5) "the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (6) "the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." LG Electronics v. Whirlpool Corp., 2010 WL 3397358, *2 (N.D. Ill. Aug. 24, 2010).

As Dr. Lewin admits, and as the empirical data demonstrates, the "sample" used by Plaintiffs' counsel is not "random" in any statistical, technical, or scientific sense, and Plaintiffs took no measures to reduce the likelihood of inherent bias in the data they reviewed.  Having failed to design a scientifically valid sample, and having failed to account for the likelihood of bias, Plaintiffs' counsel's sample generated overtly biased data that is patently unreliable for purposes of expert testimony extrapolating results from 53 workers to over 2000.  This is the inevitable result of having counsel, instead of an expert, perform the expert's work.

### a.    Plaintiffs' Counsel Failed to Employ a Scientific Methodology When Conducting the Sampling Contained in their Report.

The reliability and relevance of Plaintiffs' counsel's calculations were destined for failure from the outset, as their sample is not the product of any reliable scientific or technical methodology.  While Plaintiffs readily concede that at least 28 of the 53 person sample were "hand-picked," in reality, the entire sample was "handpicked" by counsel because Plaintiffs' counsel did not employ any accepted scientific or technical means of selecting any of the 53 technicians.  The supposed "randomly" selected technicians were actually chosen by Plaintiffs' counsel pursuant to an unscientific method vaguely discussed in the Daily Declaration.[18]  See Dkt. No. 212.  Dr. Lewin had no role in designing or implementing any portion of this 53-person sample.  It was solely the work of Plaintiffs' counsel.  See Yapp v. Union Pacific Railroad Co., 301 F.Supp.2d 1030, 1037 (E.D. Mo. 2004) (finding that "the heavy involvement of defense counsel in the design and conduct of a survey used to guide expert statistical analyses indicates a lack of independence and thus a lack of scientific validity").  Any attempt to pass off this

---

[18]  Understanding the obvious impact that their non-scientific selection process had on the reliability of their calculations, Plaintiffs did not even disclose the fact that Attorney William Daily, and not their expert, selected the so-called 25 "random" technicians, until serving their "revised" report more than a month after their original report was due.  See Ex. C, Redlined Comparison of Damages Reports.  Even then, Plaintiffs buried this critical fact in a footnote.  Id.

"sample" as scientifically valid fails under the most basic requirements of <u>Daubert</u> and the Federal Rules of Evidence.

**i.      Plaintiffs Concede that their Methodology Lacked any "Design or Plan," Much Less a Scientific One, and that <u>They Ignored the Court's Certification Opinion.</u>**

To be admissible, an expert report based upon "sampling" must be premised on a reliable scientific or technical methodology.  <u>See</u> <u>Big Lots Stores</u>, 2008 WL 1930681, *15-17; <u>see also</u> <u>United States v. Mikos</u>, 2003 WL 22922197, *4 (excluding portion of report based on database because "[t]he samples were not randomly collected according to any scientifically accepted sampling method").  Here, Attorney Daily's Declaration describing how he selected 22 of the 53 technicians contains an express admission that he was <u>not</u> working pursuant to any "design or plan," <u>id.</u> ¶ 4, much less a scientific or technical one.[19]  Instead, he merely searched the class list for individuals with qualifications deemed important by Plaintiffs' counsel, not science.  <u>Id.</u> at ¶¶ 4-5.  Even Dr. Lewin was forced to admit under oath that Plaintiffs' sample was not scientific and that it was not truly random.  Dr. Lewin went even further, testifying that it was <u>never even Plaintiffs' counsel's intent</u> to conduct a "scientific" sample.  As he explained:

> Q.      Is the answer no, it's not a scientifically-valid sample?
> A.      No. The – well, I've just given you my answer.  <u>He's not doing a piece of scientism.</u>  He's using an approach, which is widely used for sampling purposes, which is to take account of factors.  In that sense, it's a common approach.  <u>I don't think he's trying to do something for scientific purposes</u> . . . .

Lewin Dep. at 47:15-24; <u>see also</u> 46:10-13 (responding to similar question by stating that "<u>I</u> don't think he's attempting to do a piece of science here, counsel").  This admission alone

---

[19] There is no dispute also that the remaining 31 technicians were <u>not</u> selected pursuant to any scientific design or plan.  Plaintiffs' counsel does not even pretend to label them "random."  Indeed, Attorney Daily's Declaration itself nowhere uses the word "random" for the 22 he picked.  <u>Plaintiffs' counsel</u> used that word in the Exhibits they authored for Dr. Lewin's report months later.

27

invalidates Plaintiffs' expert report.  See Yapp, 301 F.Supp.2d at 1037 (E.D. Mo. 2004) (noting that "[t]he Court finds little need to further scrutinize the Ward and Woods survey, as Defendant admits that Ward and Woods never attempted to conduct a scientifically valid survey").

The Big Lots decision addresses this issue in thorough detail.  In Big Lots, the defendant attempted to use a survey that was designed and implemented in large measure by one of its former attorneys.  This alone—for reasons discussed at greater length in other sections of this brief—"casts doubt on the reliability of the interview and the gathered data."  2008 WL 1930681, at *15.  Even more troubling to the Big Lots' court, however, was "the lack of any professionally identifiable standard by which" the interviewees were identified.  Id. at *6.  Big Lots' counsel stated only that they spoke with individuals at locations where opt-in plaintiffs had not worked; and, they failed to explain how their unstated method of selection comported with Daubert.  Id.   The court rejected such unscientific methods as insufficient to justify admitting the expert report as evidence.  Id.

As in Big Lots, there is no "identifiable" standard that Plaintiffs' counsel used for selecting the sample.  Defendants know and Plaintiffs' counsel agrees that 28 individuals were "hand-picked," but there is no disclosure in the report concerning how or why these individuals were selected, or what criteria Plaintiffs' counsel used for "picking" them out of the 2,300 or so technicians in the population.  It seems the only criteria apparent from the face of Exhibit 3 to Dr. Lewin's report is that Plaintiffs' counsel were consciously trying to avoid using individuals who had been deposed, so that they could avoid the credibility and reliability problems associated with those technicians' declarations.  See Dkt No. 344, at 61-65 (detailing discrepancies between testimony and declarations).  Despite the fact that nearly 35 individuals had been deposed by the time Plaintiffs' counsel drafted their report, the "hand-picked" group of

technicians contains only a handful of individuals whose declarations were tested under oath. See Ex. E, "Handpicked Technicians Work at Home Per Day" (listing only six individuals who signed declarations and submitted to deposition).    Outside of their attempts to avoid sworn testimony in favor of untested declarations, the methods for Plaintiffs' counsel's choosing the "hand-picked" group of technicians are wholly unexplained in their report.[20]

While the twenty-five so-called "randomly" picked technicians were chosen pursuant to some vaguely described "scrolling" technique, the actual method of "scrolling" up and down a list of names is not explained or supported in the Daily Declaration.   For example, Attorney Daily states that he scrolled "down from the top [of the list]," "up from the bottom [of the list]," and from unspecified "points in between."   Doc. No. 212, ¶¶ 4-5.   He does not state, inter alia, whether he started at the top, the bottom, or the middle; does not state how many names he scrolled through from his starting point before moving to another portion of the list; and does not state how many individuals he picked from one "scrolling" location before jumping to another, or whether he decided to skip over individuals who met counsel's criteria.   Further, because Attorney Daily picked only 22 technicians in his October, 2010 declaration, there is no explanation as to how he picked other three so-called "random" technicians that appear on the list of 25.   Given that one of these three additional technicians is Mitch Hanson—whose declaration Plaintiffs filed in March, 2010, see Doc. No. 80, and whose deposition was taken in this matter, see Doc. No. 290—it is apparent that these three additional technicians were not even chosen pursuant to the picking process described in Attorney Daily's Declaration.[21]   See also

---

[20] Indeed, Plaintiffs do not even explain why their picking of the named Plaintiffs for the sample is appropriate, or how they arrived at the opinion that inclusion of the named Plaintiffs was valid.

[21] Dr. Lewin had no idea how these 3 additional technicians ended up on the so-called "random" group of 25; yet, in his "revised" report, at footnote 1, he says without any basis that all 25 were picked in the manner described in Attorney Daily's Declaration.   Exhibit A to the Daily Declaration, which Dr.

Lewin Dep. at 233-35 (noting that he was not even aware that Plaintiffs' counsel needed to select additional individuals not included in the Daily Declaration). In sum, Mr. Daily's declaration, as in <u>Big Lots</u>, contains no "professionally identifiable standard" for his method of selection.

Even Dr. Lewin was unable to provide any support, assessment, description, or review of the sampling methodology employed by Plaintiffs. He initially defined a "random" sample as one where every person in the sample frame has an equal chance of being selected. Lewin Dep. at 16:5-17:12. Given the qualifications that the technicians had to meet under the "hand-picked" and "Daily" methods of selection, the class members in this case did not each have the same probability of being included in the sample. Indeed, when asked to apply these concepts to the approach set forth in the Daily Declaration, Dr. Lewin testified:

> Q.   Is this process for selecting the sample here – is it a randomized process in your opinion?
> A.   A randomized process?
>
> Q.   Yeah.
> A.   In the chance that everybody has an equal chance of being on a list or being in these categories, in that sense, I wouldn't call it that. No.

Lewin Dep. at 53:8-14. Dr. Lewin then began to shift his stance on the "randomness" of Plaintiffs' approach, stating that it was a "form of random selection." <u>Id.</u> at 54:10-14. When pushed on this issue, however, Dr. Lewin simply read Mr. Daily's declaration into the record, <u>id.</u> at 54:15-9, stated that he was not going to "speak for him," and that the process described in the Daily Declaration was Daily's process, not his own. <u>Id.; see also id.</u> at 60:10-61:19 (reading from the Daily Declaration again when asking "to identify what were the criteria [Mr. Daily]

---

Lewin had not seen before his deposition, listed 24 names. Two of those individuals were named Plaintiffs—Aaron Espenscheid and Gary Idler. By removing them from the "random" list, Plaintiffs' counsel needed to select three additional individuals to reach the "25" used in their report. <u>Again</u>, Dr. Lewin had no idea how these additional three persons were picked and ended up in the allegedly "random" portion of the sample.

used).  Ultimately, Dr. Lewin was unable to offer any coherent description of Daily's approach, stating:

> "[h]e [Daily] explains the way he did it and explains why he did it . . . and I see that's the way he did it.  You see that's the way he did it.  Beyond that, I don't really have any characterization of it.  I think it kind of stands on its own.  **He's looking for certain things.  So for his purposes, that's the way he did it.**"

Lewin Dep. at 55:15-24 (emphasis added).   Dr. Lewin was also unable to identify any discernable difference between the so-called "random" group and the other "handpicked" group:

> Q.   How is that [Mr. Daily's process] different from hand-picking?
> A.   Well, recognizing again that the way that these 25 that Mr. Daily picked are labeled on the exhibit "random," I don't think – I may be wrong, I don't think here so far in what he has described in the matter or declaration or deposition or whether they called him or something like that was used.  It might have been, but I think not.  <u>And so on that basis, I think these 25 were chosen here and they are a different 25. And those are the labels that have been used.   So that would be my answer.</u>

Lewin Dep. at 61:20-62:6 (emphasis added).  Consequently, even Plaintiffs' expert—who likely did not even know about the selection methods used by counsel when authoring his initial report—consciously avoids supporting, explaining, or approving the processes that Plaintiffs' counsel established to select the sample.[22]   That a self-proclaimed expert in surveying and sampling could not even describe the methods used by Plaintiffs' counsel, or the difference between those methods, further reinforces the absence of a reliable method of sampling that survives scrutiny under <u>Daubert</u>.

Even setting aside Plaintiffs' counsel's failure to scientifically draw a valid sample, Plaintiffs' counsel overlooked this Court's clear direction at the certification and summary

---

[22] Despite his inability to discern the difference between Mr. Daily's method and a "hand-picking" method, Dr. Lewin admitted that he relied upon the Daily Declaration.  Lewin Dep. 68:9-17.

judgment stages of the case as it relates to subclasses.  This Court has found that not all of the individuals possess the same claims or even any claim at all.  <u>See</u> Dkt. No. 549 at 3-5.  Yet, Plaintiffs' sample design (and the resultant sample) is devoid of any considerations, variables, or assumptions that take these determined facts into account.  In fact, Plaintiffs' "revised" report eliminates reference to the subclasses.  <u>See</u> Ex. C, Red-lined version at 1.  Instead, as this Court has identified, Plaintiffs' sample methodology and the calculations that flow from it, presume that all technicians possess all of the same claims, that all of them have worked the same amount of time, and that all have been injured in the same way.  By performing an "all-in," "aggregate" sample, as opposed to disaggregating the class members in the manner directed by the Court, Plaintiffs' entire report is inherently biased and unreliable.  This too renders Plaintiffs' sample and the results flowing therefrom unreliable under the federal rules.

Thus, the sample selected by Plaintiffs' counsel was not scientific, technical, or random, yet their expert adopts it wholesale and attempts to testify as to the merits of both the selection of the sample of which he knows little or nothing about, and the propriety of generalizing results derived from this unreliable 53-person sample to the remainder of the class of approximately 2,300 technicians.  This is not permissible under <u>Daubert.</u>

          **ii.**      **The Absence of a Scientific "Plan or Design" Created Multiple Biases in the Sample that Plaintiffs' Counsel Used as the Cornerstone of their Calculations and <u>Opinions on Damages.</u>**

Where, as is the case here, a survey intentionally excludes portions of the population, "special precautions are required to reduce the likelihood of biased samples."  <u>Id.</u> (citing the <u>Reference Manual on Scientific Evidence</u>).  Dr. Lewin acknowledged this principle in his deposition.  According to him, when individuals are excluded from a survey, the appropriate thing to do is to determine whether the individuals excluded were different than those included

by looking at the available data—this is "bias control" in Dr. Lewin's practice.  Lewin Dep. at 25:22-27:9 (noting "bias control" is directly related to the confidence one would have when generalizing from those included in the sample frame to those who were excluded from the sample frame); id. at 30:8-31 (affirming that he would take efforts to determine the similarity between those excluded from a sample frame and those included).  Dr. Lewin admitted that it is his practice to review data that accounts for individuals who are excluded from the sample frame.  Lewin Dep. at 27:10-28:6; 29:22-30:2.  Here, however, there is nothing in Plaintiffs' expert report that addresses any biases that they identified, sought to avoid, or accounted for.  Instead, attorneys "hand-picked" an unscientific sample, and then limited their entire analysis to that sample, to the total exclusion of other data.  In fact, contrary to their duty to undertake efforts to reduce bias, the undisputed empirical evidence demonstrates that Plaintiffs' counsel took nearly every step possible to ensure that the sample was biased so that it generated artificially inflated damage calculations.

1.  First, the sample size is exceptionally small and under-inclusive given the size and geographical makeup of the class.  According to Plaintiffs' counsel's figures, the class in this case comprises 2,341 individuals, spread across more than numerous field offices in more than ten states.  Yet, Plaintiffs' counsel chose just 53 hand-picked individuals from which to generalize conclusions and calculations to the entire class of 2,341.  This inherently undermines and calls into question the reliability of counsel's methodology.  See Big Lots Stores, No. 05-6627, 2008 WL 1930681, at *16 (finding that "the relatively small-size of the population interviewed detracts from the reliability of [the proposed expert's] methods").  In Big Lots, the court reasoned that interviews of just 1.75 percent of the putative class "detract[ed] from the reliability of [the proposed expert's] methods" in the court's view.  Id.  The 53 person sample

in this case (only 33 of whom were used for the GPS estimates) represent just 2.2% of the class, which is only a marginal increase over the percentage found invalid in <u>Big Lots</u>. The number drops even further when analyzing just the GPS numbers, as only 33 individuals are being used to generalize GPS figures onto the entire class—this represents just 1.4% of the class. These small sample sizes "detract" even further from the reliability of the sample selected by Plaintiffs' counsel. <u>Id.</u> At a minimum, they call for further tests and efforts to validate the results, none of which Plaintiffs' counsel or Dr. Lewin did here.

2.   Second, Plaintiffs limited the sample frame to <u>opt-in</u> Plaintiffs or "self-selectors," <u>i.e.</u>, individuals who joined this action because they already believed they possessed a claim. Through this tactic, Plaintiffs' counsel eliminated absent class members from their analysis altogether, as they had zero chance of being represented in the sample of 53 technicians. As Defendants' expert, Robert Crandall, explained, "the overall class statistics show that FLSA opt-ins represent[] 43% of the class, yet they are 92% of those who were "randomly" selected . . . . The probability that someone would select 25 people from a population that is 43% opt-ins, and derive a random sample that is 92% opt-ins, <u>is significantly less than 1 in 2.9 million</u>. That leaves the alternative that these 25 declarants self-selected into this sample." Ex. D, Crandall Rep. at 14.

3.   Third, the Daily Declaration explains that their "random" sample only included individuals <u>who worked at least 4 days per week</u>. Dkt. No. 212, ¶ 4-5. This "method" of picking the sample purposely excluded individuals who work less time during the week. Dr. Lewin acknowledged that Daily was excluding individuals from the sample who failed to show enough GPS hours to satisfy Plaintiffs' counsel. <u>See</u> Lewin Dep. at 103-04 (stating that Plaintiffs' counsel excluded "people who worked fewer hours"). When asked about whether this prompts a

bias in the report that he signed, Dr. Lewin was unable to answer (despite the plainly apparent answer to the question), stating,

> [I] don't know that it creates a bias one way or another. He's done what he's done and he said what he's done and he indicated how he did it.

Id. at 104:20-22. The putative author of the proposed damages report, therefore, was unable to testify as to whether the decisions made by Plaintiffs' counsel biased the report he signed. This epitomizes that lack of bias control that plagues both damages reports.

In any event, the empirical data available demonstrates that Plaintiffs' counsel did rely upon a biased sample of GPS data. By choosing to review only 13 weeks of GPS data, for only 33 technicians, Plaintiffs' counsel purposely chose to ignore approximately 44,000 weeks of available GPS data for more than 1,000 additional technicians. Ex. D, Crandall Rep. at 12-13.

Moreover, the specific time frame that Plaintiffs' counsel selected was conveniently the busiest time of year for DirectSat. Id.; see also id. at Ex. 1 (chart demonstrating the seasonality involved in DirectSat's business). Days in the summer months are longer (allowing for a third "window" of time to perform installations—4 p.m. to 8 p.m.) and technicians are not confronted with inclement winter weather that hinders their ability to perform installations (for instance, a foot of snow in Madison or Minneapolis during the winter months). Moreover, as Dr. Lewin himself identified during his deposition, DirecTV has exclusive rights to carry the "NFL Ticket Package," which leads to a spike in installations in late summer and early fall when football season begins (the precise time period selected by Plaintiffs' counsel). Lewin Dep. at 113. These seasonality issues are not complex or hidden in DirectSat's business plan—they are obvious issues that Plaintiffs' counsel were well aware of when they strategically, rather than scientifically, chose the data that they would use in their report.

The entire set empirical data available to Plaintiffs, not merely a hand-selected subset thereof, proves the unreliability of the figures Plaintiffs' counsel used in their reports.   For example, had Plaintiffs' counsel reviewed all of the GPS data available for their 53-person sample (1,361 weeks, instead of 357 weeks), they would have discovered that "the average [total GPS time] for the self-selected group was 46.87 hours per week . . . [which] corresponds with a . . . 43% reduction from the 52.07 hours per week that Dr. Lewin calculated."  Ex. D, at 13.

If Plaintiffs' counsel went one step further and reviewed all of the available GPS for the entire technician class (which was produced to them), not just their own litigation-driven selection of only 13 weeks for only 53 technicians, they would have learned that "the average across all class members in the GPS data was only 44.2 hours per week."  Id. at 27.  This means that by using their hand-picked sample of just 13 weeks for only 53 people, Plaintiffs' counsel overstated the average number of GPS hours worked per week, per technician by nearly 8 hours (which equates to nearly an extra day of GPS data per week that is included in counsel's report). Id.

This large difference in averages is not only statistically significant, id. at 12-13, it carries great legal significance given that Plaintiffs are attempting to prove that they worked more than 40 hours a week (or 48 in Minnesota) without receiving overtime compensation, see Dkt. No. 485 at 57 (defendants only liable if number of hours worked off the clock exceeds overtime threshold and was not already compensated).  Plaintiffs' expert admitted that had Plaintiffs' counsel reviewed the entire universe of GPS and payroll data available, their review would have produced a more reliable generalization.  See Lewin Dep. at 96:2-4 (stating that had Plaintiffs' counsel reviewed the entire universe of GPS and payroll data available, their review would have

produced a more reliable generalization); see also United States v. Parra, 402 F.3d 752, 758 (7th Cir. 2005) (holding that an expert's testimony must be "based upon sufficient . . . data").

    4.  Fourth, Plaintiffs' decision to generalize the biased and limited subset of GPS data from their unscientific sample of 13 weeks for only 53 technicians, to the entire population of over 2,300 technicians, further proves the lack of reliability in Plaintiffs' methodology. First, as stated above, there is a statistically significant difference between the sample of technicians reviewed by Plaintiffs' counsel, and the balance of the class population. See Schiller & Schmidt v. Nordisco Corp., 969 F.2d 410, 415 (7th Cir.1992) (holding that "people who want damages have to prove them, using methodologies that . . . must not insult the intelligence.")   More fundamentally, however, Dr. Lewin testified that where a larger pool of data is available, he reviews that data and that reviewing a larger pool of data increases the validity of a finding. Specifically, Dr. Lewin testified as follows:

> Q.    If the person who was conducting the analysis gives no consideration to the data of the other people in that group, would you find that less valid if that person makes generalizations based on this work?
>
> A.    If you tell me you have data for a full group compared to data for a partial group, it's likely that my findings are going to have higher validity if I've got it for the whole group than if I have it for part of it. [23]

Id. at 36:6-14; see also id. at 85:13-86:1; 87:11-13 (stating that when running tests for confidence intervals, "a larger sample is better").

---

[23] It is unclear whether Dr. Lewin was ever informed that Plaintiffs' counsel possessed GPS data for individuals and weeks outside of those used by counsel in their report. Dr. Lewin initially stated that he "believed" GPS data was available only for the thirteen week period that Plaintiffs' counsel chose to analyze, Lewin Dep. at 84:9-14, but then later stated that he was generally aware that data existed for more than the 53 individuals selected, even though he did not know how many individuals for whom Plaintiffs had GPS data that they could have analyzed, id. at 84. But see id. at 84:23-84:25 (shifting testimony and stating that he was aware of additional weeks of GPS data, but that he did not ask counsel to review data for the larger set of weeks/individuals). This is yet another aspect of the report about which Dr. Lewin had little or no first-hand knowledge.

Indeed, Dr. Lewin later admitted that if he had access to a larger pool of GPS and payroll data, he would have used that data.   Id. at 94:17-95:96.   Thus, Dr. Lewin, in effect, is rebutting the methodology in his own report, by agreeing that he would have employed a completely different methodology if he knew what data was available, and if he actually performed the analysis himself.  See Rousell v. Brinker Int'l, 05-3733,  2008 WL 2714079, * (S.D. Tex. July 9, 2008) (excluding proposed expert testimony where proposed extrapolations were based upon a small sample and where "it [was] not at all clear that the sample provides sufficient support for his conclusions").

Thus, in the report adopted by Dr. Lewin, he clearly was <u>not</u> "being as careful as he would be in his regular professional work outside his paid litigation consulting[.]" <u>LG Electronics v. Whirlpool Corp.</u>, 2010 WL 3397358, *2 (N.D. Ill. Aug. 24, 2010) (St. Eve, J.); <u>Rockwell Int'l</u>, 60 F. Supp. 2d at 795.

### iii.  Conclusion Concerning Plaintiffs' Sampling "Methods"

In sum, Plaintiffs' counsel picked their sample from a group of individuals who already believed they possess a claim.  From among these biased, willing candidates, Plaintiffs' counsel picked only those technicians who worked the most days and hours, during the busiest time of year, which would cause a naturally higher "average" of hours worked.  Plaintiffs' counsel then took that stacked deck, and extrapolated it to the remainder of the class, without accounting for any of the differences in the rest of the class or any of the inherent biases and flaws in their methodology.  These fatal flaws in methodology—which are empirically established and which flow from their non-scientific sample—destroy the reliability of Plaintiffs' damages calculations in their entirety.

###### 3. The Data Obtained through Counsel's Undisclosed, Informal Surveys Are Not the Product of Reliable Scientific Principles and Methods.

Even if one was to disregard the defective sample picked by Plaintiffs' counsel, their report still violates Daubert, because Plaintiffs' counsel's data survey was likewise fatally flawed. Plaintiffs' counsel solicited and obtained all of the data they used to calculate the time technicians allegedly worked "at home" in an unknown, undisclosed manner that violates the most basic admissibility requirements for expert testimony. They memorialized these efforts in declarations that they—not Dr. Lewin—used in authoring his first report, and in "revising" his second report. Well-established case law precludes this practice under Daubert and the Federal Rules of Evidence.

As stated above, Rule 702 mandates that an expert's testimony "must be 'the product of reliable principles and methods,'" Dukes v. Wal-Mart, 222 F.R.D. 189 (N.D. Cal. 2004) (quoting F.R.E. 702). While an expert can rely upon facts and data that are independently inadmissible in certain situations, such reliance is permitted only where the evidence is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," id. (quoting F.R.E. 703).

The caselaw makes clear that evidence in the form of summaries and surveys prepared by counsel or the relevant party, in the context of an ongoing litigation, is inherently biased and unreliable, and is not properly considered by an expert or included in an expert report. Id.; see also Pittsburgh Press Club v. United States, 579 F.2d 751, 756-57 (3rd Cir. 1978) (survey must be conducted independently of attorneys involved in the litigation and respondents should not be aware of purpose of the survey). Here, the declarations serving as the predicate source of data for all "at home" time calculations in the report were prepared solely by Plaintiffs' attorneys, in the context of litigation, and in conjunction with individuals who have been knowingly asserting

affirmative claims against Defendants for many months.  This is a textbook example of how <u>not</u> to do a survey for the purpose of collecting data from a sample from which there will be extrapolations and generalizations to a broader group.  Thus, the data derived from Plaintiffs' informal, unscientific, and improper solicitations is unreliable under Rule 702.  It is <u>not</u> the type of data that an expert can rely upon under Rule 703.

The <u>Dukes</u> case is right on point.  In <u>Dukes</u>, the defendants proffered a certification expert.  As is the case here, the <u>Dukes</u> expert report was premised in part on a survey that was <u>designed and implemented</u> by defendants' counsel and the defendant itself.  <u>Id.</u> at 196-97.  The survey asked Wal-Mart store managers a series of questions concerning several employment issues.  <u>Id.</u>  The answers to the questions were then reduced to declarations, which were ultimately signed by the surveyed managers.  <u>Id.</u>  The defendants' certification expert relied upon the data from the declarations to challenge the plaintiffs' expert on the issue of "aggregation," and to support her own decision to "disaggregate" the data.  <u>Id.</u>

The <u>Dukes</u> court began its analysis by reasoning that "[it] [was] undisputed that Defendant's counsel and Defendant developed and prepared the survey instrument and administered the survey."  <u>Id.</u> at 197.  The court also found that the subjects of the survey—the store managers—"knew that the surveys were being utilized in connection with th[e] litigation."  <u>Id.</u>  The court then observed that even the proposed expert acknowledged that "typically it's difficult for an attorney to collect the information in a neutral environment so that they truly get a neutral set of information back."  <u>Id.</u>  Having made these factual determinations, the <u>Dukes</u> court concluded that "the record demonstrates that the survey was designed and administered by <u>counsel in the midst of litigation</u>, the interviewees knew the survey was related to the litigation, and the survey instrument exhibits bias on its face.  Taken together, these factors plainly

demonstrate that the results from the survey are not the 'product of reliable principles and methods,' and therefore are not the type of evidence that would be 'reasonably relied upon by experts.'" Id. (citing Fed. R. Evid. 702, 703); see also Big Lots, 2008 WL1930681, *15-16.[24]

Plaintiffs' attorneys in this case acted in nearly the same fashion as did the attorneys in Dukes. Like Dukes, Plaintiffs' counsel contacted nearly all of the individuals in the sample (at one point in the litigation) and obtained declarations from them.[25] The individuals contacted by counsel knew that the questions they were being asked were posed in the context of an ongoing litigation, as these individuals were either submitting the declarations in support of pending motions, or they signed the declarations after already opting-in to the FLSA collective action and after already selecting Plaintiffs' counsel to represent them. Further, Plaintiffs' counsel then took whatever information they received during their initial conversations with the sample and reduced that information into declarations that were written by counsel. Counsel used these declarations when they prepared the calculations contained in the two expert damages report. Plaintiffs' counsel's action in this case mirror those in Dukes. Id.; see also Yapp, 301 F.Supp.2d at 1037 (rejecting survey where there was "heavy involvement of defense counsel in [its] design and conduct"); Gibson v. County of Riverside, 181 F. Supp. 2d 1057, 1067-68 (C.D. Cal. 2002) (same); Delgado v. McTighe, 91 F.R.D. 76, 80-81 (E.D. Pa. 1981) (same).

Plaintiffs' counsel's actions in this case, however, actually go far beyond those in Dukes, and render the instant reports even more unreliable than the one at issue in Dukes. First, in

---

[24] Notably, the Dukes court addressed the admissibility of the expert report at the certification stage, where it applied a more lenient standard of review than is applicable to this Motion. Id. at 191.

[25] Plaintiffs' counsel submitted several declarations from members of the sample at the conditional certification stage and several at the Rule 23 certification stage. These declarations contain more than just a handful of paragraphs. Plaintiffs' counsel also submitted a new wave of declarations in connection with their expert report—these declarations, signed by 24 of the 25 "randomly" selected technicians, are six or seven paragraph form complaints.

Dukes, the defendant's counsel at least gave the data to an expert to review. Here, Plaintiffs' counsel solicited and compiled data for their own use. Moreover, Defendants and the Court know less about the manner and method used to obtain data from the selected sample than did the parties and the court in Dukes. Only Plaintiffs' counsel knows what was said to the technicians who were contacted to sign the declarations, and they are doing everything they can to conceal these facts from Defendants. Aside from Plaintiffs' counsel, no one knows what questions Plaintiffs' counsel posed to the technicians; how Plaintiffs' counsel responded to answers they received; what the answers to the questions were; how Plaintiffs' counsel or the technicians arrived at their averages; or, how Plaintiffs' counsel rounded numbers provided to them, to the extent such rounding was necessary. Big Lots, 2008 WL 1930681, *15-17 (failure to assure that interviews were conducted in "essentially the same manner and under conditions to ensure candor and consistency across interviews renders [an] opinion unreliable").

All Defendants know is that one or more of Plaintiffs' attorneys had a personal discussion with the individuals used in the sample, and that the declarations were drafted by counsel based on these secretive conversation(s). Consequently, the shrouded methods of data solicitation and acquisition are even more unreliable and untested in than the Dukes. Id. (criticizing surveying methods and ultimately precluded report where "[t]he manner in which the interviewees and store locations were selected is something of mystery").[26] "The burden of demonstrating reliability of an expert's methodology lies with the party seeking to admit an expert opinion, and

---

[26] Whatever questions Plaintiffs' counsel asked the selected technicians, the answers to which Plaintiffs' have shielded with privilege objections, are directly relevant to the reliability of the survey, yet Dr. Lewin never took this into account in his report, as he played no role in the development or implementation of the survey. These are significant queries, given that Plaintiffs' counsel were asking questions of individuals who had a direct financial stake in the answers they gave. Plaintiffs' counsel relied upon whatever notes and drafts they created in connection with their discussions with the technicians, thereby waiving any privilege they may have otherwise possessed as to those notes. Defendants, despite numerous requests, have not received this information.

here [Plaintiffs] ha[ve] not even addressed the role that counsel played in identifying interviewees or the contact that [they] had with them." Id. (noting that attorneys "carrying out the survey" should be avoided); Pittsburgh Press, 579 F.2d at 759-60 ("[T]he survey must be conducted independently of the attorneys involved in the litigation. The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purposes of the survey or the litigation. A fortiori, the Respondents should be similarly unaware."); Lutheran Mutual Life Ins. Co. v. United States, 816 F.2d 376, 378-79 (8th Cir. 1987) (excluding survey on similar grounds); United States v. Southern Indiana Gas & Elec. Co., 259 F. Supp. 2d 884, 893 (S.D. Ind. 2003) (finding that as in Pittsburgh Press and Lutheran Mutual, survey at issue included "interested respondents that could be harmed/benefited from the results of the survey" who knew that "the survey was connected to litigation").

In response to this wave of case law, Plaintiffs may resort to arguing that their declarations were not intended to be scientific in nature and that, therefore, their "collection of declarations" is sufficient under Daubert. This precise argument—which turns the Daubert standard on its head—was raised in Dukes and flatly rejected by that court. Because the expert relied on the declarations as the results of the "survey," the Dukes court concluded that the "collection of declarations" argument was nothing more than a "disingenuous effort to re-characterize the survey at the eleventh hour as simply a collection of declarations." Id.'; see also Big Lots, 2008 WL 1930681, at *16 (noting that a party who resorts to unreliable methodologies and relies on unreliable data generated therefrom must "live with the legal consequences of the slipshod work . . . and its decision to unduly enmesh its lawyer in the survey process").

Here, the damages report relies on the declarations secured in an undisclosed manner by Plaintiffs' counsel, in the same way that the expert in Dukes relied on the declarations generated

43

by the survey results—both use the declarations as the basis of the ultimate opinion (in this case, the "damages" opinion). Thus, the declarations in this case share the same unreliable character as those in <u>Dukes</u>. <u>Big Lots</u>, 2008 WL 1930681, at *16 (noting that "it is only 'reasonable' for an expert to rely on the statements of others if the statements or declarations were collected through methods calculated to elicit <u>reliable</u> information"). Thus, any attempt to label their collection of declarations as "the norm" does not advance Plaintiffs' position under Rules 702 and 703.[27]

The mystery of counsel's interaction with the sample is compounded by the unbelievably favorable response they received from the so-called "random" technicians. According to Plaintiffs, 100% of the individuals picked by Mr. Daily agreed to provide a declaration to Plaintiffs, and 100% of these individuals claimed to have been deprived overtime. As Mr. Crandall explained, not only is the sample itself exceedingly improbable, it is equally implausible that all of the "randomly" selected technicians would respond positively to the solicitation efforts of Plaintiffs' counsel. He continued, "Common sense would say that it is extremely unlikely that one could randomly select 25 technicians and all 25 would agree to sign a declaration." Ex. 1 at 14. By way of comparison, when Defendants chose opt-in Plaintiffs to respond to discovery, Plaintiffs took more than seven months to obtain a less than 75% response rate—and even this response rate is likely higher than any class average, given that only opt-in Plaintiffs, not absent class members, received discovery requests. Dr. Lewin agreed that the

---

[27] In effect, Plaintiffs are attempting to circumvent the hearsay and authentication rules by using their declarations and their calculations in Dr. Lewin's report. <u>see</u> <u>Lang v. Kohl's Food Stores, Inc.</u>, 217 F.3d 919, 924 (7th Cir. 2000); <u>In re James Wilson Associates</u>, 965 F.2d 160 (7th Cir. 1992); <u>see also</u> <u>Montgomery County v. Microvote Corp.</u>, 320 F.3d 440, 448 (3d Cir. 2003); <u>TK-7 Corp. v. Barbouti</u>, 993 F.2d 722, 727-28 (10th Cir. 1993); <u>Loeffel Steel Prods., Inc. v. Delta Brands, Inc.</u>, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005); <u>Lyman v. St. Jude Med. S.C., Inc.</u>, 580 F. Supp. 2d 719, 725-26 (E.D. Wis. 2008) (citing <u>In re TMI Litig.</u>, 193 F.3d 613, 697 (3d Cir. 1999)). Here, it is even worse than in these cases, because Dr. Lewin cannot even authenticate his own report, because he did not review the documents upon which the report relies.

100% opt-in rate was "unusual," especially for Americans responding to survey requests. He noted that statistically, "Japanese technicians" would have a 100% response rate, but "[w]ith Americans, <u>not a chance</u>." Lewin Dep. at 241-42 (emphasis added). The alarmingly favorable and statistically implausible response to Plaintiffs' counsel's data solicitation attempts further undermines the reliability of their survey design and the results the survey generated.

Therefore, because the method used and data obtained by Plaintiffs' counsel from their unidentified and informal survey of the selected technicians is unreliable, Plaintiffs' expert could not have relied upon that data in a report that satisfies Rule 702 or Rule 703. Accordingly, as in <u>Dukes</u>, Plaintiffs' expert damages report necessarily fails under <u>Daubert</u>.

3. The new declarations produced by Plaintiffs after they served their expert are a clear-cut example of why counsel should not be involved in surveying processes. Plaintiffs' counsel were searching for data to calculate the "at home" portion of their calculation. Recognizing, as this Court has, that the class members do not claim to have performed the same tasks outside the window, for the same duration, or at the same frequency, Plaintiffs tactically worded the declarations to mask these differences, rather than hire an independent party to craft a survey and a declaration that accounted for this issue. Specifically, Paragraph 3 of Plaintiffs' counsel's new declarations all state:

> During the time I worked as a technician (excluding time in training), I performed work related tasks before the first customer job of the day **or** after the customer job of the day. These work related tasks included at least **some** of the following tasks: reviewing work orders, **planning routes**, completing paperwork, reading emails, unloading tools and equipment, loading tools and equipment, **cleaning and maintaining my vehicle**, putting together dishes and calling customers.

<u>See</u> Ex. I, ¶ 3 (emphases added). The next paragraph in the declaration estimates a period of time spent performing the unspecified number of tasks in ¶3 that the technicians actually performed. There is no way of determining which tasks were performed, on which days, or for

how long—in other words, there is no manner in which to decipher which tasks the technicians performed or how long they performed those tasks.

This critical methodological flaw has manifested itself now that the Court has found routing and vehicle maintenance non-compensable as a matter of law. By grouping all of the activities together in a single disjunctive string and providing a single estimate of time spent doing some unknown subset of those tasks, Plaintiffs' counsel has no way of "backing out" time spent performing tasks that have now been deemed non-compensable. Accordingly, the data relied upon by Plaintiffs' counsel for the "random" group of individuals is inherently and upwardly biased.

Although counsel attempted to "back out" this time, their attempt only served to highlight the flaws of their surveying. Plaintiffs' counsel chose ".35" hours per week as this estimate, concluding that this was the amount of time spent receiving and routing jobs and that "vehicle maintenance" was negligible and need not be taken into account. See Lewin Dep. at 178-79 (admitting that Plaintiffs' counsel chose the ".35" figure, and stating that he was unable to discern what calculations generated that number). As to the "routing," in the technicians' declarations and deposition testimony, they allege that in many instances that technicians spent far more than the approximately 4 minutes of time Plaintiffs' credit. For example: Michael Smith claims that he spent 30 to 60 minutes routing per day, or 2.5 to 5.0 hours per week (Doc. No. 90 ¶ 6), David De Serre claims that he spent 10 minutes routing per day, or 50 minutes per week (Doc. No. 75 ¶ 9), named Plaintiff Gary Idler claims that he spent 10 minutes routing per day, or 50 minutes per week (Doc. No. 81 ¶ 9), John Castro testified to spending between 20 and 25 minutes per day routing, or just shy of 2 hours per week, Dkt. No. 533 at 68-69, Brian Carrier testified to spending twenty minutes per day routing, or one hours and forty minutes per week,

Dkt. No. 326 at 62-63, and Marc Braniff claims that he spent 10 minutes routing per day, or 50 minutes per week (Doc. No. 71 ¶ 9).  Each of these individual's estimates more than double that which Plaintiffs' counsel selected in their report, yet Plaintiffs' counsel settled on just 4 minutes per day for some unknown reason.

Further, Defendants do not understand how Plaintiffs' counsel came to the conclusion that "vehicle maintenance" time is negligible, given that Plaintiffs' counsel recently argued the exact opposite in opposition to Defendants' Motion for Summary Judgment and given that some Plaintiffs testified to spending extended periods of time performing such maintenance, see Dkt. No. 86, Decl. of Tyler Parker, ¶ 8 ("I spent 2 hours per week on vehicle maintenance"); Dkt. No. 93, Decl. of Richard Walker ¶ 7 ("I spent about 2 hours per week maintaining the company vehicle.").  Given that the "random" technicians declarations contained "vehicle maintenance" as an activity for which the technicians could include time estimates, see Ex. I, ¶ 3, to the extent that the individual included vehicle maintenance in his or her estimate, that time would be reflected in the aggregated estimate set forth in ¶ 4 of the declaration.  Thus, Plaintiffs' counsel "at home" average should have come down, but their decision to aggregate all of the "at home" time together indiscriminately eliminates their ability to do so in a reliable manner, leading Plaintiffs' counsel to ignore this inconvenient issue altogether.

When juxtaposing Plaintiffs' counsel's decision to review GPS data from DirectSat's busiest season against their decision to ignore unfavorable estimates concerning routing time, it appears that Plaintiffs' counsel were cherry-picking data based on what data would generate the highest damages estimates, not based upon the objective guideposts of science and reliability demanded by Daubert.  In any event, these problems should not exist under the clear line of case law that prevents an advocate from injecting themselves into what must be a scientific, objective,

and technical exercise.  See, e.g., Southern Indiana, 259 F. Supp. 2d 884, 894 (S.D. Ind. 2003)
(finding inappropriate attorney involvement in surveying where attorneys spoke with the
interviewees about the survey, "advised the consultants on how to respond to statements made by
the recipients" and then "participated in the review of the . . . data" generated by the very surveys
they oversaw and implement).

> ### 4. Plaintiffs' Proposed Method of Calculating Damages, which Relies upon Plaintiffs' Flawed Methodology For Constructing Supposedly "Average" Technicians, Is an Unreliable Method of Meeting <u>their Burden of Proof.</u>

Plaintiffs' proposed method of proving damages, which hinges solely on the use of
"averages" derived from so-called "average" technicians, is an unreliable method of proof given
the method they used for calculating averages, the facts of this case, and the uncontested
empirical data.  Plaintiffs' "averages-based" damages model does not take into account the
individuality in the technician-specific data.  If permitted as a means of proof for the purposes
proffered by Plaintiffs, substantial percentages of individuals would, if Plaintiffs' prevail,
recover overtime compensation that they are—as an undisputed matter of empirical fact—to
which they are plainly not entitled.  Such high margins of error, as discussed in this section,
cannot pass muster under <u>Daubert</u>'s reliability analysis.

> #### a. Plaintiffs' Report Presumes that Their Calculations of "Averages" Are Appropriate, But Their "Averages" Cannot <u>Meet Their Burden of Showing that this Method Is Reliable.</u>

Plaintiffs bear the burden of establishing that their method of proof is reliable.  See
Lewis, 561 F.3d at 705.  As with their "sampling" and their "surveying," Plaintiffs do not include
any discussion of whether the reliability of their "average" technicians approach is a reliable
method for proving damages in the manner they proffer.  Instead, Plaintiffs simply presume that
it is.  The absence of such a discussion, especially in light of data discussed, is fatal to Plaintiffs'

unsupported decision to employ Plaintiffs' specific "averages" based methodology. Therefore, as with their sampling and surveying, Plaintiffs have not attempted to meet their burden of demonstrating the scientific or technical propriety of "averages" to prove damages in this case.

><b>b.</b>   <b>The Empirical Data Demonstrates Unequivocally that Plaintiffs' "Averages" Are Not a Reliable Indicator of Whether <u>an Individual Plaintiff Suffered Damage.</u></b>

Plaintiffs' use of averages ignores a number of critical factors, masks the underlying individuality of each technician's claim, and falls victim to wide variability in potential outcomes. The empirical data proves these facts unequivocally. Therefore, Plaintiffs' "averages" based approach is an unreliable method for proving damages in this case.

Plaintiffs' averages based method ignores the fact that technicians record a varying number of hours per week. More specifically, their proposed model does not account for overtime actually paid, and it assumes that all individuals worked overtime hours. <u>See</u> Lewin Dep. at 180, 183-86. In other words, by using "averages," Plaintiffs are ignoring individuals who—even if adding a double-digit amount of off-the-clock time—would not have a claim, either because that individual would not reach the relevant threshold or because the individual already recorded the time worked and was already paid all wages owed. <u>See</u> Dkt. No. 485. Under Plaintiffs' "average" or "representational" approach, those individuals who are not entitled to recover <u>would recover</u>. This violates <u>Daubert</u>'s reliability standards.

These concerns are not abstract. Defendants' expert, Robert Crandall, analyzed the individual impact of adding "off the clock" time to individual payroll records. <u>See</u> Ex. D, at 35-37. Mr. Crandall analyzed the GPS data in this case to determine how many hours per day a technician was working. Based upon conservative assumptions in Mr. Crandall's analysis, between 51 and 76 percent of the class will not possess a claim for unpaid overtime, even if

Plaintiffs prove that the technicians spent between two-and-a-half and five hours per week performing tasks that they did not record.[28]   Thus, under Plaintiffs' proposed averages method, between one-half and three-quarters of the class will receive a windfall recovery if Plaintiffs establish that a small subset of individuals is entitled to overtime.   On the other hand, if the jury accepts Defendants' evidence and the objective data and finds that "on average" the technicians received all overtime compensation due to them, then the small subset of individuals who may possess an individual claim will not recover anything.   This outcome, which is the necessary result of Plaintiffs' averages-based approach, fails to account for the significant variability in hours worked per week, per technician, which Mr. Crandall analyzed at length in his expert report.[29]   See id. at 31-38, & Exs. 2-63.

The impact of Plaintiffs' proposed plan is also easily identified when reviewing the raw data, specifically, when looking at Mr. Crandall's analysis.   Where he adds between 2.5 and 5 hours of "at home" time to "modified net GPS,"[30] on average, Plaintiffs work no more than 40.8

---

[28] At the time Mr. Crandall authored his report, Plaintiffs were still contending that they could establish that commuting time was compensable.  Based on this Court's summary judgment opinion, Plaintiffs have abandoned commuting time, as evidenced by their proposed rebuttal expert report, wherein Plaintiffs now exclude such time from their estimates.  Thus, the 51%-76% figures represent the "net" additional time (meaning GPS data less commuting time and a percentage of non-landmark—i.e., non-working—daily stops).  These figures are displayed in columns two and four of the chart on page 37 of Mr. Crandall's report.

[29] Tellingly, Dr. Lewin was not even informed of the individuality in the underlying data because he was not provided with the full range of data available.  More troubling, however, is that fact that Lewin did not receive either of Crandall's reports (one signed December, 2010 and one signed April, 2010) until after Plaintiffs' counsel secured Lewin's signature on their expert report.  Lewin Dep. at 233.

[30] Rather than use "total" GPS which does not account for no-work related stops and breaks during the day, Mr. Crandall employed a net GPS or modified net GPS standard.  Under the net GPS approach, Mr. Crandall removes all non-work related stops during the day to arrive at the actual time a technician worked.  The modified net GPS approach builds a percentage of the non-work related GPS stops back into the technician's GPS time to account for any errors in the GPS data.  Thus, the modified net GPS data gives the technician an extra benefit of the doubt.  In any event, Crandall details the dramatic increase in GPS time that Plaintiffs award themselves by using the total GPS and ignoring non-work stops.  See Ex. D, at 30-31 (noting that, for example, in Wisconsin, if net GPS is used, the

hours per week.   See Crandall Rep. at 36; see also id. at 27-37 (detailing individualized findings).[31]   Given that Defendants paid on average 1.56 hours of overtime per week, per technician, see id. at 10, Plaintiffs actually received more pay on average than they were entitled to—even after accounting for allegedly unrecorded off-the-clock work.  Thus, on average, the class would not possess a claim.  If this objective, empirical data and analysis is accepted at trial by the jury, any technicians who may have an individual claim for particular weeks would not recover, because Plaintiffs' are utilizing non-representative "averages" that engulf the inherent individuality of the claims at issue.   Given the staggering potential for error—ranging conservatively from 50% to 76%—Plaintiffs' proposed method of proof cannot be deemed "reliable," which is likely the reason Plaintiffs' omitted any discussion of the reliability of the damages model from their report.

Indeed, wide-ranging results are bound to occur even if the Court was to accept most of the assumptions Plaintiffs' make.  For example, as discussed above, had Plaintiffs' counsel included all of the GPS data into their analysis, they would have discovered that the average "total" GPS "average"—which is by far the most favorable metric for Plaintiffs—drops from 52 hours in Plaintiffs' hand-selected subset, to 44 hours for the entire population of GPS data.  If the jury were to use the 44 hours as the starting point of its calculations, but retain the balance of Plaintiffs' assumptions, Plaintiffs' own "method" of calculation would demonstrate only that they worked approximately 41 hours per week (44 hours (average total GPS) – 11 hours (straight and gap time in Plaintiffs' model) + 8 hours (Plaintiffs' revised "at home" time calculations)).

---

percentage of technicians whose GPS time does not exceed 40 hours is 89%, while the percentage of individuals who do not exceed 40 hours under the total GPS approach is 21%).

[31] Again, Plaintiffs' counsel's calculations are so flawed they cannot be reliable for showing any damages or liability for overtime.  Nonetheless, even if Plaintiffs' flawed methodologies are accepted in part, it produces results that further undermine the calculations to the point of severely undermining and reducing any potential claims.

See Lewin Dep. at 212-17 (acknowledging same).  This means that by simply using the total GPS average, rather than the biased subset, and accepting the remainder of Plaintiffs' assumptions, Plaintiffs would have only worked one hour of overtime per week "on average." Finally, had Plaintiffs credited Defendants with overtime paid, 1.56 hours per week on average, Plaintiffs would have worked, on average, 41 hours, but been paid, on average for 41.56 hours (meaning that, on average, the technicians over-reported their time and received more money than that which they were entitled to).  Simply changing the starting point of the calculation, therefore, takes Plaintiffs' averages model from a 100 percent victory at 9 hours per technicians to a 100 percent loss for all technicians.  Plaintiffs' approach creates an "all or nothing" outcome regardless of whether the individuals have a claim; this approach is not a reliable method of proof.[32]  See Ex. D, 27-37, Exs. 2-63.

In sum, the objective data in this case unequivocally demonstrates the impact of Plaintiffs' flawed average-based "representative" model—as used by Plaintiffs, the approach is both over- and under-inclusive, to such an extent that if Plaintiffs prevail, a substantial number of technicians would receive an acknowledged windfall.  According to the undisputed findings of Mr. Crandall, Plaintiffs' method of proving damages will result in an error rate of greater than 50 percent—meaning, that regardless of which party prevails, a significant number of individuals will be cheated or unjustifiably enriched.  Such a high and unavoidable error rate does not meet

---

[32] The use of averages also masks the wide ranges of data derived from Plaintiffs' declarations. For example, Dr. Lewin conceded during his deposition that the range of "at home" work for hand-picked technicians—which ranged from approximately 2 hours per week to approximately 22 hours per week— was a wide range and he conceded that his use of the average would cheat the individual alleging 22 hours per week and would provide a windfall to the individual alleging just 2 hours per week.  See Lewin Dep. at 163-70.  Mr. Crandall came to similar conclusions concerning amounts of "off the clock" time claims by the declarants when he authored his liability report in December, 2010.  See Ex. J, Crandall Liability Report at 39-42 (concluding that the "declarants statements exhibited wide variability as a group regarding several of the tasks performed by the installation technicians").  Plaintiffs' counsel is, in effect, attempting to gloss over this individuality, even if the use of such "averages" would actually harm the claims of a certain percentage of their clients.

the reliability standard Plaintiffs must meet, as it calls for a zero-sum game, which is not appropriate given the underlying data.

> 5.   **Even if One Was To Disregard the Aforementioned Flaws, the Calculations and Dr. Lewin's Reports Are Unreliable Because Dr. Lewin Admittedly Did Not "Independently Verify" Plaintiffs' Counsel's Calculations, Summary Charts and Analysis of Information They Solicited from Technicians.**

Even if one ignored Plaintiffs' counsel's disregard for scientific methodologies and their intentionally biased and improper selection of the data, courts uniformly hold that while experts can receive some assistance from counsel in the preparation of an expert report, an expert must "independently verify" calculations and summaries performed by counsel.  King-Indiana Forge, Inc., No. 07-00341, 2009 WL 3187685 (S.D. Ind. Sep. 29, 2009); see Fail-Safe, LLC v. A.O. Smith Corp., 744 F. Supp. 2d 870, 888 (E.D. Wis. 2010); Lyman v. St. Jude Med. S.C., Inc., 580 F. Supp. 2d 719 (E.D. Wis. 2008).  As explained in the Rule 26(a)(2) discussion, which need not be repeated here, Plaintiffs' counsel, not Dr. Lewin, performed all of the calculations to include in the report, they summarized these calculations in charts the provided to Dr. Lewin, they inserted their own calculations as conclusions in Dr. Lewin's report, and Dr. Lewin allowed them to do so without any oversight or review.  This further renders his report invalid, unreliable, and inadmissible under Daubert.  See Baxter Int'l, Inc. v. McGaw, Inc., No. 95-2723, 1996 WL 145778 (N.D. Ill. Mar. 27, 1996) (disregarding plaintiffs' legal expert in patent case because expert "did not independently prepare his expert report, allowing himself to be a 'mouthpiece' for plaintiffs' attorneys"); Occulto v. Adamar of N.J., Inc., 125 F.R.D. 611, 616 (D.N.J.1989) (noting that an expert cannot simply be an alter ego of the attorney who will be trying the case).

IV.    **DR. LEWIN MUST BE PRECLUDED FROM TESTIFYING AS TO THE ISSUES RAISED IN HIS LIABILITY REPORT BECAUSE THAT REPORT IS EITHER MOOT OR SEEKS TO OFFER CONCLUSIONS THAT INVADE THE PROVINCE OF THE JURY.**

Plaintiffs' liability report is inadmissible, as it offers opinions or legal conclusions on issues that will determine the outcome of the case.  The liability report provides "opinions" regarding whether Defendants employ a "piece rate" system of pay, and whether Plaintiffs are non-exempt under the law, such that they are legally eligible for overtime pay.  This Court has already determined that Defendants employ a piece rate system of payment. See Doc. No. 485 at 61-62.  Also, the Court has already concluded that the technicians are non-exempt employees under the law.  Id. at 3.  Plaintiffs' report is, accordingly, inadmissible as irrelevant on these points, as the issues are no longer in dispute for purposes of trial.  See Fed. R. Civ. P. 403.

The liability report provides two additional "opinions" regarding (1) whether the Plaintiffs and Defendants had a legally binding "agreement" that payment for productive time would or would not cover time spent on non-productive tasks, and (2) whether Defendants had "knowledge" of allegedly unreported hours worked by Plaintiffs.  As to both issues, Dr. Lewin offers his subjective views and perceptions of the "facts" and evidence and gives his "opinion" in the form of legal conclusions formed by applying the law to his subjective view of the facts, notwithstanding that these issues are classic inquiries reserved for the Jury and Court.

As to the first issue, Dr. Lewin opined that "there is no agreement between technicians and defendants concerning what constitutes non-productive time" and that "there is no agreement between technicians and defendant that compensation for productive time is intended to compensate technicians for non-productive work activities."  Ex. H, Liability Rep. at 19.  Regarding the second issue, Defendants' "knowledge" of unreported hours, Dr. Lewin

acknowledged that Defendants deny knowledge of underreporting, he continued to weigh the evidence and concluded that "it is simply not tenable for defendants to claim that they have no knowledge of technicians' under reporting their actual work hours." Id. at 25.

Pursuant to Rule 702 of the Federal Rules of Evidence, "[e]xpert testimony is admissible if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue." Perez v. RadioShack Corp., 2005 WL 3455858, *1 (N.D. Ill. Dec. 13, 2005) (internal citations and quotation marks omitted). However, Seventh Circuit precedent clearly "prohibits expert witnesses from offering opinions or legal conclusions on issues that will determine the outcome of a case." Id.; see Klaczak v. Consolidated Med. Transp. Inc., 2005 WL 1564981, *3 (N.D. Ill. May 26, 2005) (both citing Good Shepherd Manor Found., Inc. v. City of Momence, 323 F.3d 557, 564 (7th Cir. 2003) ("The district court correctly ruled that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."). "While an expert may provide an opinion to help a judge or jury understand a particular fact, he may not give testimony stating ultimate legal conclusions based on those facts." Klaczak, 2005 WL 1564981 at *3; see also Rieger v. Orlor, Inc., 427 F. Supp. 2d 99, 103 (D. Conn. 2006) (holding that an expert report providing "two legal conclusions based on certain facts in the record" "impermissibly invade[d] the jury's province to apply the applicable law to the facts of the case and reach ultimate legal conclusions"); Dubiel v. Columbia Hosp. Ltd. Part., 2005 WL 5955691, *3 (S.D. Fla. Jan. 11, 2005) ("Expert testimony is not permitted, however, if it usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.").

In Perez, the district court excluded the plaintiffs' expert report, because it provided an opinion on the legal conclusion of whether, based on factors provided in the FLSA regulations

and Department of Labor handbook, the plaintiffs' primary duty was not "management." 2005 WL 3455858 at *1-3. The court explained that while the expert may provide testimony regarding the standards and practices used to assess whether an employee is exempt under the FLSA, he may not "testify as to his conclusion that [plaintiffs] do not have management as their primary duty." Id.; see Dubiel, 2005 WL 5955691 at *4 (holding, in an FLSA case, that an expert report which identified the applicable legal standards and then applied those standards to the facts to conclude that the defendant's meal break policy did not violate the FLSA was inadmissible, as the expert "evaluates the credibility of witnesses, weighs the evidence and then draws conclusions by applying his understanding of the law to his own factual determinations.").

Here, Dr. Lewin's liability report usurps the role of the jury by applying the law to the facts and proffering legal conclusions on ultimate issues in the case. Dr. Lewin reviewed corporate witnesses' deposition transcripts, payroll forms, handbooks, and circumstantial evidence like policies of paying hourly rates for certain non-productive work, weighed the evidence, and concluded that the evidence supports the conclusion that the parties did not have an agreement regarding what constitutes non-productive time and work and whether compensation for productive time was intended to compensate Plaintiffs for non-productive tasks. See Ex. H, at 19. By offering an opinion on whether the parties had an agreement regarding payment for non-productive tasks, Dr. Lewin applied the law to the facts as he weighed them and reached a legal conclusion regarding one of the elements of Plaintiffs' claims. This opinion is inadmissible under controlling Seventh Circuit precedent. Klaczak, 2005 WL 1564981 at *3.

Similarly, when evaluating whether Defendants were aware of Plaintiffs' alleged underreporting of hours, Dr. Lewin reviewed Defendants' policies, witnesses' deposition

transcripts, circumstantial evidence in the form of policies that provide "incentives" to underreport, and technicians' declarations, and concluded that "it is simply not tenable for defendants to claim that they have no knowledge of technicians' under reporting their actual work hours." Ex. H, at 25. With this opinion, Dr. Lewin clearly weighed the conflicting evidence presented by the parties and offered a legal conclusion regarding one of the elements of Plaintiffs' claims, an opinion inadmissible under Seventh Circuit law. Klaczak, 2005 WL 1564981 at *3; see also Estate of Sowell v. United States, 198 F.3d 169 (5th Cir. 1999) (affirming preclusion of expert testimony as to whether party acted "reasonably").

Plaintiffs may point to Rule 704 and assert that this rule permits a different result. Rule 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). However, Rule 704 requires that an expert opinion, "notwithstanding that it may reach an 'ultimate issue,' must be otherwise admissible." Klaczak, 2005 WL 1564981 at *8. "In this regard, an expert's opinion must, among other things, assist the trier of fact to understand the evidence or determine a fact in issue." Id. Expert testimony only assists the jury if it "concerns a matter beyond the understanding of the average person, assists the jury in understanding the facts at issue, or puts the facts in context. . . Legal conclusions as to ultimate issues generally do not assist the trier of fact because they simply tell the trier of fact what result to reach." Id. (emphasis added); see Dubiel, 2005 WL 5955691 at *5 ("expert opinion that does not assist the trier of fact under Rule 702 is not 'otherwise admissible' and so Rule 704 does not apply"). As the court in Reiger explained,

> [W]hile [the expert] would be qualified to offer expert testimony that would assist the jury in understanding the types of measures that can be taken by employers to prevent [violations of employment law] . . . the opinion he offers provides no specialized

> knowledge, but merely a legal conclusion.  Moreover, [the expert]
> states that his opinion is based on his analysis of the facts in the
> record, including the chronology of events.  Without more, this is
> an assessment the jury can make without assistance from an expert.

<u>Reiger</u>, 427 F. Supp. 2d at 103. [33]  When an opinion such as Dr. Lewin's opinion does not

provide any specialized knowledge and invokes legal standards, his opinion "does not <u>aid</u> the

jury in making a decision, but rather attempts to substitute his judgment for the jury."  <u>Klaczak</u>,

2005 WL 1564981 at *8 (citing <u>United States v. Duncan</u>, 42 F.3d 97, 101 (2d Cir. 1994))

(emphasis in original).

Accordingly, Plaintiffs' liability report is inadmissible pursuant to Rules 702 and 704.

---

[33] By way of further example, in <u>Dubiel</u>, the expert weighed the evidence and provided conclusions by "applying his understanding of the law to his own factual determinations."  2005 WL 5955691 at *4.  The court reasoned, "Despite [the expert's] extensive experience as a compliance officer and human resources consultant, there is no evidence that [the expert] brings any particular expertise to making these factual determinations."  <u>Id</u>.  Here, likewise, there is no evidence that Dr. Lewin brings any particular expertise to weighing facts and applying the law as he understands it to those facts – rather, this is the exact evaluation performed by jury members in their role as trier of fact.

## V.    CONCLUSION

For the forgoing reasons, the Court must grant Defendants' Motion, strike and/or preclude Plaintiffs' proposed damages and liability expert reports, and preclude Dr. David Lewin from testifying as to any matter at trial.

Respectfully submitted,

/s/ Colin D. Dougherty

OF COUNSEL:

ELLIOTT GREENLEAF & SIEDZIKOWSKI, P.C.

Frederick P. Santarelli
Eric J. Bronstein
John P. Elliott
Colin D. Dougherty
Gregory S. Voshell
Union Meeting Corp. Ctr.
925 Harvest Dr., Suite 300
Blue Bell, PA 19422
(215) 977-1000

Laura Skilton Verhoff
Drew J. Cochrane

STAFFORD ROSENBAUM LLP

222 W. Washington Ave., Suite 900
Madison, Wisconsin 53701-1784
(608) 256-0226

DATED:  May 6, 2011

*Counsel for Defendants*